| | | |
|---|---|---|
| JAMES MURRAY; LATAVIUS PASCAL; ANTONE HENDERSON, <br> Plaintiffs <br><br> Versus <br><br> JAMES LEBLANC, SECRETARY OF DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS; <br> SHERIFF SAMMIE BYRD, SHERIFF OF MADISON PARISH; <br> LASALLE MANAGEMENT, LLC; <br> WARDEN ARTHUR ANDERSON; <br> ASSISTANT WARDEN CHRIS STINSON; <br> MAJOR TOMMY FARMER; MAJOR STEVEN CHASE; LIEUTENANT CANTRELL GUICE; CAPTAIN JOHN MURRAY; <br> CAPTAIN WENDELL HUGHES; CAPTAIN EDWARD MCDOWELL; SERGEANT JONATHAN KNOX; SERGEANT SHEPHERD; C.O. ESCO TILLMAN; C.O. ROBERT THORNTON; C.O. JANE DOE; PRINCETON EXCESS AND SURPLUS LINES INSURANCE COMPANY, <br><br> Defendants | * <br> * <br> * <br> * <br> * <br> * <br> * <br> * | Civil Docket Number: 3:21-cv-592-SDD-RLB <br><br> JUDGE: SHELLY D. DICK <br><br> MAGISTRATE: <br> RICHARD L. BOURGEOIS |

## AMENDED COMPLAINT

### I. INTRODUCTION

Like many sheriff-owned, rural correctional centers, Madison Parish Correctional Center

(MPCC) is responsible for safely holding both sentenced and pre-trial prisoners from around the

state. There are three entities responsible for ensuring the safety of people held in their custody at

MPCC: LASALLE MANAGEMENT, LLC (the privately-owned operator of MPCC), JAMES

LEBLANC (Secretary of Department of Public Safety and Corrections (DPSC)), and Sheriff

SAMMIE BYRD (Sheriff of Madison Parish). All of these Defendants have allowed fatally dangerous conditions of confinement to flourish at MPCC. Each of these entities is aware that MPCC has no functional classification, investigation, or staff supervision in place. Each of these entities is aware that these conditions allow threat of serious injury from rampant violence to go unchecked. As a direct result of these conditions, JAMES MURRAY, LATAVIUS PASCHAL, and ANTONE HENDERSON were stabbed and beaten. Their attackers were people who should not even have been housed with them on the same unit. As a result of these preventable assaults and batteries, JAMES MURRAY, LATAVIUS PASCHAL and ANTONE HENDERSON suffered serious injuries which continue to cause each of them pain and suffering, and require medical attention.

## II. JURISDICTION

1.      This action is brought pursuant to 42 U.S.C. §§ 1983. Jurisdiction is founded on 28 U.S.C. §§ 1331 and 1343, and the Eighth and Fourteenth Amendments to the Constitution of the United States. Plaintiff also invokes supplemental jurisdiction over claims under state constitutional and statutory law, pursuant to 28 U.S.C. §1367.

2.      The venue is proper in the Middle District of Louisiana under 28 U.S.C. § 1391(b)(2) where Defendant JAMES LEBLANC is domiciled and DPSC operations are based.

## III. PARTIES

### Plaintiffs

3.      **JAMES MURRAY** is a citizen of the full age of majority of the State of Louisiana and is currently domiciled at Tensas Detention Center in Waterproof, Louisiana.

4.      **LATAVIUS PASCHAL** is a citizen of the full age of majority of the State of Louisiana and is currently domiciled in Union Parish, Louisiana.

5.     **ANTONE HENDERSON** is a citizen of the full age of majority of the State of Louisiana and is currently domiciled at LaSalle Correctional Center in Olla, Louisiana.

**Defendants**

6.     **LASALLE MANAGEMENT, LLC** is a limited liability company authorized to do business in the State of Louisiana. **LASALLE MANAGEMENT's** registered agent is William K. McConnell, 192 Bastille Lane, Ste. 200, Ruston, LA 71270. **LASALLE MANAGEMENT** is a private entity systematically organized to perform the major administrative task of operating various correctional facilities in Louisiana, including the Madison Parish Detention Correctional Center (MPCC) at all times described herein. **LASALLE MANAGEMENT** was responsible for provision of all staffing, training, hiring, discipline, and policies and procedures for all MPCC correctional officers. **LASALLE MANAGEMENT** is liable both directly and vicariously for the actions complained of herein. **LASALLE MANAGEMENT** is the named insured of the **PRINCETON** insurance coverage.

7.     **WARDEN ARTHUR ANDERSON**, in his individual and official capacity as Warden of MPCC, is an adult citizen of the State of Louisiana and domiciled in the Western District of Louisiana. At all times described herein, he was Warden of the MPCC and, as such, was responsible for the hiring, training, supervision, discipline, and control of the deputies under his command. He was responsible for all actions of the staff at MPCC. At all times described herein, he was an employee of **LASALLE MANAGEMENT** and as such he was also responsible for the supervision, administration, policies, practices, customs, and operations of **LASALLE MANAGEMENT** at the MPCC. He was and is a final policy maker. He is liable both directly and vicariously for the actions complained of herein.

8.     **ASSISTANT WARDEN CHRIS STINSON,** in his individual and official capacity as Warden of MPCC, is an adult citizen of the State of Louisiana and domiciled in the Western District of Louisiana. At all times described herein, he was Assistant Warden of the MPCC and, as such, was responsible for the hiring, training, supervision, discipline, and control of the deputies under his command. He was responsible for all actions of the staff at MPCC. At all times described herein, he was an employee of **LASALLE MANAGEMENT** and as such he was also responsible for the supervision, administration, policies, practices, customs, and operations of **LASALLE MANAGEMENT** at the MPCC. He was and is a final policy maker. He is liable both directly and vicariously for the actions complained of herein.

9.     Major **TOMMY FARMER**, in his individual and official capacity as Major and Chief of Security at MPCC, is an adult citizen of the State of Louisiana and domiciled in the Western District of Louisiana. At all times described herein, he was an employee of **LASALLE MANAGEMENT** and held the position of Major at MPCC. As such, he was responsible for the hiring, training, supervision, discipline, and control of the correctional officers under his command. He was also responsible for the supervision, administration, policies, practices, customs, and operations of **LASALLE MANAGEMENT** at MPCC. He was and is a final policy maker. He is liable both directly and vicariously for the actions complained of herein.

10.     Major **STEVEN CHASE,** in his individual and official capacity as Major and Chief of Security at MPCC, is an adult citizen of the State of Louisiana and domiciled in the Western District of Louisiana. At all times described herein, he was an employee of **LASALLE MANAGEMENT** and held the position of Major at MPCC. As such, he was responsible for the hiring, training, supervision, discipline, and control of the correctional officers under his command. He was also responsible for the supervision, administration, policies, practices,

customs, and operations of **LASALLE MANAGEMENT** at MPCC. He was and is a final policy maker. He is liable both directly and vicariously for the actions complained of herein

11.     Lieutenant **CANTRELL GUICE**, in his individual and official capacity as a correctional officer at MPCC, is an adult citizen of the State of Louisiana and domiciled in the Western District of Louisiana. At all times described herein, Defendant **GUICE** was employed by **LASALLE MANAGEMENT** as a ranking correctional officer at MPCC. As such he was responsible for the supervision, discipline, and control of correctional officers under his command and maintaining the care, custody, and control of individuals in the custody of MPCC. He is liable both directly and vicariously for the actions complained of herein.

12.     Captain **JOHN MURRAY**, in his individual and official capacity as a correctional officer at MPCC, is an adult citizen of the State of Louisiana and domiciled in the Western District of Louisiana. At all times described herein, Defendant **MURRAY** was employed by **LASALLE MANAGEMENT** as a ranking correctional officer at MPCC. As such he was responsible for the supervision, discipline, and control of correctional officers under his command and maintaining the care, custody, and control of individuals in the custody of MPCC. He is liable both directly and vicariously for the actions complained of herein.

13.     Captain **WENDELL HUGHES**, in his individual and official capacity as a correctional officer at MPCC, is an adult citizen of the State of Louisiana and domiciled in the Western District of Louisiana. At all times described herein, Defendant **HUGHES** was employed by **LASALLE MANAGEMENT** as a ranking correctional officer at MPCC. As such he was responsible for the supervision, discipline, and control of correctional officers under his command and maintaining the care, custody, and control of individuals in the custody of MPCC. He is liable both directly and vicariously for the actions complained of herein.

14.     Captain **EDWARD MCDOWELL**, in his individual and official capacity as a correctional officer at MPCC, is an adult citizen of the State of Louisiana and domiciled in the Western District of Louisiana. At all times described herein, Defendant **MCDOWELL** was employed by **LASALLE MANAGEMENT** as a ranking correctional officer at MPCC. As such he was responsible for the supervision, discipline, and control of correctional officers under his command and maintaining the care, custody, and control of individuals in the custody of MPCC. He is liable both directly and vicariously for the actions complained of herein.

15.     Sergeant **JONATHAN KNOX,** in his individual and official capacity as a ranking correctional officer at MPCC, is an adult citizen of the State of Louisiana and domiciled in the Western District of Louisiana. At all times described herein, Defendant **KNOX** was employed by **LASALLE MANAGEMENT** as a ranking correctional officer at MPCC. As such he was responsible for the supervision, discipline, and control of correctional officers under his command and maintaining the care, custody, and control of individuals in the custody of MPCC. He is liable both directly and vicariously for the actions complained of herein.

16.     Sergeant **SHEPHERD,** in his individual and official capacity as a ranking correctional officer at MPCC, is an adult citizen of the State of Louisiana and domiciled in the Western District of Louisiana. At all times described herein, Defendant **SHEPHERD** was employed by **LASALLE MANAGEMENT** as a ranking correctional officer at MPCC. As such he was responsible for the supervision, discipline, and control of correctional officers under his command and maintaining the care, custody, and control of individuals in the custody of MPCC. He is liable both directly and vicariously for the actions complained of herein.

17.     Correction Officer ("CO") **ESCO TILLMAN**, in his individual capacity as a correctional officer at MPCC, is an adult citizen of the State of Louisiana and domiciled in the

Western District of Louisiana. At all times described herein, Defendant **TILLMAN** was employed by **LASALLE MANAGEMENT** as a correctional officer at MPCC. As such he was responsible for maintaining the care, custody, and control of individuals in the custody of MPCC. He is liable directly for the actions complained of herein.

18.     CO **ROBERT THORNTON**, in his individual capacity as a correctional officer at MPCC, is an adult citizen of the State of Louisiana and domiciled in the Western District of Louisiana. At all times described herein, Defendant **THORNTON** was employed by **LASALLE MANAGEMENT** as a correctional officer at MPCC. As such he was responsible for maintaining the care, custody, and control of individuals in the custody of MPCC. He is liable directly for the actions complained of herein.

19.     CO **JANE DOE**, in her individual capacity as a correctional officer at MPCC, is an adult citizen of the State of Louisiana and domiciled in the Western District of Louisiana. At all times described herein, Defendant **JANE DOE** was employed by **LASALLE MANAGEMENT** as a correctional officer at MPCC. As such she was responsible for maintaining the care, custody, and control of individuals in the custody of MPCC. She is liable directly for the actions complained of herein.

20.     **JAMES LEBLANC,** in his individual and official capacity as Secretary of the Department of Public Safety and Corrections (DPSC), is an adult citizen of the State of Louisiana and domiciled in the Middle District of Louisiana. At all times described herein, he was secretary of DPSC, and as such, was responsible for making, altering, amending, and promulgating rules and regulation necessary for the administration of the functions of DPSC, organizing, planning, supervising, directing, administering, and executing programs vested in DPSC. He was responsible

for all actions of DPSC and its staff. He was and is a final policy maker. He is liable both directly and vicariously for the actions complained of herein.

21.    Sheriff **SAMMIE BYRD**, in his official and individual capacities as Sheriff of Madison Parish Sheriff's Office (MPSO), is an adult citizen of the State of Louisiana and domiciled in the Western District of Louisiana. At all times described herein, he was Sheriff of MPSO, and as such, was the head and representative of the Madison Parish Law Enforcement District responsible for the management and operation of Madison Parish Correctional Center and Southern Correctional Center. He was and is a final policy maker. He is liable both directly and vicariously for the actions complained of herein.

22.    Defendant **PRINCETON EXCESS AND SURPLUS LINES INSURANCE COMPANY ("PRINCETON")** is a foreign insurer, licensed and authorized to do business in the State of Louisiana, providing a policy of insurance coverage on behalf of Defendants **BYRD** and **LASALLE MANAGEMENT**, at all times described herein.

## IV. FACTUAL ALLEGATIONS

### JAMES LEBLANC, SAMMIE BYRD and LASALLE MANAGEMENT EACH FAIL IN THEIR RESPECTIVE RESPONSIBILITIES TO ENSURE PRISONERS ARE HELD IN CONSTITUTIONAL CONDITIONS.

23.    In 1996, DPSC entered into a formal partnership with Sheriffs of the State of Louisiana to hold DPSC-sentenced prisoners in facilities owned and operated by Sheriffs and private entities as a means of resolving the capacity limitations in state-operated facilities. These non-DPSC facilities were to operate in accordance with Basic Jail Guidelines (hereinafter the "Guidelines") developed by both DPSC and the Louisiana Sheriff's Association to assure that the fundamental rights of DPSC prisoners housed in secure non-DPSC facilities are not jeopardized by this arrangement. The Guidelines have undergone periodic updates and revisions, the most

recent being reviewed on October 1, 2019 and signed by JAMES LEBLANC and the Executive Director of the Louisiana Sheriff's Association.

24.     A quarter century after this agreement was first formalized, DPSC facilities had capacity for 15,565 people while non-DPSC facilities had capacity for 15,247 people. Nearly half the capacity for housing Louisiana's sentenced population is located in non-DPSC facilities. At all times described herein, LASALLE MANAGEMENT operated capacity for 8,208 people or roughly 53% of this non-DPSC facility capacity.

25.     In Madison Parish, Sheriff SAMMIE BYRD, as representative of the Madison Parish Law Enforcement District, entered into a contract with DPSC to house sentenced prisoners in Madison Parish's correctional facilities, including MPCC.

26.     Sheriff BYRD is responsible for the management and operation of Madison Parish's correctional facilities, including MPCC. Sheriff BYRD, contracted with LASALLE MANAGEMENT most recently in February 2020 to manage and operate Madison Parish's correctional facilities for a period of ten years, continuing the company's operation of the facility beginning in January 2014.[1]

27.     By the terms of that agreement, LASALLE MANAGEMENT was to be responsible for management of MPCC, including operating and maintaining the facility for the secure custody, care, and safekeeping of prisoners at the facility in accordance with federal, state, and local law, as well as the Guidelines.

28.     Guideline II-A-012 requires a classification system that includes a written policy and procedure providing for a written classification plan. Housing assignments are to consider age, gender, legal status, custody needs, special problems and needs, and behaviors. Further,

---

[1] As of May 31, 2021, Security Management has taken over operations at MPCC pursuant to a contract with BYRD.

classification must be done by an objective process that identifies appropriate custody and appropriate housing assignment, and identifies the prisoner's interest and eligibility to participate in programs. The Guidelines lists housing records and classification records as documentation of adherence to this guideline.

29.     Guideline II-A-003 requires sufficient staff at all times to perform functions relating to the security, custody, and supervision of prisoner to operate the facility in conformance with other guidelines.

30.     Guideline II-A-008 requires records to accompany a prisoner at the time the prisoner is transferred to a local or DPSC facility. Those records include, but are not limited to classification actions and reports of disciplinary actions, grievances, incidents or crimes committed while in custody.

31.     Non-DPSC facilities, including MPCC, are required to submit statements of compliance with the Guidelines annually, which must include proposed expansions, available rehabilitative programs, and a summary of reentry initiatives. The only external validation or evidence that must accompany these statements of compliance are Fire Marshal and Health Inspection reports.

32.     Annual monitoring reports include sparse discussion of compliance with various Guidelines. For example, the classification system focuses entirely on trustees working outside the secure perimeter of the facility with no metric to look beyond this narrow question.

33.     On their face, DPSC policies, guidelines, and practices for local facilities are so vague that they cannot adequately protect sentenced DPSC prisoners and place both sentenced and un-sentenced prisoners at risk of harm from inadequate classification systems. Perfunctory monitoring and audits allow non-DPSC facilities to ignore even these vague guidelines.

34.     Although Sheriff BYRD and LASALLE MANAGEMENT and its supervisors had an obligation to develop and implement a classification system to assess risk and efficiently manage the pre-trial detainee and sentenced prisoner population, these Defendants failed to meet even the vague recommendations of the Guidelines. Specifically, these defendants failed to develop a written classification plan, failed to appropriately or adequately classify people based on information available at intake, failed to ensure requisite transfer records accompanied people entering custody to inform housing and classification decisions at intake, and failed to regularly review classification status of all individuals involved in incidents of violence.

35.     Instead of creating a policy to ensure detainee and prisoner safety, the stated aim of the MPCC classification policy was "to provide an offender work force to accomplish the maintenance needs of the facility to the best extent possible."

36.     The policy then stated initial intakes are held in administrative segregation for 48 hours while an intake process is completed before being moved to general population. MPCC offers only three options for classifying prisoners and detainees – general population, trustee, and administrative segregation. The remainder of the policy defines minimum criteria for trustee status. This policy was signed by Defendant warden ARTHUR ANDERSON.

37.     Further, LASALLE MANAGEMENT and its supervisors failed to hire sufficient, qualified staff, and failed to adequately monitor and train guards working in prisoner housing areas at MPCC. As a result, staff improperly documented and investigated acts of violence among prisoners which allowed preventable harm to come to prisoners and detainees due to lack of supervision and lack of re-classification procedures in response to violence.

38.     As a result, in practice, no proper classification plan existed at MPCC and prisoners were assigned to housing units based on available beds without regard to custodial status,

disciplinary history, known enemies, or any other consideration included in classification plans. Although the Basic Jail Guidelines clearly require consideration of legal status in classifying people, MPCC as operated by LASALLE MANAGEMENT failed in this most basic of classification measures. Plaintiff MURRAY was housed in the same dorm as multiple sentenced DPSC prisoners, who ultimately attacked him. The assault on MURRAY was not the first instance. In January and May 2020, MPCC reported to DPSC four different stabbing incidents involving DPSC and non-DPSC, pre-trial individuals on the same housing unit.

39.     Nevertheless, in October 2019, only four months before the first of these reported stabbings, DPSC signed off on MPCC's compliance with the Guidelines, including the provisions relating to classification.

40.     Additionally, as a result of these policies and practices MPCC reported the deaths of three people to LEBLANC and DPSC between September and October 2020:

      a.     Robert Thomas, who was thirty-five, was found dead in his bunk during morning count. The cause of his death was undetermined;

      b.     Kendall Reed, who was thirty-four, died of rhabdomyolysis following an altercation;

      c.     Connie Brown, who was twenty-six, died after receiving multiple stab wounds to the chest.

41.     From January 2020 to January 2021, there were also at least nine serious assaults among prisoners in the facility known to LASALLE MANAGEMENT and reported to DPSC. Seven of these incidents resulted in hospital transports for one or more of the injured persons. At least four of these incidents involved knives or shanks resulting in serious lacerations and puncture wounds from stabbings.

42.     Each of these deaths and assaults illustrates the lack of prisoner supervision, the availability of weapons, and the level of violence at MPCC. LASALLE MANAGEMENT reported these deaths and serious injuries to DSPC and BYRD, alerting all three parties to the serious risks of harm posed by the plainly inadequate classification and supervision at the facility.

43.     BYRD, LASALLE MANAGEMENT, and LEBLANC each ignored the serious risk of harm and actual harm befalling people at MPCC.

44.     LASALLE MANAGEMENT and its employees ignored these prior incidents and took no action to appropriately classify and house people in their custody to prevent further acts of violence. Nor did they require appropriate in-service training or re-training of guards who were known to have engaged in misconduct in failing to appropriately document, report, investigate, or otherwise respond to violence and threats of violence on housing units. Further, they refused to terminate, suspend, discipline, warn, or in any way punish and/or re-train correctional officers and rank for incidents involving failures to remain on post, failing to adequately carry out duties, failing to report, and failing to investigate, thereby failing to adequately discourage further constitutional violations by their guards, including the defendant guards in this case.

45.     Defendant SAMMIE BYRD failed to monitor the contract with LASALLE MANAGEMENT to ensure that Madison Parish's correctional facilities held prisoners in constitutionally adequate conditions. In the wake of multiple reports of violent attacks at MPCC resulting in hospital treatment and death, Sheriff BYRD knew, must have known, and should have known that LASALLE MANAGEMENT was failing to provide constitutionally adequate conditions of confinement by failing to reasonably respond to risks of serious harm posed to all prisoners at MPCC by the extreme violence of the facility. Sheriff BYRD knew, must have known, or should have known of the serious risk of harm posed by LASALLE MANAGEMENT's failure

to reasonably respond to the lack of classification system, failure to investigate, and failure to adequately staff but failed to take action to address these risks.

46.     Finally, Secretary LEBLANC chose to continue to contract with Sheriff BYRD and the Madison Parish Law Enforcement District to house sentenced DPSC prisoners at MPCC. Defendant LEBLANC has authority to determine whether to house DPSC prisoners at local facilities based on the facilities' adherence to the Guidelines. Further, Secretary LEBLANC has authority to review files and other necessary information to determine if local facilities are complying with the Guidelines, but did not avail himself of this power. Despite the reports of assaults and deaths, the clear presence of weapons and other contraband, and the lack of classification system at MPCC, LEBLANC took no steps to look beyond the self-serving reports offered by LASALLE MANAGEMENT and Defendant BYRD regarding compliance with the Guidelines and the adequacy of the conditions of confinement for DPSC prisoners.

47.     This problem extends beyond MPCC to a range of local jail facilities. In 2019, non-DPSC facilities in Ouachita, Franklin, and Tensas all reported at least five serious altercations and assaults involving DPSC and non-DPSC individuals on the same housing units. In spite of these reports of violence arising from co-housing DPSC and non-DPSC individuals together, annual compliance reports for these facilities found them in compliance with the Guidelines including classification system and offender management systems.

48.     Defendant LEBLANC's failures to ensure adequate classification and staffing at facilities housing sentenced DPSC prisoners pose credible ongoing threat of harm to Plaintiffs MURRAY and HENDERSON. Plaintiff MURRAY is currently a sentenced DPSC prisoner being held in a non-DPSC facility and may be held at any non-DPSC without adequate classification planning and procedures. Plaintiff HENDERSON is a pre-trial detainee held at a non-DPSC

facility that also holds DPSC prisoners. Plaintiff HENDERSON may be transferred back to MPCC or to any local facility that also houses DPSC prisoners without adequate classification planning and procedures.

49.    It was and is the policy and/or custom of Defendant LEBLANC to inadequately monitor, audit, review, and supervise local jail facilities, including MPCC to ensure sentenced prisoners were not subjected to unconstitutional conditions or unreasonable risks of harm, thereby failing to adequately discourage further constitutional violations at local facilities tasked with holding sentenced DPSC prisoners and creating a risk of harm to both sentenced and un-sentenced detainees held in these institutions.

## FIRST ATTACK ON JAMES MURRAY

50.    JAMES MURRAY arrived at MPCC on June 19, 2020, as a pre-trial detainee being held on charges brought under La. R.S. 14:62. As part of the intake process, Captain MCDOWELL took MURRAY's photograph for identification and was also responsible for determining whether MURRAY faced potential safety risks as a result of his transfer. Captain MCDOWELL did not ask for any information about MURRAY's incarceration history or any known or potential enemies. MURRAY was then taken to Building 4, B-Dorm.

51.    At MPCC, Defendants BYRD and LASALLE MANAGEMENT held both sentenced and pre-trial detainees in the same dorm. MURRAY raised his concerns about the lack of a classification system by letter to DPSC, and by talking to Major CHASE and Captain HUGHES at MPCC. He expressed his concerns for his safety arising out of the housing of pre-trial and sentenced people together in the same dorm and the threat of violence on the dorm. He did not receive a response.

52.     After approximately two months of increasing tensions, attacks, and stabbings on this unit, around August or September 2020, MURRAY learned that one of the people in the dorm, only known to him as "Swamp," was stabbed by another individual held in the dorm several times while he slept. After this incident, the dorm was split up and MURRAY was moved to Building 3, C-Dorm.

53.     In Building 3, C-Dorm, MURRAY was again housed with both sentenced and other pre-trial detainees. He became increasingly concerned for his safety. On October 18, 2020, MURRAY told Sgt. KNOX the he needed to leave or "check off" the unit because of his safety concerns.

54.     The same day, Sgt. KNOX took MURRAY out of C-Dorm and told him to go across the hall to B-Dorm. Consistent with MPCC's practice, Sgt. KNOX did not consult with anyone regarding this transfer. Sgt. KNOX did not advise MURRAY as to who was on B-Dorm to determine if MURRAY had any potential enemies on B-Dorm or take any other steps to ensure his safety. For example, Sgt. KNOX did not check the custody status of the people on B-Dorm to determine if MURRAY was at risk of being hurt by or hurting anyone on B-Dorm.

55.     At that time, B-Dorm held a number of people who had previously stabbed or attacked other sentenced prisoners and pre-trial detainees, including H.W., M.T., and B.H.,[2] each of whom had previously been involved with attacks, including stabbings of other detainees.

56.     B-Dorm had capacity for approximately 80 people and was near capacity on October 18, 2020. Security staffing ranged between one and three guards. These guards included one guard who was assigned to the control room, or "key," multiple dorms via windows and guards

---

[2] Sentenced prisoner assailants are referred to by initials and pre-trial detainee assailants are referred to by John Doe designations in the interest of protecting the safety of those Plaintiffs who remain incarcerated.

who did occasional walk-throughs of the dorm, often no more than three times a day. The evening of October 18, 2020, CO TILLMAN was assigned to monitor B-Dorm from Control Room 2.

57.     MURRAY had been on B-Dorm for approximately half an hour and was sitting on his rack repairing a pair of sweatpants when sentenced prisoner H.W. approached MURRAY from behind and began stabbing him. Two other detainees assisted H.W. in hitting and stabbing MURRAY for several minutes. No LASALLE MANAGEMENT employees came to assist MURRAY. Finally, MURRAY was able to escape his attackers and run to the front of the dorm. Although CO TILLMAN was tasked with observing the dorm, MURRAY had to bang on the flap at the front door several times to get the attention of CO TILLMAN and get out of the dorm.

58.     CO TILLMAN and a sergeant moved MURRAY off the unit into the hallway and worked to staunch the bleeding from multiple stab wounds. A lieutenant called an ambulance without waiting for evaluation by a nurse because he was concerned that MURRAY had been stabbed in the lung and could die without prompt medical attention.

59.     MURRAY was transported to Madison Parish Hospital by ambulance where he was treated for multiple stab wounds to his left elbow, upper left arm, left shoulder, and on the right side of his back. He received sutures for his wounds. He was prescribed antibiotics to prevent infection, a tetanus booster, and pain management medications. He also received radiographic imaging to rule out any pneumothorax, hemothorax, or other effusions into the chest.

60.     CO TILLMAN, who had been in the control room at the time of the attack, identified three individuals involved. He reported that sentenced prisoner H.W. was the primary alleged aggressor, and said he observed H.W. stabbing MURRAY from behind. CO TILLMAN also reported that he observed sentenced prisoners B.H. and M.T. acting as accessories to the

attack. These three individuals were taken off B-Dorm and questioned in relation to the attack on MURRAY.

61.     Each of these three individuals were known to present a serious risk of harm to other prisoners and detainees. H.W. was sentenced in Lafayette in May 2017, and he was moved to various sheriff-run, non-DPSC facilities, before finally going to the Hunt Reception and Diagnostic Center in September 2019 for classification. While incarcerated in parish facilities, H.W. was sentenced on three different aggravated battery charges for assaulting other prisoners and detainees in May 2018, December 2018, and April 2019 in Ouachita, Franklin, and Winn Parishes respectively. He arrived in Madison Parish in November 2019. Despite noting H.W.'s numerous and recent assault convictions on his initial classification form, Defendant MCDOWELL did not make any notations under disciplinary summary or take any steps to consider the safest classification for H.W. and other detainees. Defendant MCDOWELL assigned H.W. to Building 3, B-Dorm with custody status noted as "med."

62.     On August, 5, 2020, H.W. stabbed another prisoner with a knife in the course of a fight on Building 4, D-Dorm. MAJOR FARMER was informed of this incident and signed off on an unusual occurrence report. On information and belief, no one at MPCC conducted any investigation to identify the source of weapon or to recover the weapon. On information and belief, no one at MPCC conducted any review of H.W. classification status to determine what classification status would best protect him and others, like MURRAY, or took any other steps to ensure other detainees could be safe while H.W. was held at MPCC.

63.     MURRAY's second assailant, M.T., was sentenced in Orleans parish in June 2010, and arrived at Madison Detention Center in May 2019. Defendant MCDOWELL completed an

initial classification form assigning M.T. to Building 4, B-Dorm and also assigned M.T. "med" custody status.

64.    On October 2019, M.T. was written up for aggravated fighting after using a weapon on another prisoner in Building 4, D-Dorm. Captain HUGHES was aware of this altercation, and yet, on information and belief, no investigation was undertaken to identify the source of the weapon used in the altercation or to recover the weapon. On information and belief, no one at MPCC conducted any review of M.T classification status to determine what classification status would best protect him and others like MURRAY or took any other steps to ensure other detainees could be safe while M.T. was held at MPCC.

65.    MURRAY's third attacker, B.H. was sentenced in Lafayette in August 2019. According to the DPSC Master Record, B.H. never went through the Hunt Diagnostic and Reception Center, and instead, was immediately moved to various local facilities, arriving at MCC in February 2020. Defendant MCDOWELL completed an initial classification form assigning B.H. to Building 4, B-Dorm. MCDOWELL also assigned a "med." custody status to B.H. On March 2020, B.H. received a disciplinary write up for possession of contraband, including a metal shank. On information and belief, no one at MPCC undertook any investigation to identify the source of the weapon in B.H. possession or took any other steps to ensure other detainees could be safe while B.H. was held at MPCC.

66.    After the attack on MURRAY, MPCC officials learned that B.H. and M.T. had been using drugs.

67.    ANDERSON, STINSON, FARMER, and CHASE were all informed of this attack on MURRAY, the use of weapons, and the evidence of drugs in the facility. On information and belief, no one at MPCC undertook any investigation into the source of the weapons or drugs.

ANDERSON, STINSON, FARMER, and CHASE never sought further investigation into these matters.

## THE CREATION OF J-DORM PERPETUATED THE SERIOUS RISK OF HARM CAUSED BY THE LACK OF A CLASSIFICATION SYSTEM.

68.     In early November, Building 4, J-Dorm was emptied of all sentenced DOC prisoners and became the only dorm for pre-trial detainees housing 40-45 people.

69.     ANDERSON, FARMER, STINSON, CHASE, HUGHES, JOHN MURRAY, MCODOWELL, and GUICE did not take any steps to develop a classification system for pre-trial detainees, but held every pre-trial detainee at MPCC on one dorm without regard to age, behavioral history, custody needs, pending charge, enemies, or any special needs. In the complete absence of any classification system for pre-trial detainees, J-Dorm became an increasingly violent unit.

70.     J-Dorm housed multiple pre-trial detainees from Tallulah, Louisiana. ANDERSON, FARMER, STINSON, CHASE, HUGHES, MURRAY, MCDOWELL, and GUICE were all aware that there were tensions on the unit between a group of pre-trial detainees from Tallulah (referred to as Tallulah John Does 1-12) and prisoners from other parts of Louisiana, particularly southern Louisiana. Corrections officers and rank as well as people housed on J-Dorm knew the Tallulah John Does 1-12 regularly engaged in attacks on other prisoners.

71.     On J-Dorm, PASCHAL, MURRAY, and HENDERSON all witnessed daily assaults on other detainees by Tallulah John Does 1-12. After an attack, the perpetrators of the attack remained on the unit while the injured person was sent to punitive lockdown conditions while his injuries healed. If LASALLE MANAGEMENT employees needed the lockdown cell for someone else, the victim of the attack was placed right back on J-Dorm with his attackers.

72.     Corrections officers were infrequently on the unit, coming onto the unit only briefly, twice a day to count detainees, to bring food, and to bring medications during "pill call."

73.     There was a "control key," which was an area where a corrections officer was assigned to stay and to watch the dorm, but it was rarely staffed with any corrections officers.

74.     In fact, PASCHAL and MURRAY frequently observed other detainees sneak into the control key area through the flap on the unit. Detainees would fashion shanks out of materials taken from the control key.

75.     This lack of supervision allowed violence on J-Dorm to flourish unchecked, creating an atmosphere of terror for every detainee held on the unit.

## SECOND ATTACK ON JAMES MURRAY

76.     MURRAY was placed on J-Dorm in late October 2020 when he came off of lockdown.

77.     After less than a month on J-Dorm, MURRAY fell prey to the rampant violence on the unit. From November 21, 2020 through November 23, 2020, MURRAY was attacked by Tallulah John Does 1-4. Over the course of the weekend, MURRAY was repeatedly threatened, whipped with a belt, stabbed with the belt buckle, and punched in the face, ribs, stomach, and back. Each time a corrections officer briefly appeared on the unit for meals, MURRAY tried to ask to leave the unit. Corrections officers ignored MURRY through the weekend. Each time he attempted to approach a corrections officer, Tallulah John Does 1-4 beat and threatened MURRAY more. Although MURRAY was being openly beat, as could be seen by MPCC personnel tasked with monitoring the dorm, no one helped him.

78.     On the afternoon of November 23, 2020, when an LPN and CO ROBERT THORNTON came onto the dorm to pass out medication, MURRAY was finally able to run out of the dorm.

79.     After MURRAY finally escaped his attackers, on the hallway outside the dorm, the LPN observed MURRAY bleeding from his mouth, and discovered paper lodged in MURRAY's throat. MURRAY reported he had been whipped with a belt, stabbed with the buckle, and punched in the face, ribs, stomach, and back by Tallulah John Does 1-4. These batteries resulted in red welt marks on MURRAY's mid-back, right shoulder, and hip, and a puncture wound on his right shin. While receiving medical treatment, MURRAY also reported that he had been attacked on several occasions because other detainees believed that he reported the prisoners who stabbed him in Building 3.

80.     After receiving treatment, MURRAY was removed from J-Dorm and returned to punitive lockdown conditions.

81.     MURRAY's detailed report of his attack is included in his medical record, but the report of the incident offered by CO THORNTON only notes that MURRAY came running out of the door, that there was blood coming from MURRAY's mouth, and that MURRAY refused to go back on the dorm. CO THORNTON failed to document MURRAY's reports and physical signs of repeated beatings or MURRAY's explanation of the cause.

82.     MURRAY provided a signed statement on November 23, 2020, explaining that the assault began because, on November 20, 2020, an MPCC corrections officer handed MURRAY's grievance response to another prisoner. The detainee read it and determined that MURRAY was a "snitch." MURRAY reported that other detainees then begun beating him on Saturday, November 21, 2020. He also reported that he was ignored by staff until he forced his way out of the unit at pill call on the afternoon of Monday, November 23, 2020. In his statement, MURRAY stated that when Captain JOHN MURRAY was on duty, there was never any staff supervising the unit. MURRAY further identified by name the four people who had been involved in beating him.

83.     Despite MURRAY's naming all of the individuals he could, the following week, on December 2, 2020, STEVEN CHASE prepared an incident report stating that the incident had been reviewed, but that MURRAY had refused to name his attackers.

84.     ANDERSON, STINSON, and CHASE all knew of this incident.

85.     Neither CHASE, nor any other MPCC rank or staff, initiated any investigation into the sharing of MURRAY's grievance response by its own staff, the report of lack of staff on the dorm over the weekend, or the attack on MURRAY.

86.     Despite the lack of proper investigation, or any indication that CHASE or anyone at MPCC undertook any review of the classification status of the people assigned to J-Dorm, MURRAY was eventually returned to J-Dorm.

87.     In early January 2021, Sgt. SHEPHERD came to MURRAY and told him that MPCC needed the use of the lockdown cell and that MURRAY had to return to J-Dorm. MURRAY told Sgt. SHEPHERD that he could not be safe on J-Dorm as the people who had attacked him remained on the dorm. MURRAY requested to be placed on a different dorm. Sgt. SHERPHERD refused this request, stating that, because MURRAY was pre-trial, he could only be housed in J-Dorm.

88.     Soon after returning to J-Dorm, Tallulah John Does 4-6 stole MURRAY's blanket, slippers, and his bible. Further, other detainees broke the dorm window and, as a result of the theft, MURRAY was left in frigid temperatures on J-Dorm without a blanket for four days.

89.     MURRAY saw Tallulah John Does 1-12 attack other detainees daily on J-Dorm, just as he was assaulted, after he returned to J-Dorm, including ANTONE HENDERSON and LATAVIUS PASCHAL.

## FIRST ATTACK ON ANTONE HENDERSON

90.     ANTONE HENDERSON arrived at MPCC in August 2020 as a pre-trial detainee being held on charges brought under La R.S. 14:64 and 14:30. His initial classification form was completed by Defendant MCDOWELL. But HENDERSON never spoke with MCDOWELL or anyone from classification regarding his history in other facilities, possible enemies, or other information critical to classification. The form included a scratched out pre-typed N/N and a hand-written notation "St. John the Baptist" in the field for detainer/pending charges. Although several other fields were not completed, custody status included a pre-printed notation "med."

91.     On January 17, 2021, four men from Tallulah, including Tallulah John Does 4 and 9 and two others, surrounded HENDERSON's rack. Tallulah John Doe 4 struck HENDERSON above his left eye. The others joined in attacking HENDERSON until he fell to the ground. He attempted to get away from his attackers by crawling under a table. He fought back against his attackers and made his way to the door at the front of the dorm.

92.     Looking for help, HENDERSON saw there was no deputy in the control key. He banged on the front door of the dorm repeatedly for approximately fifteen minutes until Lt. GUICE responded, and removed him from the dorm and placed him in lockdown.

93.     Neither Lt GUICE nor any other MPCC staff reported the incident. Neither Lt GUICE nor any other MPCC staff undertook any investigation into the incident. HENDERSON was never taken before a disciplinary review board, nor did he undergo any other process to review his placement in lockdown.

94.     HENDERSON was in lockdown for approximately three weeks. While in lockdown, on January 28, 2021, HENDERSON reported that he had been injured in a fight while on J-Dorm and believed his hand was broken. He requested to see a medical doctor to evaluate

this injury. After this report, on information and belief, there was no investigation, unusual occurrence report, or any other documentation that this altercation was investigated or that any person's classification status or any staffing plans were modified as a result.

95.     A few days later, while HENDERSON was still on lockdown, many of the same group of detainees who attacked HENDERSON attacked LATAVIUS PASCHAL.

<u>**ATTACK ON LATAVIUS PASCHAL**</u>

96.     LATAVIUS PASCHAL was a pre-trial detainee who was transferred to MPCC in November 2020. PASCHAL was being held pre-trial on charges brought under La R.S. 14:37. MCDOWELL was noted as the booking officer on PASCHAL's transfer documentation. Upon PASCHAL's arrival at MPCC, he was held in a lockdown cell for eleven days for quarantine. He was then assigned to Building 4, J-Dorm. MCDOWELL did not ask PASCHAL any questions about prior incarceration history or known enemies.

97.     On January 20, 2021, just after second meal had been delivered around 10:30 a.m., PASCHAL was struck by Tallulah John Doe 7. PASCHAL attempted to defend himself from the attack, while others, among them Tallulah John Does 2-12, rushed to attack PASCHAL. He was stabbed multiple times by a knife, not a homemade shank, and began bleeding. As he attempted to escape his attackers, PASCHAL slipped on his own blood and fell to the floor where Tallulah John Does 2-12 continued to punch, kick and stab him. Tallulah John Doe 8 smashed a mop bucket on PASCHAL's head. When another detainee intervened to attempt to prevent his attackers from killing him, PASCHAL was able to get to the front of the dorm and beat on the door.

98.     As he was beating on the door, PASCHAL could see onto the hallway and saw there was no deputy on the hallway. As usual, there was also no officer observing the detainees in the control key. Finally, a sergeant who happened to be walking by, heard PASCHAL beating on

the door and came to open the unit. Although the attack on the unit had been going on for fifteen minutes, PASCHAL had to beat on the door twenty times or more before he was able to get anyone's attention.

99. Lt. GUICE and a sergeant finally came onto the unit to get PASCHAL. PASCHAL's attackers told Lt. GUICE and the sergeant that they should remove PASCHAL from the unit as they planned to kill him.

100. A nurse came to examine PASCHAL and told Lt. GUICE that PASCHAL needed to be routed to the hospital for stitches and to better assess any internal injuries he might have. Lt. GUICE exerted pressure on the nurse to stitch PASCHAL at MPCC to avoid the hospital route, but the nurse refused.

101. On January 20, 2021, PASCHAL was transported by ambulance to Madison Parish Hospital to treat multiple stab wounds and swelling to the left side of his face. He received multiple stab wounds to his left arm, upper and lower back, and left hand. Radiographic imaging was done to rule out internal damage to his abdomen, bowls, or cardio-pulmonary systems and fracture to his maxillofacial bones. He received antibiotics to ward off infection, oral tetanus booster, and pain management medications.

102. Although PASCHAL's injuries were so severe he had to be taken to the hospital for treatment, Lt. GUICE failed to complete any unusual occurrence report, commence any investigation, or complete any other documentation of what caused PASCHAL's injuries. There is no indication of any effort to identify PASCHAL's attackers or review PASCHAL's or his attackers' classification status to identify appropriate housing to keep each of these individuals safe from further harm.

103. Although PASCHAL was taken to lockdown after he returned from the Madison Parish Hospital, PASCHAL was never taken before a disciplinary review board, nor did he undergo any other process to review his placement on lockdown. PASCHAL remained on lockdown for several weeks. PASCHAL was ultimately transferred to another facility.

104. In addition to physical injuries, these incidents also caused PASCHAL significant emotional harm.

## JAMES MURRAY'S EFFORTS TO LEAVE J-DORM AND UNACCOUNTED FOR INJURIES

105. Around the time of the attacks on ANTONE HENDERSON and LATAVIUS PASCHAL, in late January 2021, MURRAY attempted to file a grievance related to the violence on J-Dorm and attempted to leave the dorm.

106. In January 2021, MURRAY also began requesting medical care for an injury that was ultimately diagnosed as a hand fracture at the fifth left metacarpal. MPCC created no documentation, incident report, unusual occurrence report, or other explanation as to how MURRAY broke his hand.

107. After MURRAY sought care for the injury to his hand, he filed a grievance related to the violence on J-Dorm and requested to be moved. In response, Captain HUGHES pulled MURRAY out into the hallway and threw his grievance into a trash can. HUGHES and CO THORNTON then told MURRAY to return to J-Dorm.

108. While CO THORTNON was still on the dorm to return MURRAY, Tallulah John Doe 4 told MURRAY he could not live on the dorm and needed to leave. Despite this threat, CO THORNTON and HUGHES continued to refuse to move MURRAY to another location.

109.    Fearing for his life, MURRAY grabbed his property bag, ran out of the dorm, and sat in the hallway. After Tallulah John Doe 4's threat, MURRAY was so scared to remain on J-Dorm that he refused to go back on the dorm and demanded to be placed in lockdown.

110.    HUGHES eventually placed MURRAY on lockdown, where he remained on until he was eventually transferred from MPCC to another facility in mid-February 2021.

111.    Later, after Murray was finally transferred away from MPCC, MURRAY became a sentenced DPSC prisoner.

112.    As a result of the assaults, MURRAY continues to experience pain and diminished function in both his left hand and left elbow from the injuries he received during his time at MPCC.

113.    These incidents also caused MURRAY significant emotional harm.

## SECOND ATTACK ON ANTONE HENDERSON

114.    In early February 2021, Lt. GUICE came to HENDERSON and told him that MPCC needed the lockdown cell for another detainee, and that HENDERSON would be returned to J-Dorm. HENDERSON protested the return to J-Dorm to Lt. GUICE, stating that the same people who attacked him previously were still on the dorm and would attack him again. Lt. GUICE sought to have HENDERSON sign a form agreeing to return to J-Dorm. HENDERSON refused. Lt. GUICE and another unknown deputy forcibly moved HENDERSON into J-Dorm.

115.    On February 18, 2021, on information and belief, Lt. GUICE had his first shift after HENDERSON had been forcibly moved to J-Dorm. HENDERSON reported to Lt. GUICE that he did not feel safe on the dorm because of the individuals who had attacked him previously. Lt. GUICE refused to move HENDERSON off the dorm and closed the door in his face. HENDERSON went to get his property bag together and moved to the front of the dorm in an effort to remove himself from the dorm at the next opportunity. As he approached the front door

of the dorm, Tallulah John Does 2-12 surrounded the door. HENDERSON saw a female CO was in the control key, CO JANE DOE. He told the Tallulah John Does that he did not want to fight. HENDERSON banged on the flap of the key to get the attention of the CO on the other side of the door, so she could get him out of the dorm. Although she heard him, CO JANE DOE ignored HENDERSON's efforts to escape his attackers. Tallulah John Doe 7 then hit HENDERSON with a broom handle on the top of his head. Other Tallulah John Does also repeatedly hit and kicked HENDERSON. He fell to floor and again began banging on the front door of the dorm in an effort to be let out. HENDERSON heard someone say that he was going to stab him. HENDERSON felt blood in his eyes, but did not know who had stabbed him or with what.

116.     After 5-7 minutes, Lt. GUICE removed HENDERSON from J-Dorm because he had a puncture wound to the top of his head and swelling to his top lip. HENDERSON reported to Lt. GUICE that multiple people from Tallulah, Louisiana attacked him on the dorm and he was unsure why. He was not able to identify his attackers by name when questioned by Captain JOHN MURRAY, but he did say that they attacked him previously.

117.     At the time of the attack, there was no staff on the unit. Captain MURRAY reported that he spoke with people inside the dormitory who declined to write a statement or speak. Captain MURRAY did not include any information relating to the people he attempted to speak to, the context in which he was attempting to interview them, or how he selected individuals he attempted to speak with.

118.     Although MURRAY informed ANDERSON, STINSON, and FARMER and LASALLE MANAGEMENT's director of operations of this serious incident, there is no documentation that anyone at MPCC reviewed the classification status or staffing deployments to J-Dorm after this incident.

119.     HENDERSON's medical evaluation at the facility reflected a laceration to his scalp, swelling, and bruising to his right forearm. Lt GUICE was reluctant to send HENDERSON to the hospital, but HENDERSON's head wound could not be closed on site. After a delay of several hours, HENDERSON was finally sent to Madison Parish Hospital for sutures for his scalp laceration and imaging of his arm to rule out a fracture.

120.     These incidents also caused HENDERSON significant emotional harm.

## PUNITIVE LOCKDOWN CONDITIONS WERE THE ONLY ALTERNATIVE TO THE DANGEROUSLY VIOLENT ENVIRONMENT ON J-DORM.

121.     Each of these three Plaintiffs was subjected to punitive lockdown conditions as a direct result of MPCC's lack of classification system.

122.     MURRAY was placed on lockdown three times, after the October 2020 attack, the November 2020 attack, and again in January 2021.

123.     PASCHAL was placed on lockdown after the January 2021 attack.

124.     HENDERSON was placed on lockdown twice, after the January 2021 attack and again after the February 2021 attack.

125.     While MURRAY, PASCHAL, and HENDERSON were on lockdown they did not receive time out of their cells to exercise outside. They were deprived of natural light because windows were boarded up. Instead, artificial lights are kept on 24 hours a day.

126.     MURRAY, PASCHAL, and HENDERSON were only given occasional and sporadic opportunities to shower.

127.     In January 2021, lockdown cells were without water for several days, causing in-cell toilets to back up, worsening the already difficult conditions of lockdown.

128.    Because LASALLE MANAGEMENT and its employees failed to develop a classification system, as of early November 2020 the only locations MURRAY, PASCHAL, and HENDERSON could be housed at MPCC were in lockdown or J-Dorm.

129.    Despite these restrictive and punitive lockdown conditions, MURRAY, PASCHAL, and HENDERSON felt so threatened on J-Dorm that they sought to be placed on and remain on lockdown to avoid the serious risk of harm J-Dorm posed to them.

130.    Because of their complete failure to create a pre-trial classification system, LASALLE MANAGEMENT and its employees ensured that the intolerable conditions on lockdown were the only place MURRAY, PASCHAL, and HENDERSON were safe from serious injury.

131.    MURRAY, PASCHAL, and HENDERSON suffered significant emotional harm as direct result.

## IV. CAUSES OF ACTION

### COUNT ONE

**VIOLATION OF THE U.S. CONSITUTION, FOURTEENTH AMENDMENT**
**(By All Plaintiffs against All Individual Capacity Defendants)**

132.    Plaintiffs repeat and re-allege each and every allegation of the complaint.

133.    Defendants acting individually and together, under color of law, acted to violate the plaintiffs' right to due process and equal protection of the laws as protected by the Fourteenth Amendment of the United States Constitution and 42 U.S.C. § 1983.

134.    At all times described herein, the Defendants acting individually and collectively, acted unreasonably, recklessly, and with deliberate indifference and disregard for the safety, and constitutional and civil rights of Plaintiffs.

135.    These failures were a moving force in the substantial risk of harm and unconstitutional conditions of confinement leading to the Plaintiffs' harms.

136.    Defendants' violated Plaintiffs' clearly established rights of which reasonable persons in the Defendants' position knew or should have known.

137.    Defendants' conduct was intentional and willful, and in reckless disregard for HENDERSON, PASCHAL and MURRAY's rights.

## COUNT TWO

### VIOLATION OF THE U.S. CONSITITUION, EIGHTH AMENDMENT
**(By Plaintiff Murray against All Defendants)**

138.    Plaintiff repeats and re-alleges each and every allegation of the complaint.

139.    Plaintiff's right to be free from cruel and unusual punishment under the Eighth Amendment of the U.S. Constitution was violated by Defendants.

140.    Defendants acting individually and together, under color of law, acted to violate the plaintiffs' rights protected by the Eighth Amendment of the United States Constitution and 42 U.S.C. § 1983.

141.    At all times described herein, the Defendants acting individually and collectively, acted unreasonably, recklessly, and with deliberate indifference and disregard for the safety, and constitutional and civil rights of Plaintiff.

142.    These failures were a moving force in the substantial risk of harm and unconstitutional conditions of confinement leading to the Plaintiff's harms.

143.    Defendants' violated Plaintiff's clearly established rights of which reasonable persons in the Defendants' position knew or should have known.

144.    Defendants' conduct was intentional and willful, and in reckless disregard for MURRAY's rights.

### COUNT THREE

### <u>MONELL</u>, <u>HINOJOSA</u>, AND SUPERVISORY LIABILITY: FAILURE TO TRAIN, SUPERVISE, AND DISCIPLINE

**(By All Plaintiffs against LaSalle Management, LLC, and All Defendants in their Official Capacities)**

145.    Plaintiffs repeat and re-allege each and every allegation of the complaint.

146.     Defendants acting individually and together, under color of law, acted to violate Plaintiffs' rights to due process of law protected under the Fourteenth Amendment and right to be free from cruel and unusual punishment under the Eighth Amendment.

147.     The misconduct described above was caused by the policies, practices, and customs of Defendants.

148.     Defendants knew of the levels of extreme violence at the facility, the lack of a classification plan, the lack of investigation and response to known drivers of violence, and the chronic understaffing, but nevertheless continued to operate the facility with minimal adjustments, including continuing to house sentenced DPSC prisoners in the facility, allowing an intolerable risk of harm to come to those held in Defendants' custody, including Plaintiffs.

149.     Defendants knew of the failure of individuals at MPCC to perform crucial duties, including failures to develop and implement a classification plan, failure to respond appropriately to imminent risks of harm by correctional officers under their supervision, failure to investigate incidents of harm.

150.     Defendants were aware of the need to supervise, train, investigate, and discipline their subordinates to mitigate unreasonable risks of harm to people in Defendants' custody.

151.     Despite this knowledge, Defendants failed to train, supervise, or discipline individuals who engaged in these behaviors. This failure to train and supervise was a moving force behind the harm experienced by Plaintiffs, in violation of their Eighth and Fourteenth Amendment rights.

152.     As final policymakers, these Defendants acting individually and collectively, engaged in, established, condoned, ratified and encouraged customs, policies, customs, usages, practices, patterns, and procedures that they knew would and did directly and proximately create

conditions of confinement that failed to mitigate serious risks of harm to people in their custody, including Plaintiffs, thereby violating their constitutional rights protected under the Fourteenth and Eighth Amendment.

153. Further, these Defendants failed to establish and maintain policies to mitigate known serious risks of harm, and these Defendants knew of should have known that such failures would deprive people in their custody, including Plaintiffs, of their constitutional rights under the Fourteenth and Eighth Amendments.

154. Defendants were aware that the policies, procedures, practices, customs, and usages they established and those they failed to establish would result in violations of constitutional rights.

155. The did so by engaging in, establishing, condoning, ratifying and encouraging policies, customs, usages, practices, patterns, and procedures that they knew would and did directly and proximately create conditions of confinement that failed to mitigate serious risks of harm to people in their custody, including Plaintiffs, thereby violating their constitutional rights protected under the Fourteenth and Eighth Amendments.

156. These policies and practices specifically included Defendants' practice of failing to adequately classify detainees or develop and implement an adequate classification plan, failing to ensure adequate investigation into critical incidents, failing to implement corrective action plans to address known substantial risks of harm, failing to ensure deputies were observing housing units, failing to investigate incidents of harm, failing to provide appropriate training and supervision of staff, failing to ensure adequate staffing so as to effectively create conditions of confinement that allowed known substantial risks of serious injury to go unmitigated, failing to follow or enforce Basic Jail Guideline requirements, failing to engage in oversight of MPCC

sufficient to prevent constitutional rights violations, and failing to respond to MPCC's obvious violations of constitutional rights of people held at MPCC.

157.    These actions, and failures to act, were a moving force in the substantial risk of harm and unconstitutional conditions of confinement leading to the Plaintiffs' harms.

158.    At all times described herein, Defendants named in this Count, individuals and collectively, were acting under color of law and in the course and scope of their employment. Defendants named in this Count acted unreasonably, recklessly, and with deliberate indifference and disregard for the safety and constitutional rights of Plaintiffs by failing to mitigate known serious risk of harm. The above-described widespread practices, which were so well-settled as to constitute the *de facto* policy of the Defendants, were allowed to exist because policymakers with authority over these acts exhibited deliberate indifference to the problems, thereby effectively ratifying them.

159.    The policies, practices, and customs set forth above were the driving force behind the numerous constitutional violations in this case that directly and proximately caused Plaintiffs to suffer the grievous and permanent injuries and damages set forth above.

160.    These Defendants ignored the serious risk of harms they created and acted unreasonably and with deliberate indifference to Plaintiffs' constitutional rights as described above.

## COUNT FOUR

### VIOLATION OF THE LOUISIANA CONSTITUTION
### (By All Plaintiffs against All Defendants)

161.    Plaintiffs repeat and re-allege each and every allegation of the complaint.

162.     Article One, Section Two of the Louisiana Constitution of 1974 guarantees that "[n]o person shall be deprived of life, liberty, or property, except by due process of law," and Section Twenty prohibits cruel and unusual punishment.

163.     By reason of the same conduct that violated Plaintiffs' federal constitutional rights, Defendants violated their state constitutional rights to liberty and due process and Defendants violated MURRAY's right to be free of cruel and unusual punishment.

164.     This conduct resulted in the assaults of Plaintiffs and caused the physical, emotional, and pecuniary damages as described above and below.

## COUNT FIVE

### SUPPLEMENTAL STATE LAW CLAIM FOR
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (All Plaintiffs against All Defendants )

165.     Plaintiffs repeat and re-allege each and every allegation of the complaint.

166.     Defendants conduct, by among other things, knowingly subjecting Plaintiffs to repeated assaults while incarcerated and relying on Defendants to ensure their safety, and establishing punitive lockdown conditions as the only alternative to suffering repeated assaults, was extreme and outrageous.

167.     The emotional distress suffered by the Plaintiffs was severe.

168.     Defendants desired to inflict severe emotional distress, or knew that severe emotional distress would be certain, or substantially certain, to result from their conduct.

169.     Plaintiffs' status as detainees entitled them to a greater degree of protection from Defendants.

170.     Defendants conspired to commit an intentional or willful act as described herein, and are liable *in solido*, with each other, for the damage caused by such act.

171. As a result of Defendants' unlawful actions, Plaintiffs suffered damages including emotional distress.

172. Defendant LASALLE MANAGEMENT, LLC and official capacity Defendants are liable for the acts and/or omissions of their agents and employees.

173. Defendants, either directly, or by and through their agents, directly and proximately caused Plaintiffs' severe injuries, damages and losses.

## COUNT SIX

### NEGLIGENCE
### (All Plaintiffs against All Defendants)

174. Plaintiffs repeat and re-allege each and every allegation of the complaint.

175. Defendants, as jailers, had a duty to care for the safety of detainees in their custody, and protect detainees in their custody from harm.

176. Plaintiffs were detainees in the custody of Defendants.

177. Defendants breached this duty with their acts and omissions, when they failed to classify, observe, and secure the safety of detainees. These acts and omissions created an unreasonable risk of injury to Plaintiffs.

178. The risks and harms that Defendants caused were within the scope of protection afforded by the duties they owed to Plaintiffs.

179. Defendants knew or should have known of these risks, but failed to make the conditions of confinement safe, or take adequate steps to make the conditions of confinement safe.

180. Defendants' breach of their duty of care, through their acts and omissions, resulted in Plaintiffs' injuries.

181.    PRINCETON EXCESS AND SURPLUS LINES INSURANCE is a proper party as an insurer of Defendants BYRD and LASALLE MANAGEMENT, LLC as the accident occurred in Louisiana.

182.    Defendant LASALLE MANAGEMENT, LLC and official capacity Defendants are liable for the acts and/or omissions of their agents and employees.

183.    Defendants, either directly, or by and through its agents, directly and proximately caused Plaintiffs' severe injuries, damages and losses.

## COUNT SEVEN

### SUPPLEMENTAL STATE LAW ACTION AGAINST INSURANCE
**(All Plaintiffs against
Defendant Princeton Excess and Surplus Lines Insurance Company)**

184.    Plaintiffs repeat and re-allege each and every allegation of the complaint.

185.    Defendant insurer, PRINCETON, provided a contract of insurance to Defendants BYRD and LASALLE MANAGEMENT, that is applicable to the claims asserted herein.

186.    The above-named Defendant is liable for the actions of its insured, LASALLE MANAGEMENT, LLC, and its employees pursuant to La. R.S. 22:1269.

## VI. PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs MURRAY, PASCHAL, and HENDERSON pray for the following relief:

a.  Declaratory relief;

b.  Injunctive relief;

c.  Judgment against Defendants' for Plaintiffs' asserted causes of action;

d.  An order and judgment granting reasonable attorney's fees and costs incurred pursuant to 42 U.S.C. § 1988 with all legal interest;

e.  Award of compensatory damages as allowed by law; and

f.  Award of punitive damages as allowed by law.

Respectfully submitted,

/s/ Elizabeth Cumming
**ELIZABETH CUMMING (**Bar Roll No. 31685), T.A.
**EMILY WASHINGTON** (Bar Roll No. 34143)
Roderick and Solange MacArthur Justice Center
4400 S. Carrollton Ave.
New Orleans, LA 70119
Phone: (504) 620-2259
Fax: (504) 208-3133
elizabeth.cumming@macarthurjustice.org
emily.washingting@macarthurjustice.org

-AND-

/s/ Casey Denson
**CASEY ROSE DENSON** (Bar Roll No.33363)
**MERCEDES TOWNSEND** (Bar Roll No. 39540)
**CASEY DENSON LAW, LLC**
4601 Dryades Street
New Orleans, LA 70115
Phone: (504) 224-0110
Fax: (504) 534-3380
cdenson@caseydensonlaw.com
mtownsend@caseydensonlaw.com