UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


BRIAN HUMPHREY, ON
BEHALF OF HIMSELF AND
ALL OTHERS SIMILARLY
SITUATED
                              CIVIL ACTION

                              NO. 3:20-cv-0233

VERSUS


JAMES LEBLANC



          Deposition of SECRETARY JAMES M.
LEBLANC, taken on January 7, 2022, via Zoom
Teleconference.

```
 1   APPEARANCES:
 2   PROMISE OF JUSTICE INITIATIVE
     BY: REBECCA RAMASWAMY, ESQ.
 3   1024 Elysian Fields Avenue
     New Orleans, Louisiana  70117
 4   Phone: (504)529-5955
     Email: rramaswamy@defendla.org
 5       AND
     MOST & ASSOCIATES
 6   BY:  WILLIAM MOST, ESQ.
     201 St. Charles Avenue
 7   Suite 114
     New Orleans, Louisiana  70170
 8   Phone: (504)509-5023
     Email: williammost@gmail.com
 9       AND
     LOEVY & LOEVY
10   BY:  SARAH GRADY, ESQ.
     311 North Aberdeen Street
11   3rd Floor
     Chicago, Illinois  60607
12   Phone: (312)243-5900
     Email: sarah@loevy.com
13       REPRESENTING THE PLAINTIFF
14
15   KEOGH, COX & WILSON
     BY:  ANDREW BLANCHFIELD, ESQ.
16   701 Main Street
     Baton Rouge, Louisiana  70802
17   Phone: (225)383-3796
     Email: ablanchfield@keoghcox.com
18       AND
     JONATHAN RAY VINING, ESQ
19   504 Mayflower Street
     Baton Rouge, Louisiana  70802
20   Phones: (225)342-6728
     Email: jonathan.vining@la.gov
21       REPRESENTING THE DEFENDANTS
22
23   REPORTED BY:
24   Cecilia M. Henderson
     Certified Court Reporter
25
```

EXAMINATION INDEX

Page

MR. MOST ................................5


        E X H I B I T   I N D E X

                                    Page

Exhibit 6 ...............................10
Exhibit 42 ..............................13
Exhibit 41 ..............................29
Exhibit 32 ..............................30
Exhibit 31 ..............................33
Exhibit 36 ..............................36
Exhibit 44 ..............................41
Exhibit 46 ..............................44
Exhibit 49 ..............................54
Exhibit 34 ..............................55
Exhibit 43 ..............................95
Exhibit 35 ..............................95

1             S T I P U L A T I O N

2

3        It is stipulated and agreed by and

4   between counsel that the deposition of

5   SECRETARY JAMES M. LEBLANC is hereby being

6   taken under Federal Rules of Civil Procedure

7   for all purposes in accordance with law;

8        That the formalities of filing and

9   certification are hereby waived; that the

10  formalities of reading and signing are hereby

11  specifically not waived;

12       That all objections, except those as

13  to the form of the question and/or

14  responsiveness of the answer, are hereby

15  reserved until such time as this deposition or

16  any part thereof may be used in evidence.

17       *   *   *   *   *   *   *   *

18       CECILIA M. HENDERSON, Certified Court

19  Reporter, in and for the State of Louisiana,

20  officiated in administering the oath to the

21  witness.

22

23

24

25

1                SECRETARY JAMES M. LEBLANC, 510

2  MAYFLOWER STREET, BATON ROUGE, LOUISIANA

3  70802, AFTER FIRST BEING DULY SWORN IN THE

4  ABOVE-ENTITLED MATTER, DID TESTIFY AS FOLLOWS:

5         MR. MOST:

6              Drew, can we stipulate that the

7              deposition is properly noticed; the

8              court reporter is duly qualified and

9              there's no objection doing this via

10             Zoom?

11         MR. BLANCHFIELD:

12             Yes, we can.

13         MR. MOST:

14             Thank you very much.

15           EXAMINATION

16  BY MR. MOST:

17     Q   Good Morning, Secretary LeBlanc, how

18  are you?

19     A   Good morning, William.  Okay.

20  Dealing with COVID, as you can expect.

21     Q   When you say, "Dealing with COVID,"

22  you mean dealing with the general --

23     A   Not me, no.

24     Q   Okay.

25     A   We are the middle of it right now, so

1  it's got our attention.  Let me just say that.

2      Q    Yeah.  I understand.  And I think the

3  last time we met, there was sort of an

4  emergency situation brewing and you had to go

5  meet with GOHSEP.  The same is true today.  If

6  any emergency scenarios pop up and you need to

7  pause, you know, just let us know.  We can

8  work that out.

9          Secretary, could you give us your

10  full name and title for the record?

11      A    James M. LeBlanc, and my title is

12  Secretary of Public Safety and Corrections.

13      Q    All right.  And this is a question I

14  know the answer to, but you've given several

15  depositions, at least, in the past, correct?

16      A    I have; 20, 30.  I don't know what

17  the numbers are; somewhere in that range.  I

18  would think or more.

19      Q    And so you understand that you're

20  under oath here today?

21      A    I do.

22      Q    That your answers here today have the

23  same force as if we are in a courtroom with a

24  judge and jury?

25      A    Correct.

1     Q    Is there anything today that will

2   prevent you from giving me your full attention

3   and truthful and complete answers, whether

4   it's illness, medication, substances or

5   anything else?

6     A    No.

7     Q    And like I said, at any point we can

8   take a break as needed.  Just let me and your

9   counsel know, and we'll take breaks as

10   necessary.  Although, I will tell you in

11   advance that it's my practice to ask you after

12   every break who you talked to and what you

13   talked about during that break; any documents

14   you looked at during that break.  And there's

15   not necessarily the same expectation of

16   confidentiality during those breaks.  So even

17   if you talk to your lawyer, I might ask about

18   it, so just as a forewarning.

19         And one thing I know that you do well

20   is you wait until I'm finished my questions

21   before answering.  And I will try and extend

22   to you the same courtesy of waiting until you

23   finish before I ask the next question.  That

24   way, we'll have a cleaner record or

25   transcript.  All right?

1    A    Okay.

2    Q    And if I ask a question and you
3    either don't understand the question or my
4    question is vague or confusing, will you agree
5    to tell me that that's the case, rather than
6    just trying to answer it?

7    A    Yes.

8    Q    Thank you.  And, also, because we are
9    doing the deposition via Zoom, we can't see
10   the entirety of the room that you're in.  Is
11   there anyone in the room with you right now?

12   A    No one.

13   Q    And, similarly, we won't be able to
14   necessarily see if anyone tries to communicate
15   with you during this deposition, via hand
16   signal, by text messages, by whispers or a
17   slipped note or anything like that.  Will you
18   agree now to tell me if anyone tries to
19   communicate with you during this deposition by
20   those means or any other means?

21   A    I will.

22   Q    Thank you.  And approximately when
23   did you begin preparing for this deposition?

24   A    Yesterday, I guess.  You know, I
25   looked at a few documents and things like that

1  to prep.

2      Q    And other than your lawyer or

3  lawyers, did you talk to anyone to prepare for

4  today's deposition?

5      A    No.

6          THE COURT REPORTER:

7              I'm sorry.  What was that

8          response?

9          THE WITNESS:

10              No.

11 BY MR. MOST:

12      Q    And approximately how much time did

13 you spend preparing for this deposition,

14 total?

15      A    Not long, William; probably an hour

16 at the most, off and on a little bit.  As I

17 mentioned, you know, with everything else

18 going on in the department right now, I'm a

19 little bit preoccupied, so I didn't have a

20 whole lot of time to prepare.

21      Q    I understand.  You mentioned that you

22 looked at a couple of documents to prepare for

23 this deposition.  Do you have those documents

24 with you today?

25      A    I do.

1      Q    Could you tell me what those
2  documents are?
3      A    One is our response, the
4  interrogatory response that we submitted to
5  you guys.  And the others are a few notes that
6  I made, just kind of reminding myself of
7  things that we've done and things like that.
8  It's a couple of pages of handwritten notes.
9  That's it.
10     Q    Great.  I'm going the pull up what is
11 labeled Exhibit 6.  Are you able to see this
12 on your screen, Secretary?
13     A    No, I don't see anything, other than
14 what was already up there.
15     Q    You don't see a document up on the
16 screen?
17     A    No.
18     Q    Let me try that again.  Okay.  Does a
19 document pop up now?
20     A    No, I'm afraid not.
21          MR. MOST:
22               That's odd.  Drew, are you able
23          to see this document that I'm
24          sharing?
25          MR. BLANCHFIELD:

1          Yeah, it's on my screen, yeah.
2     BY MR. MOST:
3          Q    Secretary LeBlanc, do you see, like,
4     faces of the people in the Zoom on your
5     screen?
6          A    I do.  I see you.  I see myself.  I
7     see --
8               MR. VINING:
9                    Secretary, you want to holler at
10               Miss Debbie to come in there to see
11               if she can figure it out?  Because I
12               can see it.
13               THE WITNESS:
14                    Can I step out?  Is that okay?
15               MR. MOST:
16                    Yeah.  Secretary, while you're
17               at it, will you have her scan the
18               handwritten notes you have there, so
19               we can share those around, while
20               we're at it?
21                    (OFF-THE-RECORD DISCUSSION)
22               MR. MOST:
23                    Okay.  Let's go back on the
24               record.
25

1    BY MR. MOST:

2        Q    So, Secretary LeBlanc, do you see

3    what's labeled as Exhibit 6 that I've pulled

4    up on the screen?

5        A    I do.  I can see it.

6        Q    Is this the interrogatory response

7    you said was the document that you looked at

8    to prepare for today?

9        A    I believe it is, yes.

10       Q    So in addition to this document and

11   your handwritten notes, did you look at any

12   other documents to prepare for today's

13   deposition?

14       A    You know, I looked back at and real

15   briefly at my previous deposition in regards

16   to this issue that you and I had.  What was

17   that?  A couple of years ago, maybe?

18       Q    Yeah.

19       A    I looked at that.  That was about the

20   extent of it.

21       Q    In addition to your handwritten

22   notes, interrogatory response and your prior

23   deposition, did you review any documents to

24   prepare for today's deposition?

25       A    No.

1  Q Thank you.  I'll pull up on the

2 screen Exhibit 42.  Is this the deposition

3 transcript you're talking about, the May 2019?

4  A I'm sure it is, William.  I can't see

5 that, but I'm -- yes, that would have to be

6 it.  I can't imagine it being any other.

7 Yeah, that's it.

8  Q Okay. Great. One thing that will, I

9 think, accelerate today, I'm just going to go

10 quickly through some of your testimony from

11 this one and make sure it's still your

12 testimony today.  I think we can do that to

13 make sure that's your testimony.  This

14 deposition is also your testimony in the case

15 you're here for today.

16   Do you know what case you're here for

17 today, in a general sense?

18  A In a general sense, I do.  My

19 understating is this is a class action in

20 regards to over-detention.

21  Q Right.  So I'm just going to begin by

22 confirming that some of your -- well, let me

23 back up.  So you recall giving this deposition

24 in May of 2019?

25  A I do.

1      Q     And your answers during that

2   deposition were truthful and complete answers?

3      A     Yes.

4      Q     And so, generally, unless something

5   has changed in the intervening time, your

6   answers today to those questions would be the

7   same truthful and complete answers?

8      A     Yes.

9      Q     Great.  And so I'm going to go

10  through some of this fairly quickly to confirm

11  your testimony.  As Secretary of the DOC,

12  you're responsible for the inmates that's in

13  the custody of DOC, whether or not they're in

14  a state run facility, a parish run facility or

15  a private facility, correct?

16     A     Yes.

17     Q     When I say, "DOC," I mean the same

18  thing as the Department of Public Safety and

19  Corrections or DPS&C or the Department.  Would

20  you understand me if I use all of those terms

21  interchangeably?

22     A     Yes.

23     Q     And if the DOC has a legal duty to do

24  something with regards to an inmate, it's your

25  job as Secretary to make sure that happens,

1    correct?

2        A    Correct.

3        Q    It's the Department of Corrections'

4    duty to timely release inmates, correct?

5        A    Yes.

6        Q    The DOC is legally bound to release

7    inmates on their correct release date, agreed?

8        A    I'm not sure how I answered that the

9    last time.  Where is that answer?

10       Q    Yeah.

11           MR. BLANCHFIELD:

12               And let me just object to it to

13           the extent it calls for a legal

14           conclusion.  Object to the form of

15           the question; but, Secretary, can go

16           ahead and answer it.

17   BY MR. MOST:

18       Q    Yeah.  So, Secretary, do you see that

19   in your prior deposition, the question was:

20   "And the Department of Corrections is legally

21   bound to release inmates on their release

22   date, correct?"

23           And your response was, "Yes."  Do you

24   see that?

25       A    Okay.  Now I see it, yes.  Okay.

```
 1          MR. BLANCHFIELD:
 2               I need to point out that it
 3          looks like Mr. Evans agreed, but he
 4          objected to the form of the question
 5          as well back then.
 6   BY MR. MOST:
 7      Q    Subject to that same objection, I'll
 8   ask the question:  Secretary LeBlanc, the
 9   Department of Corrections is legally bound to
10   release inmates on their release date,
11   correct?
12      A    Yes.
13      Q    That is to say, the DOC is legally
14   bound to release inmates when their
15   judge-ordered sentence is complete, correct?
16          MR. BLANCHFIELD:
17               Object to the form.
18          THE WITNESS:
19               Yes.
20   BY MR. MOST:
21      Q    And when we're talking about release
22   date here, we mean the date they should be
23   released when the judge-ordered sentence is
24   taken into account, as well as good time and
25   jail credit, correct?
```

1     A     Yes.

2     Q     Some people sentenced to the custody

3  of the DOC are eligible for immediate release

4  on the day of their sentencing, correct?

5     A     Yes, that is correct.  And, actually,

6  could be overdue on their day of sentencing.

7     Q     So if it takes a week for the DOC to

8  calculate their sentence for those kinds of

9  people and they're not released until after

10  the DOC calculates their sentence, that person

11  has been held past the end of their sentence

12  for a week, correct?

13     A     Correct.

14     Q     The Department of Corrections has had

15  a problem with immediate releases, correct?

16     A     Well, yeah.

17           MR. BLANCHFIELD:

18                This Drew Blanchfield.  I'm just

19           objecting to the form.  The Secretary

20           can answer.

21           THE WITNESS:

22                So would you ask the question

23           again, William?

24  BY MR. MOST:

25     Q     Sure.  Subject to the same objection,

1  the question is:  The Department of
2  Corrections has had a problem with immediate
3  releases, correct?
4      A    Yes.  We've had a problem with
5  immediate releases with the definition of a
6  problem being that getting the appropriate
7  paperwork and documents that we need to
8  discharge people from, either the sheriff, the
9  judge, the clerk of court.  I just want to
10  make that clear that the problem is not just
11  the Department of Corrections, but other
12  agencies involved in the processing of time
13  comp.
14      Q    Yeah.  I understand you, Secretary.
15  And we'll get into more of that throughout
16  this deposition, questions about that.  I hear
17  you.
18           And the problem with immediate
19  releases that the Department has had is that
20  inmates have been held past the end of their
21  sentence, correct?
22      A    Correct -- well, the end of their --
23  not necessarily sentence, but being held past
24  their release date.
25      Q    Do you see on the screen Exhibit 42,

1    page 27.  In your prior deposition, you were

2    asked, Question:  "And the problem with

3    immediate releases is that people are being

4    held past the end of their sentence, correct?"

5           And the answer is, "Correct."  Do you

6    see that?

7       A    I did -- I do see that.

8       Q    Okay.

9       A    But I think I stipulated later on in

10   my testimony that -- that, you know,

11   "Sentence" is the incorrect word here, because

12   they haven't finished their sentence.  The

13   majority of these people are on parole,

14   getting out on good time and have more of

15   their sentence to do on parole.

16           MR. BLANCHFIELD:

17               Let me just point out, William,

18           that if you read the next line, it's

19           the same answer that the Secretary

20           gave in his deposition.  "People are

21           being held past their release date."

22   BY MR. MOST:

23       Q    Secretary, when you say, "Not past

24   their sentence," I think what I hear you

25   saying is:  People are eligible for immediate

1   release -- some inmates are eligible for

2   immediate release on the date of their

3   sentence -- on the date of their conviction

4   because of the application of good time,

5   although their full term of their sentence

6   will not yet be complete; is that what you're

7   saying?

8        A    Yes.

9        Q    And when we talked about good time,

10  we're talking about Louisiana statutes that

11  entitle inmates to the shortening of their

12  sentence, unless good time is removed,

13  correct?

14       A    Correct.

15       Q    And the good time statute, that's a

16  legal entitlement to inmates; it's not

17  discretionary.  That's something they're

18  entitled to unless they have good time

19  removed, correct?

20       A    I'm not sure I can answer that

21  question, "Entitled," because they have to

22  earn good time, you know.  It's 35 percent,

23  and they're given that time upfront.  But as

24  you mentioned, I think, in your statement that

25  -- or your question -- that unless it's

1    removed, because it can be removed.

2        Q    Right.

3        A    If they don't earn it -- if they --

4    for various disciplinary reasons, it can be

5    taken.  If that makes sense.

6        Q    It does.  So when we talk about "Good

7    time," that is something that is set up by the

8    state legislature and statute, correct?

9        A    Yes, it is.

10       Q    And so the problem that the DOC has

11   had with immediate releases is that people are

12   being held past their proper release date,

13   correct?

14       A    Correct.

15       Q    And at least by 2012, you learned

16   that the DOC had a systemic problem with

17   people being held past their release dates,

18   correct?

19       A    Correct.

20       Q    And the DOC still has that systemic

21   problem today, correct?

22       A    Well, I think that's a question --

23   "Systemic," that adjective may not -- I mean,

24   I think we've improved what we've done since

25   that date.  We still have issues, as we've

1   already discussed, with the proper paperwork

2   and those sorts of things that we've dealt

3   with.  But in a sense, we've done a lot of

4   reorganization.  We've got a lot of things in

5   that regard to help move things along a little

6   bit quicker, so it has improved.  It's not

7   where it needs to be.

8        Q    So the systemic problem you learned

9   about, at least as early as 2012, has been

10  improved but if not solved as of today,

11  correct?

12       A    Correct.

13       Q    It's a problem for one inmate to be

14  held past their release date, correct?

15       A    Yes, agree.

16       Q    And in 2012, you learned -- at least

17  by 2012, you learned that thousands of people

18  in the custody of Department of Corrections --

19  for whatever reasons -- were being held past

20  their release date, correct?

21       A    According to that report that we got,

22  that's what they said in that report, so, yes.

23       Q    Did you at any point learn anything

24  to suggest that that report was inaccurate?

25       A    Not -- no, I don't think "Inaccurate"

```
 1   is the word for it.  It didn't talk about the
 2   reasons why that people were being held past
 3   their release date.  I don't think there was
 4   enough said about the issues with the
 5   paperwork and those sorts of things, but --
 6   no, I have no reason to believe -- you know,
 7   that report was okay.
 8        Q    And when we talk about that report,
 9   we're talking about the Six Sigma report from
10   2012; is that right?
11        A    Yes.
12        Q    So you have -- you never had any
13   reason to doubt the accuracy of that report in
14   the way it characterized the scope of the
15   problem, although it may not have fully -- to
16   your opinion -- characterized the causes; is
17   that your testimony?
18        A    Yeah, that is.  And I think our
19   response to that report is an indication that
20   we thought the report was -- you know, it --
21   you know, in its recommendations, we followed
22   those recommendations and did everything we
23   could to improve that situation.
24        Q    And part of the problem identified in
25   that 2012 report was that:  "Many inmates were
```

1   being held past their release dates in part

2   because it was taking days or weeks for the

3   sheriffs to bring Pre-class Packets to the

4   DOC," correct?

5        A    Yeah.  I'm assuming that's in there.

6   I'm not looking at the report, William, but

7   I'm assuming that's part of it.  I mean, you

8   can't expect me to remember everything in that

9   report.  I'm sorry.  Yeah, I think that was

10  the gist of it.

11       Q    Okay.  Yeah, and this isn't a pop

12  quiz.  As you need to, we'll be pulling up

13  documents.  I'm not trying to test you.  My

14  question is, primarily -- my understanding is

15  that what this 2012 report identified was not

16  an idiosyncratic problem for this inmate or

17  that inmate; it was a systemic problem that

18  needed systemic solutions, correct?

19       A    Correct.

20       Q    And so then after this Six Sigma

21  report in 2012, the DOC took certain steps to

22  try and improve the problem identified in this

23  Six Sigma report, correct?

24       A    Correct.

25       Q    These are what we refer to as the

1  "Six Sigma Interventions," the recommendations
2  recommended by that report, correct?
3      A    Correct.
4      Q    And so -- and then after the Six
5  Sigma Interventions, the DOC still had people
6  being held in average of about two months past
7  their release date, correct?
8      A    I don't know what those numbers are,
9  William.  But, you know, I would have to
10 assume that -- you know, what you're saying is
11 correct, but I don't know.
12     Q    Sure.
13     A    I honestly don't know the answer to
14 that.
15     Q    So looking at your 2019 deposition
16 here on pages 44 to 45, you see that the
17 question was:  "After the Six Sigma
18 Interventions, we've still got people being
19 held an average of about two months past their
20 release a date, correct?"
21          And your answer was, "Correct."
22 That's your testimony today, as well?
23     A    Yes.  I don't see any reason why that
24 would change.
25     Q    And then in 2019, there were still

1   about 200 people per month being held past

2   their release date for an average of 49 days

3   per person, correct?

4        A    I'm just looking at what you're

5   showing me.  I basically said, "Correct."  So

6   I'm assuming that is correct.

7        Q    So that's your testimony today, as

8   well?

9        A    Yeah, I'm not sure today what that

10  number is.  But at that point in time, that's

11  what the number was.

12       Q    Right.  Okay.

13       A    I don't know whether that average has

14  gone down since that time, but I'm assuming it

15  probably has.

16       Q    Okay.  And to your knowledge, has

17  anyone at the DOC at any time from 2012 to the

18  present been fired, demoted, disciplined, had

19  their pay docked or in any way had any other

20  sort of discipline as a result of this problem

21  of inmates being held past their release date?

22       A    So, I know my answer.  I think, if I

23  remember right, was that I didn't think

24  anybody had.  But I think, as we went on in

25  this process, I think that there were -- there

1    have been some disciplinary action taken in

2    some regards.  And some of it -- I'm not

3    exactly sure, William, what that is, but I

4    think there was some discipline action taken

5    somewhere along the line.  With -- actually, I

6    think it was more about releasing too early,

7    rather than releasing after the release date.

8    So I don't know that I'm really the person to

9    answer that.

10         Q    Okay.  Who at the DOC knows that

11   best?

12         A    Probably -- you know, I think Derrick

13   or Seth would be the two people -- you know,

14   they supervise those sections, at the time.

15   Derrick doesn't any more, but did at the time.

16   And I would assume those -- and Angela

17   Griffin, those are the people that manage that

18   section.  I'm assuming they were managing at

19   that time.

20         Q    Okay.  Would that be Derrick Ellis,

21   Seth Smith and Angela Griffin?

22         A    Right.

23         Q    And I think you're right.

24         A    Wait, wait, wait.  William, I'm

25   sorry.  But also you have institutional staff

1    at each facility that do the state facility

2    processing in addition to Wade Correctional

3    Center, where our north Louisiana processing

4    facility is.  So you have -- you have those

5    people that may have been involved if there

6    was some disciplinary action.  And I don't

7    know the names of the direct supervisors of

8    those areas, but the wardens at those

9    facilities would be ultimately responsible.

10        Q    I think you're right.  I think the

11   DOC did mention that some people had been

12   disciplined for releasing inmates too early.

13   So it's my understanding that you're saying,

14   some DOC staff members may have been

15   disciplined for releasing inmates too early,

16   but you don't know of any discipline of any

17   kind for any DOC inmate for releasing inmates

18   after their correct release date.  Is that

19   true?

20        A    Yeah.  I mean, I don't know of any.

21   So that doesn't mean there hadn't been any,

22   but I don't know of any.

23        Q    Yeah, I got you.  I'm going to pull

24   up Exhibit 41.  Do you recognize this document

25   here; have you ever seen this before?

1        A     You know, I don't think I have,

2    William.  I don't -- offhand, I don't

3    recognize it.

4        Q     This is a document that we received

5    from the Department of Corrections.  Do you

6    see here on page 2 there's a chart and the

7    yellow line says, "Total sentence length."  Do

8    you see that?

9        A     I do.

10       Q     Do you see that in the upper right

11   there's an arrow that's labeled,

12   "Over-detention"?

13       A     Yes.

14       Q     And do you see that that arrow is

15   pointing to the time in excess of total

16   sentence length?

17       A     Yes.

18       Q     Okay.  And that's incorporating good

19   time.  Do you see that's the red part or

20   orange?

21       A     Right.

22       Q     Okay.  So does this reflect the

23   Department of Corrections' understanding of

24   what over-detention is?

25       A     I really can't answer that.  I mean,

1    you know, that -- somebody else needs to

2    answer that, William.  I can't.

3         Q    Okay.  Does it reflect your

4    understanding of what over-detention is,

5    which -- by which, I mean over-detention being

6    time an inmate has been incarcerated past the

7    end of their sentence, once good time is

8    incorporated?  Is that your understanding?

9         A    Yes.

10        Q    Okay.  So we're going to go through

11   the timeline a little bit.  We covered it with

12   you some before, but we received more

13   information that fills in the story a little

14   bit, so we'll be asking about that.  I'm going

15   to be pulling up Exhibit 32.  Do you see that

16   that this is one of the early documents from

17   the -- as part of the Six Sigma investigation?

18        A    I really don't recognize that.  I

19   mean, I don't recognize the document.  I mean,

20   you know, like I said, I haven't looked at the

21   Six Sigma document in quite some time.  So if

22   it is part of it, I'm assuming it is.

23        Q    Okay.

24        A    I can't --

25        Q    No reason to think that this is not

1    part of the Six Sigma?

2        A    No, no reason.

3        Q    And it's got your name on it as

4    Project Champion.  I understand you don't

5    recall this particular document, correct?

6        A    No.  You know, I think we talked

7    about in the last -- when I did my deposition

8    before that.  Those titles are a little bit

9    simulations that we were okay with the

10   project.  But we didn't -- when I say, "We" --

11   we've got three on there -- you know, we

12   really weren't that involved in this project.

13   They did the project on their own.

14       Q    I understand you weren't involved in

15   the day-to-day grunt work of this Six Sigma

16   Project, but you at least, you know, sort of

17   approved the investigation of the problem and

18   then you saw the results when it was complete,

19   correct?

20       A    Yes.  Let me -- when you say

21   investigation of the problem, that's not what

22   that was.  I want to make that real clear.

23   When they came to me -- "They" being the

24   Division of Administration -- had Six Sigma

25   Projects going on throughout the state.  And

1   they came -- the Six Sigma Project was with
2   Public Safety with State Police.  They
3   finished that project and they came to me to
4   see if there's anything we wanted to look at.
5   And we all know that time comp is a very
6   complicated process.  So I said:  Why don't
7   you look at that area of our department and
8   see how we can improve time computation.
9   Well, that led to where we are today, in a
10  sense, for over-detention.  But that was not
11  an investigation into over-detention.  We had
12  -- that's when it was brought to our
13  attention, that we had that issue going on.
14  So, anyway, I want to make sure everybody
15  understands that.
16      Q    Sure.  So in this document here that
17  we're looking, Exhibit 32, the "Problem
18  Statement," the first sentence says:  "Today,
19  the DOC Pre-class backlog leads to an
20  unacceptable number of immediate releases."
21  Do you see that?
22      A    I do.
23      Q    So part of the problem that the Six
24  Sigma Project was to investigate was the
25  unacceptable number of immediate releases,

1    correct?

2        A    Once they determined that that

3    existed, yes.

4        Q    Okay.

5        A    That was part of their process.

6             THE COURT REPORTER:

7                 I'm sorry.  You're talking about

8             the Six -- what --

9             MR. MOST:

10                We're saying the words, "Six,"

11            like the number six, S-I-X.  And then

12            we're saying, second word, "Sigma."

13                Is that your understanding as

14            well, Secretary?

15            THE WITNESS:

16                Yes.

17            THE COURT REPORTER:

18                Thank you.

19   BY MR. MOST:

20       Q    Now, we're going to move forward in

21   time to 2014.  We're looking at Exhibit 31.

22   Can you see that, Secretary LeBlanc?

23       A    Yes.  I can't read the print, the

24   small print, but I see it.

25       Q    Yeah.  We'll zoom in as necessary.

1    Do you see that this is a Louisiana
2    Performance Review from 2014?
3         A    Yes.
4         Q    Is this a document that you're
5    familiar, this kind of document?
6         A    Not really.  I'm not sure what that
7    is.  It says, "Health and Hospitals," so I
8    don't know --
9         Q    Yeah.  If we go down, it also covers
10   the Department of Public Safety and
11   Corrections.  Do you see this?
12        A    Yeah.
13             MR. BLANCHFIELD:
14                  Can we identify this document?
15             I don't see a Bates stamp, so I
16             didn't produce it.  Do you know where
17             it came from?
18             MR. MOST:
19                  I think y'all did produce it.
20             It's Exhibit 31.  We can track down
21             where it came from, certainly.  I'm
22             pretty sure it came from production
23             in Humphrey.  I don't know why it's
24             not Bates stamped.
25             MR. BLANCHFIELD:

```
1              We don't send out documents

2         without a Bates stamp.  But it looks

3         pretty -- it looks fairly genuine.

4    MR. MOST:

5              I can guarantee I did not

6         generate this document.  I can tell

7         you that.

8    BY MR. MOST:

9    Q    Does the Department of Public Safety

10   and Corrections participate in periodic

11   performance review with other agencies like

12   this, Secretary?

13   A    You know, if we do, I'm not aware of

14   it.  Performance Review, is that by the

15   legislative auditors?  I'm not sure where

16   that's coming from, honestly.

17   Q    Okay.

18   A    I don't recognize it.  It's probably

19   a statewide document, because it has all the

20   agencies on there.  I assume.

21   Q    Yeah.  Do you see lower down on

22   page 1 under "Department of Public Safety and

23   Corrections," one of the issues here is

24   identified as "Stricter adherence to inmate's

25   good time rerelease dates."  Do you see that?
```

1      A    Yes.

2      Q    So assuming this is a document that

3 DOC had input on, does this document suggest

4 that adherence to inmate's good time release

5 dates were still an issue in 2014?

6      A    I would assume it would, yes.

7      Q    I'm pulling up Exhibit 36 here.  Do

8 you see this document that says at the top

9 "Governor's time calculation talking points"?

10     A    I do.

11     Q    Is this a document that you're

12 familiar with?

13     A    No, I'm not.  Maybe I should be, but

14 I'm not.  It's probably something that we

15 prepared at some point in time for the

16 governor in relation to -- you know, our

17 communication staff put together for the

18 governor at some upon with his staff.

19     Q    Okay.

20     A    I assume.  I'm not sure.

21     Q    Yeah.  You see at the bottom of

22 page 1 and page 2, it talks about the process

23 for releasing inmates?

24     A    I assume it does, William.  I'm

25 struggling seeing.

```
 1       Q    Yeah.  At any point today, if you
 2   can't read it, will you just tell me to zoom
 3   in.  Would you agree to do that?
 4       A    Yeah.  I need you to zoom in where
 5   you're referring to.  Is that the shaded area?
 6       Q    Yeah.  Do you see the shaded area?
 7       A    I do.
 8       Q    Do you see it talks about the steps
 9   of releasing an inmate.  And then it says,
10   quote:  "Once all these steps are completed,
11   the Certificate of Release is issued and then
12   the offender may be released, which may take
13   up to 90 days."
14       A    Yeah.  Just from my standpoint --
15   and, look, I'm not in weeds with this,
16   obviously.  You know, 90 days -- you know, if
17   it is an average of 90 days, we get a lot of
18   people in our department that have a lot of
19   time to do.  And, you know, they may get put
20   on the side, and we're dealing with these
21   immediate releases and all the things that
22   have to happen today.  And some of that
23   average may -- that has an impact on the
24   average, I would think.  That's kind of an
25   overall average and doesn't necessarily mean
```

1   that everybody that's immediate release is

2   over 90 days.  I'm trying to make myself clear

3   here.

4           We figure time for a lot of people,

5   obviously.  We've got a lot going on.  We're

6   releasing a lot of people.  We're bringing in

7   a lot of people and there's a lot of stuff

8   going on.  It's not just those ones that are

9   immediate releases that we're talking about

10  here in this case.

11      Q    I understand.  And so this may not be

12  an average, but at least the DOC anticipates

13  that may take up to 90 days for at least some

14  of inmates.  That's sort of the ballpark that

15  the DOC anticipates for processing release for

16  at least some inmates, correct?

17      A    Yeah, I mean -- but, again, it's not

18  the time that it takes.  When an immediate

19  release hits us, we're working on it every

20  day.  It's not the same.  But anyway.

21      Q    Do you have a sense of how long it

22  takes when an immediate release hits the DOC?

23      A    Again, I refer back to some of the

24  people that you probably already deposed or

25  going to depose; people that are in that

1   department that are in the -- you know, I

2   don't know what that number is today.  I

3   don't.

4       Q    Have you asked for any assessment of

5   what that number is today or recently?

6       A    Not recently, William.  Again, I've

7   been dealing with COVID for two years.  I've

8   got a lot going on in this department right

9   now.  We're giving this priority.  We're doing

10  a lot of different things.  I'm not going to

11  get in all the weeds with you on all of the

12  things we're working on for this issue.  We

13  understand the issue.  And we are working hard

14  on getting us where we need to be.  I can't

15  say more than that.  That's my priority is

16  getting us where we need to be.

17      Q    It's your testimony that it's your

18  priority to get it to the point where inmates

19  are released on their release date?

20      A    Correct.  I think that's all our

21  priority.  I don't think there's any question

22  about that.  We all need to be there.  But

23  there's a lot of work to do to get us there

24  with these other agencies that are also

25  involved in this issue.

1    Q    And we will go -- during this
2    deposition, we'll go through some of the
3    things that the DOC says it has done to try to
4    get there.  But it's safe to say that the DOC
5    is not there yet in terms of systemically
6    releasing inmates on their release date,
7    correct?
8    A    I think, as I said earlier, I'm not
9    sure systemic is still the definition of the
10   problem that we have.  Because I think it has
11   improved.  No, we're not where we need to be.
12   Q    And when you say, "We're not where we
13   need to be," is it fair to say the DOC is not
14   currently consistently releasing inmates who
15   are eligible for immediate release upon
16   sentencing within a day or two days of their
17   sentencing; is that fair to say?
18   A    I'm not sure if one or two days is
19   the -- you know, if I can say that or not.  I
20   can say that we still have issues with
21   immediate releases, so -- I mean, I don't know
22   what the day number is.  But I know they work
23   on it every day.  If there's an issue with a
24   case, they are working on that case every day.
25   Q    Moving to 2015, do you see that this

1    is email correspondence between you and Raman

2    Singh.  This is Exhibit 44.

3         A    Yeah, I see it.

4         Q    And do you see that on April 1st,

5    2015, Dr. Singh wrote to you talking about

6    release of inmates saying, "So many times many

7    of them become eligible for an immediate

8    release once all the credits are computed.

9    Not sure how they will be held back for

10   medical testing."  Do you see that?

11        A    Number 2?

12        Q    Yeah.  And he's talking about testing

13   inmates for diseases before they're released

14   from DOC custody, correct?

15        A    I'm not sure which testing he's

16   talking about.  I'm not sure if this wasn't in

17   the middle the Hep C project, which was --

18   yeah, "Hepatitis panel," see that at the top?

19        Q    Yeah.

20        A    That's Hep C testing.  That something

21   that -- to elimination of Hep C for the state,

22   which was a statewide project outside of the

23   Department of Corrections to include the

24   Department of Corrections.  So testing at the

25   state level was easy enough.  But testing at

1  the local level on discharges was going to be
2  challenge for us there.  We're not even there
3  yet.  COVID has pretty much put that project
4  on hold until we get -- the testing part is
5  for Hep C.
6      Q    So testing was done of inmates before
7  they were released for at least Hep C,
8  right -- or was that the plan?
9      A    Yeah.  That was the goal, to get
10 everybody tested before they released and
11 treated upon -- if they're released, then
12 treated on the outside to cure Hep C.
13     Q    And so in April of 2015 Dr. Singh was
14 saying there's a problem because so many
15 inmates are immediately eligible for release,
16 it's hard to test them for Hep C before they
17 are released?  Is that what he's trying to
18 communicate?
19     A    Yes, that's right, which means we
20 need to look at the parole option.  When they
21 get out on parole, then we need to know that
22 they need to be tested when they hit parole in
23 the private sector.
24     Q    So this immediate release problem
25 that had been identified was not only an issue

1  of finances and liberty; it was also a public

2  health issue, as well, agreed?

3      A    You know, I don't know I would agree

4  with that.  This is an issue that's been

5  ongoing since the beginning of time.  Nothing

6  has really changed.  Everybody at the local

7  level is discharging without testing currently

8  and then, period.  This is an improvement on

9  what we were doing.  So immediate releases --

10 you know, you can look at it either way.  I

11 mean -- you know, it would -- immediate

12 release has become a challenge, a challenge

13 that we would address to test them when they

14 get to the parole -- get to their parole

15 office and working out that testing when

16 they -- you know, in the private sector

17 through Medicaid or Medicare.

18     Q    Okay.  Is it fair to say that this

19 immediate release problem at least caused

20 challenges with regard to public health that

21 had to be addressed?

22     A    Yeah.  I mean, I think that Hep C is

23 a public health challenge for everyone.

24 Curing Hep C in the state is a challenge.  I

25 don't know that I would intermingle immediate

1   releases with a public health issue, in my

2   opinion.

3       Q    Well, it seems that Dr. Singh was

4   indicating that there were public health

5   implications of the immediate release problem,

6   agreed?

7       A    That was his opinion, but he doesn't

8   understand the process of what we can do to

9   meet that challenge.  That's on me.

10      Q    It's on you to address the challenge

11  of immediate releases, is that what you're

12  saying?

13      A    Immediate releases and that they get

14  tested on parole, because the Parole Division

15  is under me.  If I may, this is with

16  pretrials.  Same difference.  So it's a

17  challenge on all aspects of prison population

18  getting out, no matter where you are.

19      Q    Okay.  I'm pulling up here Exhibit

20  46.  Do you see that this was correspondence

21  between you and -- in 2016 -- between you and

22  directorlaclerks@yahoo.com.

23      A    I don't know what -- I have no idea

24  what that is.

25      Q    Maybe I can refresh your

1   recollection.  Do you recall that in 2016 you

2   met with Debbie Hudnall, who is the Director

3   of the Clerk of Court's Association?

4      A   Yes, I don't when it was, but I do

5   know that I met with her more than once.

6      Q   And you discussed with her issues

7   surrounding inmates being released after the

8   release dates and the DOC trying to get the

9   paperwork to speed that up; is that correct?

10      A   Yes.

11      Q   And with that sort of refreshed

12   recollection, does this appear to be an email

13   you sent to Debbie Hudnall following that

14   meeting?

15      A   It looks like it is, yes.  The reason

16   why it throws me off, because that format is

17   different than what I'm used to seeing on my

18   emails.  But, anyway, go ahead.

19      Q   Yeah.  I understand you.  Do you see,

20   Secretary, under Number 2 in your email here,

21   you wrote:  "We will look at the feasibility

22   of receiving the UCO and Bill of Information

23   documents electronically from the Clerks"?

24      A   Yes.

25      Q   Did the DOC investigate the

1   feasibility; did they do any sort of
2   feasibility report on that?
3        A    You know, we looked at that.  And I
4   think when we started looking at it, my
5   understanding -- and, again, staff were doing
6   that.  I wasn't doing it.  My understanding is
7   that everybody was in such -- you know, on
8   such different -- each of Clerk of Court -- I
9   think some of them were similar, but the
10  majority of them were different -- different
11  software systems that they were using at their
12  facilities, which -- the electronic part made
13  it almost impossible to accomplish that -- I
14  think -- I don't remember the date of the
15  application for the grant, but that was part
16  of my application is to go to a web-based
17  process and that would be a lot easier to do.
18  I think ultimately that's what came out of
19  that, is that promoting a web-based process
20  that we could use to communicate -- not just
21  with the Clerk of Courts, but with the
22  sheriffs and anyone else that's involved in
23  the process; but mainly the Clerk of Courts
24  and the sheriffs and the judges.  But, again,
25  we didn't get the award for the grant -- I

1    forget how much it was.  But, I mean -- and
2    that's something we're continually looking at
3    to do.  Hopefully, we'll get that.
4        Q    Okay.  So in 2016, it was suggested
5    that one way things could be speeded up is
6    that the Clerk of Courts to send documents
7    electronically to the DOC, right?
8        A    Yes.
9        Q    And you're saying that to respond to
10   that suggestion, the DOC applied for a grant
11   from the U.S. Department of Justice?
12       A    I'm not sure if that's who it was.
13   It was -- I'm not sure who we applied for.  It
14   could have been Justice.
15       Q    But it was to the federal government,
16   right?
17       A    Yes.
18       Q    So to respond to this proposal of
19   sending documents electronically, the DOC
20   applied for a grant to the Federal Government,
21   correct?  And that was in 2019?
22       A    Yes.  Somewhere in that neighborhood.
23   I don't know the date.
24       Q    So after the suggestion was made in
25   2016, a couple of years went by, and then the

1    DOC applied for a grant and did not get it,
2    correct?
3        A    Yes.  In addition to trying to get
4    everybody on the same page with a Uniform
5    Commitment Order, I think was part of it, too.
6    And that, we passed a statute.  I don't know
7    what the date of that was, that everybody has
8    to use the Uniform Commitment Order.  But,
9    again, judges have a tendency not to want to
10   use the Uniform Commitment Order, for whatever
11   reason.
12       Q    Do you see on Exhibit --
13       A    I guess my point is, William, is that
14   I don't want you to think that from 2016 to
15   2019, we thought about it again.  Because
16   that's not the case.  There's a lot of work
17   going on trying to improve this and, you know,
18   just to pull out certain segments here and
19   make it look like -- to me, anywhere -- it
20   makes it look like:  Well, 2016, we had his
21   meeting, but then in 2019, we applied.  That's
22   not exactly how that worked.  There was a lot
23   going on in between that time.
24       Q    I understand, Secretary.  And we'll
25   go through your interrogatory response that

1    summarizes all the things that you've done to

2    mitigate this.  Certainly, you'll have an

3    opportunity to go through all the things you

4    think have been done in an attempt to mitigate

5    this problem.  But let me ask you this:

6    Specific to this proposal to electronically

7    transmit documents from clerks to the DOC, was

8    anything done between 2016 and the grant

9    application in 2019?

10        A    Yeah, I think, you know -- we were

11    trying to working with Debbie Hudnall on --

12    y'all say we have problems.  Where are the

13    problems.  She said, what parishes?  And very

14    honestly, they -- I mean, they were difficult

15    to work with.  And I don't know whether just

16    because it's so many different players in this

17    Clerk of Courts thing.  But very difficult to

18    work with.  I don't know why.  I can't answer

19    that.  That's a better question for them.  I

20    don't know why they're not at this table

21    sitting here with me.  But, anyway, we did

22    everything within our means to get -- to

23    communicate and try to get this right.  And,

24    you know, to establish -- and I think

25    ultimately we did find out the Parish -- the

1   clerks that were our biggest problems, and we

2   sent that to them.  And my understanding,

3   again, is that we never heard back from them

4   until, you know, way after our request, if we

5   did hear back from them.  Again, I'm not the

6   weeds with that.  I wish I could be a better

7   respondent to that.  At this point, I know our

8   staff is working hard on trying to make things

9   meet our obligations here.  It's not like we

10  ignored it.

11       Q    Do you see on Exhibit 46 under 3, you

12  wrote about -- that you would develop an

13  action plan?

14       A    For the ten parishes; is that the one

15  you're talking about?  Yeah, that's what I was

16  just referring to.

17       Q    Okay.  Did you --

18       A    That's the part I'm talking about is

19  trying to identify those with the biggest

20  problem.  And to do that -- the problem was

21  between the sheriffs and the clerk of courts,

22  because they go to them.  So we had to go

23  through the sheriffs to get -- I mean, it's

24  just real complicated.  I mean -- I wish I

25  could explain it better, but I can't.  You've

1   got the sheriffs, the check of courts and
2   you've got the judges, and all three of team
3   -- I said that in my testimony, I believe in
4   the last time we did this.  I have no control
5   over these people.  I do everything I can.  I
6   met with them.  You know, I don't know what
7   else we can do.  We send the committees.
8   We've been to the legislature.  We've had task
9   force.  You know, we've done all that.  And it
10  goes nowhere.  But here I am.  Here the
11  Department is.
12      Q    And I think I understand --
13      A    I'm frustrated.
14      Q    Yeah, I hear your frustration.  I
15  understand the mechanics of this.  I
16  understand that a sentence is issued by a
17  judge.  It's recorded by a clerk of court.
18  It's --
19      A    A judge that won't use a Uniform
20  Commitment Order, a clerk of court has
21  resistence in even correspondence with us, for
22  whatever reason.  And then the sheriffs who --
23  you know, we do everything we can to work with
24  them.  A lot of times it's not their fault
25  because they can't get the documents to send

1    to us.  Just the jail credit letter for the

2    sheriffs is their problem.  But, anyway, yes.

3         Q    So the documents go from the judge to

4    the clerk to the sheriff to the DOC under the

5    way it's currently set up.  And you're saying

6    because of that, it's kind of out of the DOC's

7    hands to improve the situation; is that your

8    testimony?

9         A    Without -- you know, it's part of my

10   testimony, in that sense.  But at the same

11   time, you know, we met with all of those

12   parties in trying -- just from this

13   document -- trying to get people moving in the

14   right direction.  And we have made some

15   progress.  But, again, as we're already talked

16   about, we have a ways to go.

17        Q    So under Section 3 here in your email

18   in Exhibit 46, it talks about developing --

19   the DOC developing an action plan.  Do you see

20   that?

21        A    Yes.

22        Q    Did the DOC ever develop that action

23   plan?

24        A    I'm not sure.  I know that Angela in

25   my office -- Whitaker -- was working on it.  I

1  think we did determine what areas were the

2  problems with ten parishes.  Where we went

3  from there, I'm not real sure.  I think COVID

4  probably got us a little disoriented, maybe

5  distracted, to some extent here.  But I don't

6  know the answer to that.  I know we were

7  getting responses on finding parishes that --

8  the clerks that were the biggest problems.

9       Q    I pulled up Exhibit 47.  Do you see

10  that this is a response from your counsel to

11  request to produce the action plan and the

12  response is that:  "There are no responsive

13  documents to the request to produce the action

14  plan."

15       A    And what is that the date of that?

16       Q    2020, October 23rd, 2020.

17       A    Okay.  So I guess there isn't any.

18  Who responded to that?

19       Q    Phyllis Glazer.

20       A    Okay.

21       Q    So you don't know of any action plan

22  that was created -- as you described in your

23  2016 email to Debbie Hudnall, correct?

24       A    No.  I don't know of any action plan

25  that was created.  That was my answer.  I

1  thought we got to the bottom line of where we

2  thought the bigger issues were, but maybe we

3  didn't do that, either.

4     Q    Moving forward -- this is Exhibit 49.

5  Moving forward to 2020.  Do you see this is --

6  does this appear to be an email that you sent

7  in February of 2020?

8     A    It looks like it is.

9     Q    And in this email, it refers to a

10 meeting you had about paperwork processes?

11    A    Uh-huh.

12    Q    And you asked for numbers related to

13 immediate releases and the cost of

14 over-detention?

15    A    Yes.

16    Q    So this reflects that in February of

17 2020, you understood that there was still a

18 problem with the DOC's over-detention, right?

19    A    Yes.  I mean, I guess I was looking

20 for how big is the problem at that point in

21 time?  I'm not sure.  Do you have the answer,

22 too?

23    Q    We do.  Response was -- someone

24 asking if this information had been provided?

25 And then I'll show you Exhibit 50, which are

1  responses to -- do you see that this is us

2  asking for -- this is plaintiff's counsel

3  asking for any documents responsive to your

4  request in that February 2020 email?  The

5  response is:  "There were no documents."  Do

6  you see that?

7       A    I do.

8       Q    Okay.  So it appears that you did not

9  actually obtain answers to those questions in

10 your email, correct?

11      A    Evidently not.

12      Q    And you didn't follow up to get those

13 answers subsequently, did you?

14      A    Must not have.

15      Q    So shifting gears a little bit, I

16 want to talk about the Basic Jail Guidelines.

17 Are you familiar with what those are?

18      A    Yes.

19      Q    I'm looking at Exhibit 34 here, I've

20 pulled up.  This is Basic Jail Guidelines

21 dated April 25, 2019.  Is this the current

22 version of the Basic Jail Guidelines?

23      A    I'd have to say it is.  I'm not sure.

24      Q    And the Basic Jail Guidelines are a

25 contract between the Department of Corrections

1    and the sheriffs across Louisiana, correct?

2        A    Yes -- no.  It's not a contract.

3    It's just guidelines.

4        Q    Right, they're guidelines for -- if

5    the sheriffs are going to hold DOC inmates in

6    their local prisons, they have to adhere to

7    these guidelines, correct?

8        A    Correct.

9        Q    And if they don't adhere to these

10   guidelines, they can't hold DOC inmates,

11   correct?

12       A    That's not exactly correct.  I mean

13   -- yeah, that's correct.

14       Q    Okay.  So these guidelines

15   essentially reflect a deal that the DOC has

16   with the sheriffs, that you can hold DOC

17   inmates and be paid for it, but you have to

18   follow these guidelines, correct?

19       A    Yes.

20       Q    And the DOC pays the local sheriffs

21   for each day they hold an inmate who's been

22   sentenced to the custody of the DOC, correct?

23       A    Correct.

24       Q    Turning to page 17 of these Basic

25   Jail Guidelines, do you see that this --

1    A    I can't see that.

2    Q    Sure.  Let me zoom in.  Do you see
3 this page 17, Section 2-A-0008?

4    A    Yes.

5    Q    And do you see that this section of
6 the Basic Jail Guidelines discusses that
7 sheriffs are to transmit Pre-class paperwork
8 to the DOC?

9    A    Yes.

10    Q    But I don't see anything that talks
11 about a timeline for when the sheriffs are
12 required to do so, do you?

13    A    No.

14    Q    The DOC could put a provision in
15 these Basic Jail Guidelines requiring the
16 sheriffs to provide the Pre-class Packets
17 according to a certain timeline, correct?

18    A    Yeah, we could.  But I'm not sure,
19 you know, like a Bill of Information and court
20 minutes, we can put a timeline on them, but
21 then they've got the issues with the courts.

22    Q    Okay.

23    A    Hen we get into the issue of who's at
24 fault here.  And you start deducting from the
25 pay.  That becomes an issue.  But anyway.

1      Q     Okay.  It sounds like what you're
2   saying is you could put a timeline into these
3   Basic Jail Guidelines and deduct from
4   sheriffs' pay if they don't adhere to it,
5   although you then have to figure out whether
6   it was ultimately their fault, correct?
7      A     Correct.
8      Q     But you haven't put that in the Basic
9   Jail Guidelines, have you?
10     A     No.
11     Q     In fact, when you were asked about
12  this at a deposition, you said there was no
13  reason why you couldn't do it, correct?
14     A     No, I don't think there's any reason,
15  other than what I just said.
16     Q     Putting such a timeline into the
17  Basic Jail Guidelines would -- could help
18  mitigate the problem of people being held past
19  their release dates, correct?
20     A     I'm not sure it would, because I
21  don't know -- I mean, the problem is with the
22  judges and the clerk of courts.
23     Q     At the very least, it would
24  incentivize the sheriffs to speed up their
25  process, correct?

1     A     The jail credit letter.

2     Q     Putting in a timeline with

3 consequences for the sheriffs for not adhering

4 to the time lime, would it -- at the very

5 least, it would help speed up the whatever

6 part the process the sheriffs are responsible

7 for, would you agree with that?

8     A     You'd have to ask the sheriffs that.

9     Q     You don't think it would do any good

10 at all to include a timeline in the Basic Jail

11 Guidelines?

12     A     I think that would cause -- when you

13 do something like that, then you've got to

14 determine:  Well, who hadn't submitted?  Who

15 submitted?  Did they submit?  You've got

16 accounting issues.  It becomes a nightmare to

17 try to enforce that.  We already have enough

18 to do.  So, I mean, now we're going to create

19 another problem of deciding who hadn't

20 submitted; did they submit.  Is it their fault

21 or is it the judge's fall?  Have the judges

22 sentence gotten -- you know, there's a lot of

23 issues with that, William, that it's not that

24 simple.  I wish it were, but it's not.  I just

25 think that would be creating another problem

1   for us to deal with.  It wouldn't cure it, the

2   issue.

3       Q    You don't think it would mitigate the

4   issue?

5       A    I don't.

6       Q    But at the very least, the DOC does

7   have influence over the way the sheriffs

8   handle Pre-class paperwork, because the DOC

9   sets the terms of how that works in the Basic

10  Jail Guidelines, correct?

11      A    Yeah, I mean, we -- that's right.  We

12  go in and do our audits, our annual audits.  I

13  haven't seen any reports to say that they

14  aren't keeping up as best they can.  You know,

15  if you have a file that's -- like the one you

16  just referenced, that file doesn't have

17  anything in it that they're supposed to, what

18  they're going to say is:  The judge hadn't

19  sent it to us.  You know, we don't have those

20  documents yet.  So -- yeah, I mean, we can do

21  the best we can and try to enforce that.  It's

22  an issue with the other parties involved,

23  which is two; clerk of courts and the judges.

24      Q    You talked about not seeing any

25  audits saying the sheriffs had timeliness

1   problems.  Does the DOC audit --

2       A    Not timeliness problems; problems

3   that their files weren't complete.  In other

4   words, when we go in and audit, we look at the

5   files.  We look at their files.  They have to

6   have files on these guidelines, each

7   guideline.  So they go to the file and see if

8   they have what they're supposed to have in it

9   for that inmate.  If that's not in there,

10  chances are, what their response is going to

11  be is, they don't have it.  I hadn't gotten it

12  yet.  So, you know, there may be a comment in

13  the audit that says that, but I haven't seen

14  any of that.  I try to read all the audits as

15  best I can.  There's 104 jails out there that,

16  you know -- we try -- I try to keep up with as

17  best I can.

18      Q    But there's no auditing of how

19  quickly the process moves with the sheriffs

20  handling Pre-class paperwork, because there's

21  no timeline --

22      A    No.

23      Q    Right.  Okay.  I'm going to pull up

24  Exhibit 6 here.  Do you see this document

25  here, Secretary?

1    A    I can't read it.  Okay.  Yeah.  Okay.

2    Q    Is this the same document that you've

3  got in front of you on the table?

4    A    Yes.

5    Q    That way you can follow along with

6  the document in front of you --

7    A    Okay.

8    Q    -- which may be easier.  Turning to

9  page 3.  Do you see that Interrogatory Number

10  10 asks:  "Identify all steps you've taken

11  since be January 1st, 2012 to mitigate or

12  prevent the risk that prisoners in the custody

13  of DOC will be detained beyond the date on

14  which the DOC's legal authority to detain a

15  prisoner expires."  Do you see that?

16    A    Yes.

17    Q    And on the next page, you give your

18  answer to that, right?

19    A    Correct.

20    Q    And interrogatories like this need to

21  be verified, i.e., the witness has to say

22  under oath that they're truthful and complete.

23  I don't think we got the verification page for

24  this.  So would you look at that page with

25  your answer and see if it looks truthful and

1   complete to you?

2       A    Actually, as I read through this, the

3   one part -- during the '21 session, I'm not

4   sure if they're two separate bills.  I'm only

5   aware of one bill, which is House Bill 603,

6   which didn't make it.  And that was

7   Representative James who actually substituted

8   for a task force, which we never caught.  So

9   if there's another one, I'm not aware of it.

10  There may be.  I'm just not aware of it.  As

11  far as completeness, there are other things

12  that we have done that aren't on here -- that

13  I think we've done, anyway, that -- so it's

14  not -- it's completed.  I don't know if we get

15  a chance to resubmit it or how you want to do

16  it, but --

17      Q    Yeah.  We can go through it today and

18  make sure we've have a complete set.  I want

19  to make sure I understand a complete set of

20  all the things that you believe you and your

21  department have done to mitigate this problem.

22  I want to make sure we've got a complete set.

23  First, let's at least say, the only inaccuracy

24  you see in this response is that it talks

25  about two bills in 2021, and you only know of

1    one, right?

2        A    I only know of one.  Again, I may be

3    wrong.  I only know of one.

4        Q    And I only know of one, as well.  I

5    was going to ask you about what that second

6    bill is.  I think that may be in error.

7            That's the only inaccuracy you see,

8    right; aside from incompleteness, correct?

9        A    Yes.  Well, wait.  Wait.  So CIPRS --

10   it's not spelled right.  And MI-Case, I

11   don't -- I don't think MI-Case is spelled

12   right.  We can check on that.  That's minor

13   stuff.

14       Q    So CIPRS, that might be sort of a

15   phonic of C-I-P-R-E-S.  Is that what you're

16   referring to?

17       A    Yeah, I think CIPRS is C-Y-P-R-I-S.

18   It's the appropriate document -- you know, the

19   acronyms that represent the new system coming

20   on.

21       Q    Aside from the spelling of CIPRS,

22   MI-Case and the two bills at issue, is there

23   any other inaccuracy?

24       A    No, that's good.

25       Q    So what's incomplete about this?

1    What are the mitigation measures that -- to
2    keep people from being held past the end of
3    their proper release time that's not on here?
4         A    You know, the notes that you have
5    from me --
6         Q    Uh-uh.
7         A    -- the handwritten note are things
8    that we have done.  So I think if you --
9    without taking up the whole day here, there
10   are things on that list that are not on this
11   list, which I think are things that we have
12   done.
13        Q    So just running through your list
14   real quickly, we've got Number 1 is the Lean
15   Six Sigma Project itself, right?
16        A    Yeah.  That's 13 and 14.  That's kind
17   of covered in that first statement.
18        Q    And Number 2 is --
19        A    Go ahead:  "Working closely with
20   judges," yeah.  So I don't know if that's on
21   here or not.
22        Q    And that refers to --
23        A    It goes down at the bottom.  Yes,
24   it's covered.  So 2 is covered.  "Passing a
25   statute on the Uniform Commitment Order," I

1　don't know if that's in here or not.  That's

2　Number 3 for me.  We -- it's a statute

3　requiring the judges to use Uniform Commitment

4　Order.  Yeah, 17.  That's in that second to

5　last paragraph, I guess, in the Uniform

6　Commitment Order, but I don't know if it

7　mentions the fact that it's not statute.

8　　　　Q　　So to add to this response, the

9　statute about the UCO?

10　　　　A　　Uh-huh.

11　　　　Q　　You chaired a Justice Reform

12　Committee, Number 4?

13　　　　A　　Right, which recommended a felony

14　class task force to develop a felony class

15　system, which was done and presented to the

16　legislature, which fell on deaf ears for

17　whatever reason.  I think the DAs had a little

18　bit to do with that, which would have assisted

19　with the complexity of time computation.

20　　　　Q　　Number 5, you had meetings with

21　judges and clerks of court?

22　　　　A　　Yeah, DAs, clerk of courts

23　addressing -- that's probably on here

24　somewhere.  I did this before.  I'm not sure

25　if that's -- yeah, that's in that second to

1   last paragraph.  We -- that's fine.  That's

2   covered.

3       Q   Six is the new CIPRS system that's

4   reflected in this answer?

5       A   No, six is actually what we actually

6   tried to do somewhere between Six Sigma and --

7   I don't know what the dates were, but we

8   developed a new system, a custom system, a

9   case management system for the whole

10  department, which when turned on, just

11  completely failed.  I think we spent 2 million

12  doing that.  That was a big time-consuming

13  issue.  And I put the note currently building

14  on the new system, CIPRS.  So we did that once

15  and it failed.

16      Q   Right.  So that's the 2015 computer

17  system that failed?

18      A   Right.  I guess that was the date.  I

19  don't know the date when I made a note on this

20  yesterday.

21      Q   Seven is opening a reception center

22  at Raymond Laborde; is that right?

23      A   Correct.  Yes, and, again, we talked

24  a little bit about that, I believe, in my

25  first deposition where we talked about for

1  Orleans and Jefferson, you know, that -- when
2  they come into us and then to process, we have
3  to have the paperwork, so we chase the
4  paperwork from there at those reception
5  centers, which helps improve -- in my
6  opinion -- helps improve the system.
7  Everybody had to go --
8      Q    So if --
9      A    Excuse me?
10     Q    Go ahead.
11     A    I was going to say just that, if
12 everyone had to go to a state reception
13 center, it with make things a lot easier for
14 us, but unfortunately, they don't.  Again, I
15 think it was something we talked about in my
16 first deposition, where they go -- if they get
17 sentenced that day, they can stay right there
18 in that local jail or get sent to another
19 local jail.  They don't come into us, which is
20 a challenge.  That's part of the reasons why
21 we have the challenges that we do have in the
22 state.  And state is MI-Case, M-I-C-A-S-E.
23 That's mentioned in that -- right after the
24 CIPRS comment, the new software, which is
25 not -- and I said estimated November.  It's

1   going to take until November of this year to

2   complete that software, which will tie into

3   the CIPRS system to figure time.

4       Q    And then Number 19 is something about

5   the training of Pre-class people?

6       A    Yeah, that's -- you know, we created

7   and implemented a training manual and classes

8   for our Pre-class Division.  I don't know if

9   that's in here or not.  It may be.  They had

10  the positions and they tend to establish the

11  new positions in Pre-class to improve quality

12  control, quality assurance.

13              THE COURT REPORTER:

14                  I'm sorry, sir.  I'm having a

15              problem hearing you.

16              THE WITNESS:

17                  I'm saying that's already in

18              there.  That's the bottom line.  It's

19              in the response for the

20              interrogatory.

21  BY MR. MOST:

22      Q    Eleven is provide training --

23      A    Provide training at sheriffs and

24  wardens' conference on the paperwork process,

25  helping them understand the importance of it.

1    That's an annual thing.  COVID has kind of
2    slowed that down.  They didn't -- I'm not sure
3    if they had the conference this year.  I
4    believe they did.  They haven't had it in the
5    last two years.
6         Q    Number 12 appears to be the grant
7    that's reflected in your answer here.
8         A    Yes.
9         Q    Is that right?
10        A    Right.
11        Q    Thirteen is HR CR-1, which is the
12   2021 bill that you described; is that right
13   oh, no.  That's the study committee.
14        A    Study committee by Representative
15   Katrina Jackson.  Sorry.
16        Q    Did the DOC suggest that study
17   committee?
18        A    We did.  Actually, I asked them to do
19   it personally, and she did.  And we did -- you
20   know, we had PowerPoints.  We did a
21   presentation.  We went through all that with
22   the legislature with that group.  She moved
23   over to the senate; and not much happening
24   from there, honestly -- that I'm aware of,
25   anyway.

1    Q    Okay.  So by my count, a complete

2  answer to what things have you done since 2012

3  to mitigate the risks that inmates are held

4  beyond the end of the DOC's legal authority to

5  hold them would be the things reflected in

6  this interrogatory response, plus the UCO

7  substitute, the proposal for the felony class

8  system, the 2015 computer system that failed,

9  the Raymond Laborde intake center, some

10  training of Pre-class staff members and

11  training to -- or meetings with the sheriffs

12  and others about the importance of Pre-class

13  documents.  Is that accurate statement?

14    A    It's really not meeting.  It's

15  training at the sheriffs and wardens

16  conference.  It's not that big of deal.

17    Q    So with that clarification, that's

18  the universe of things you've done to try

19  mitigate or solve this problem since 2012,

20  correct?

21    A    Correct.

22    Q    Looking at the last page of your

23  handwritten notes here --

24    A    Yeah.  That's just -- you know,

25  that's some of the issues that -- you know,

```
 1    what are all the issues; delaying paperwork,
 2    Uniform Commitment audit from clerks, jail
 3    credit letters from the sheriffs, you know,
 4    those are the delays and, of course, overdue
 5    immediately upon sentencing by the judge.
 6    That's just notes I made for myself.
 7        Q    So part of the problem is, some
 8    people are eligible for immediate release upon
 9    sentencing, but there's not a system in place
10    to get them quickly released, correct?
11        A    Correct.
12        Q    And your first thing here, your
13    understanding of the delay in the paperwork is
14    caused, in part, by the clerk's not using the
15    UCO and the sheriffs not quickly providing the
16    jail credit letters; is that right?
17        A    Right.
18        Q    Would it be fair to say that the
19    Department of Corrections is at least -- at
20    the very least -- responsible for the time
21    after it receives all the Pre-class documents;
22    is that fair?
23        A    Yeah, I would agree with that.  I
24    think, if you look at Number 5 at the
25    bottom --
```

1     Q    Uh-huh.

2     A    -- "law enforcement keeping up with

3 the arrests and detainers at the local level,"

4 you know, we end up having to chase detainers

5 and arrests that haven't been -- that aren't

6 in the system and we have to chase it down

7 because we cannot -- anybody with -- if we

8 release people with detainers and something

9 happens, then they're on me for allowing

10 people to get out with a detainer.  Those

11 files aren't up to date.  That's other issue

12 with figuring time that's not talked about a

13 lot, but that exists.

14     Q    So at the bottom of this page, these

15 Items 1 through 6, are these sort of your

16 proposed solutions to the problems; what are

17 these?

18     A    It is, you know.  If I had a magic

19 wand mandating the use of the UCO, legislature

20 -- you know, as far as -- we made an attempt

21 at trying to require the paperwork be sent to

22 us within the time constraints.  That's part

23 of the legislation that we recommended that's

24 not gone anywhere; do it by statute -- which

25 would help us a lot; a web portal between all

1  parties involved, which is the sheriffs, the
2  clerks and the judges, CIPRS and MI-Case
3  software.  And five is law enforcement keeping
4  up with the rest on detainers at the local
5  level.  And then the last is felony class
6  system.
7      Q    Did I hear you say something about
8  CIPRS being done in November?  Did you say
9  something about that?
10     A    MI-Case.
11     Q    MI-Case.
12     A    We'll be able to implement the
13 software before CIPRS is completed, is my
14 understanding.  So we can begin that in
15 November or December, in that timeframe with
16 software that will figure time for us.
17 MI-Case is the company that's working on it,
18 as I understand it, I believe.
19     Q    So by December of 2022, there will a
20 system in place that will automatically do
21 time computation?
22     A    Correct.
23     Q    Will that have the functionality of
24 allowing clerks of court or sheriffs to
25 electronically submit documents?

1    A    No.  We still have that problem.

2    Q    Okay.  And the actual math of the

3  time computation is not really the problem for

4  immediate releases, right?

5    A    Not really, no.  But it -- to me, it

6  frees up time to really -- you know, to do

7  things -- working on high priority stuff.  So

8  figuring time is -- I'm not sure how much

9  you're involved in that.  I'm not -- I've been

10  clear about that.  It's very complicated.  I

11  know our attorneys have been working heavily

12  with MI-Case and I think they realize how

13  complicated Louisiana statutes are to figure

14  time, too.  So anyway.

15    Q    The people who are subject to

16  immediate release upon sentencing, their time

17  computation is pretty simple, right?  It's

18  comparing --

19    A    Yeah.  The other thing I didn't

20  mention here -- if I can add -- Number 7 would

21  be to pass a statute that will eliminate good

22  time for jail credit.

23    Q    So if we just held people in prison

24  longer, it would make it easier to do the

25  calculations?

1    A    Well, it would.  It would help us.
2  Because when we get it, they're overdue.
3  Because a year is what?  Three months.  And if
4  we get a year, they're already overdue, if
5  they had been a year in the jail.
6    Q    Is that a solution you've advocated
7  for?
8    A    No, not really.  It's not anything
9  I've advocated for, but it would help.  As you
10  know, that is against my -- the principals of
11  the things we're trying to do in this
12  department for reform.
13    Q    Yeah, I would be surprised to hear
14  you would were advocating for that.  So all of
15  these potential solutions you've described
16  here, none of them are specific to a
17  particular inmate; they're all systemic
18  solutions, right?  Broad solutions.
19    A    Correct?
20    Q    They're broad solutions to process
21  these, because what you have here is a broad
22  processes problem, correct?
23    A    Yeah, I mean, I have to agree with
24  that.
25    Q    In your response here, you talk about

1  you hired five additional compliance

2  specialists in the Time Computation Division.

3  Do you know roughly when that was, what year?

4      A    I don't.  I really don't, I mean, I

5  have no idea.

6      Q    Was it -- do you know if it was

7  before COVID or after COVID?

8      A    I want to say it was probably before

9  COVID; maybe a little after; in that

10  timeframe.  Last couple of years.  I could be

11  wrong.

12          MR. BLANCHFIELD:

13              And, William, let me just tell

14          you that issue was covered earlier

15          this week by Rebecca.

16          MR. MOST:

17              Great.  Thank you.

18  BY MR. MOST:

19      Q    I'm pulling Exhibit 6 back up, again,

20  here.

21      A    I can't read it.

22      Q    Yeah.  That's okay.  I'll zoom in

23  here.  We're looking at page 4 of Exhibit 6

24  here.  Do you see that one, two, three, four

25  -- fourth paragraph down, second sentence, it

1  says:  "Efforts are made with the local
2  partners and the clerks of court to get time
3  computation packets quicker."
4       A    Yes.
5       Q    What are those efforts?
6       A    You know, that's a question for the
7  ones that are working that section.  I don't
8  -- I'm assuming they're calling and they're
9  doing everything they can to get the
10  information.  But other than that, I'm not --
11  I mean, somebody else needs to answer that.
12       Q    So you're talking about sort of
13  informal ad hoc efforts, not any sort of
14  policy or systemic effort, correct?
15       A    Not that I'm aware of.
16       Q    One of the -- so the 2021 bill that
17  the DOC attempted to have introduced, you were
18  involved with the request for that
19  legislation, correct?
20       A    Yes.
21       Q    Okay.  And that legislation proposed
22  some timelines on the order of weeks for the
23  clerk to provide documents to the sheriff and
24  the sheriff to provide documents to the DOC,
25  correct?

     1        A     I don't remember the exact timeframe,
     2   but, yeah.
     3        Q     And included in it was a limitation
     4   of liability, that the DOC could not be held
     5   liable for people being held past their
     6   release date within up to about 45 days,
     7   correct?
     8        A     I'm sure you're looking at the
     9   document.  I'm not.  I would assume that's
    10   correct.
    11        Q     But you know that there was a request
    12   for a limitation of liability, right?
    13        A     Yes, right.
    14        Q     So one of the things that you asked
    15   for in the context of people being held past
    16   their release dates was for the legislature to
    17   say your department couldn't be held liable
    18   for it, correct?
    19        A     For issues that involve -- in other
    20   words, yeah.  I mean, not liability when
    21   somebody else is at fault.
    22        Q     Because fundamentally, you don't
    23   think that you are at fault for all these
    24   people being held past their release date; is
    25   that correct?

1    A    I think -- no, I don't think we're at

2    fault.  I think we're doing everything we can

3    on our end to make it work.  I mean, it's not

4    like -- as I said earlier, we're not ignoring

5    this.  We're doing things that we think we

6    need to do make this a better system.  Just

7    like everything else that we do in this

8    bureaucracy.  It doesn't always happen in the

9    timeframe that you want it to.

10    Q    One of the central things that can

11    make this process better is for documents to

12    go electronically straight from the courts

13    straight to the DOC, right?

14    A    I would think that would help, sure.

15    Q    That's the idea behind the web

16    portal, right?

17    A    Right.

18    Q    The web portal, you don't expect it

19    to be online this year, 2022, right?

20    A    No.  I don't think that's the web

21    portal, 2022.  You're talking about MI-Case

22    now right?

23    Q    Well, I'm asking the functionality --

24    let me back up.  The DOC is trying to develop

25    a system to have the functionality to receive

1    documents electronically.  It's trying to
2    build that, right?
3        A    I'm not sure that -- again, what's
4    going on with CIPRS right now is a lot more
5    complicated than I could explain.  I don't
6    think that's the issue with having access to
7    the clerks of courts or the judges.  That's
8    something that we're doing separately.  But
9    I'm not sure where we are with that.
10       Q    Okay.  So setting aside what -- the
11   web portal thing.  You at least understand
12   that it would dramatically improve things if
13   clerks of court could just send documents --
14   Pre-class documents -- straight to the DOC,
15   correct -- electronically?
16       A    Right, yes.
17       Q    That's what you talked to Debbie
18   Hudnall about in 2016, correct?
19       A    Correct.
20       Q    And that would have been obvious in
21   2012 with the Six Sigma report as well,
22   correct?
23       A    I don't know if it was that obvious
24   at that time.  But I think as we get into this
25   and learning where the issues are, you know,

1  we realize how dysfunctional clerk of courts

2  are.

3      Q    Okay.  And you still haven't

4  developed a system for the clerks of court to

5  send documents electronically to the DOC,

6  correct?

7      A    No.

8      Q    Do you have any current plans to

9  develop that system?

10     A    We don't have any current written

11 plans, no, not that I'm aware of.  Certainly,

12 we want -- that's something that we're going

13 to -- you know, we're working on, but I'm not

14 sure exactly where we are with it.

15     Q    So you're working on it, but you have

16 no written plan; it's like an idea that's been

17 talked about?

18     A    Well, yeah.  It's been talked about.

19 It's been requested through grants.  It's been

20 -- you know, every which way, you know, we

21 figured out.  You know, we don't have the

22 funding to pay for the clerk of courts to have

23 web.

24     Q    What about email, Secretary LeBlanc?

25 Why can't they just email documents to you?

```
 1        A    Well, that's something that Judge
 2   Schlegel has come up in our last judges'
 3   liaison meeting.  That's over my head,
 4   William.  You know, I'm not able to have that
 5   kind of conversation in, you know, a
 6   deposition, because I'm just not that involved
 7   in the weeds with that stuff.  But I know
 8   they're working on it.  Judge Schlegel is
 9   helping us.  He's very up -- he knows what's
10   going on with the automated side of things and
11   I think he thinks there's ways we can do this
12   that are not that difficult.  But, again, I'm
13   not in a position to elaborate on that,
14   because I don't know enough about it at this
15   point.
16        Q    Yeah.  Okay.  But at least, it's now
17   ten years after the Six Sigma and you think
18   there's discussions and talking and ideas
19   about electronic transmission of documents to
20   the DOC, but there's, you know, no written
21   plans to put that into place; is that a fair
22   summary?
23        A    Yeah.
24             MR. MOST:
25                  Okay.  Looking at the document
```

1          in front of you on the screen -- this
2          is Exhibit 38.  Let me just pause
3          here.  It's 11:30.  Does anybody need
4          a break; either break for water,
5          restroom, the bathroom or lunch or
6          anything like that?
7      MR. BLANCHFIELD:
8              No.
9      MR. MOST:
10              We will power through.
11  BY MR. MOST:
12      Q    We're looking at Exhibit 38.  Do you
13  see this document here, Secretary?
14      A    Yes.
15      Q    This appears to be a memo from you
16  from February 2020; is that right?
17      A    A memo?
18      Q    What would you call that?
19      A    I don't know what it is.  I'm not
20  sure what I'm looking at.
21      Q    Let's see on page 2 in the upper
22  left-hand corner, it says:  "DPS&C monthly
23  report, February 2020."
24      A    That's the governor's monthly report,
25  I guess.  I don't know.  Yeah, I guess that's

1    what it is.  I assume.

2        Q    So this is a monthly report to the

3    governor?

4        A    That's a monthly report.  I'm not

5    sure if that's the one that we sent to the

6    governor or where -- yeah.

7            MR. BLANCHFIELD:

8                Could you page down to the end

9                and see is this signed or is it --

10   BY MR. MOST:

11       Q    So sections are "Community

12   supervision, health care, reentry, security

13   operations."

14       A    Yeah.  That's a monthly report that

15   we submit to the governor's office.

16       Q    Okay.  So this monthly report -- I'm

17   sorry.  This is a monthly report from you to

18   the governor's office; is that right?

19       A    I assume it is.  You know, it's hard

20   to say.  I don't know.  Where did you get it?

21       Q    We got it in discovery requests.  We

22   did the search for key words, and this is a

23   document that popped up.  And it's got your

24   name at the top, "James M. LeBlanc,

25   Secretary."  It's dated February 2020.  So --

1    I don't have any secret knowledge about this
2    document that I'm withholding from you.  I'm
3    asking you.
4         A    I'm assuming it is, but I can't tell
5    without a cover, you know, if that's what went
6    to the governor in February 2020 or is this a
7    monthly report.  Normally, that looks like a
8    report that goes to the governor's office, but
9    I can't swear to that, looking at it.
10        Q    Sure.  So your office sends monthly
11   reports from the Secretary of DOC to the
12   governor as a general practice; is that right?
13        A    Yes.
14        Q    Okay.  And this looks to you --
15   you're not sure.  You don't recognize this
16   particular one.  But this looks like one of
17   those monthly reports to you, correct?
18        A    Yes.
19        Q    And it begins, "The lawsuits filed
20   last year relative to claims of over-detention
21   continue to be an area of focusing attention.
22   A recent brief filed by the attorney in these
23   cases has brought significant media attention
24   to the issue.  I continue to work with our
25   criminal justice partners statewide, as this

1    is a systems problem complicated not only by

2    complex Louisiana law and paper processes, but

3    depending on all facets of the justice

4    system."  Do you see that part?

5         A    Yes.

6         Q    So in February of 2020, this reflects

7    that you understood that over-detention was

8    still a systems problem facing the Department

9    of Corrections; is that right?

10        A    Yes.

11        Q    And at the bottom of that paragraph,

12   it says:  "Staff are also working towards

13   opportunities to automate the time computation

14   process."  Do you see that part?

15        A    Correct.

16        Q    So in 2020, your staff was working

17   towards automated systems, right?

18        A    Yes.

19        Q    And now almost two years later,

20   they're still working towards that, right?

21        A    Yes.  Like I say, it's going to be

22   probably another two or three years before

23   they finish.

24        Q    But they're not currently working

25   towards an automated system for electronically

1   receiving documents, right?  That's just an

2   idea at this stage?

3       A    A case management system, CIPRS that

4   we're working on.  Believe me, the timeframe

5   for getting anything like that done in this

6   department -- or any department, I would

7   imagine.  Ours is more complicated.  We're

8   bringing in Probation and Parole from their

9   case management system into a unified system,

10  in addition to the MI-Case that I mentioned,

11  which is a software.  That will be completed

12  by the end of the year.  But the CIPRS system

13  is just -- it's a long, long process.  I think

14  we have seven, eight people from the Division

15  of Administration assigned to this department

16  working on it.  You know, I wish I could speed

17  it up, but I can't.  So this -- I mean,

18  they've been working on it since 2020 --

19  probably before that.  And it's going on for

20  another two or three years, according to what

21  I understand.

22      Q    Will the CIPRS system -- is it going

23  to have functionality to electronically

24  receive documents from the clerks of court to

25  DOC?

```
 1      A    No.

 2      Q    That functionality at this stage is

 3  just an idea without actually any steps to

 4  implement it, correct?

 5      A    Yes.

 6           THE COURT REPORTER:

 7                Can we take about a five-minute

 8           break?  I need a restroom break,

 9           please.

10           MR. MOST:

11                Yeah, of course.  We'll

12  reconvene at 11:40.

13           (BRIEF RECESS)

14           MR. MOST:

15                Let's go back on the record.

16  BY MR. MOST:

17      Q    Okay.  I pulled back Exhibit 42,

18  which is your deposition from 2019.  Do you

19  see that, Secretary?

20      A    Yeah.

21      Q    This is a deposition you and I took

22  on May 23, 2019, right?

23      A    Yeah.

24      Q    Going down to pages 100 to 101.  Do

25  you see -- the question was:  "So one of the
```

1    things you mentioned today that the DOC could

2    do to mitigate the problem of being held past

3    the release date is for the DOC to go out and

4    get the paperwork itself, rather than just

5    waiting to receive it?"  And your answer was:

6    "Yes," correct?

7         A    Yes.

8         Q    That's still your testimony; that's

9    one thing the DOC could do to mitigate it,

10   right?

11        A    Yeah.

12        Q    And on page 31, you describe to me

13   that:  "Ultimately, we're bringing on seven or

14   eight more parishes come to July 1st.  So

15   we're going to get 70 to 80 of our local

16   prison population by the end of the next

17   fiscal year."

18             Then the question was:  So the idea

19   there is the Department of Corrections won't

20   wait for the sheriff to bring them an inmate's

21   paperwork; they'll go out and get it

22   themselves.  Is that right?"  And you

23   answered:  "Basically, that's right.  Yeah."

24   Do you see that?

25        A    Yeah.

1     Q   So in 2019, you were saying that you

2 were going to be implementing a system by the

3 end of the next fiscal year, by which the

4 Department of Corrections would go out and get

5 the paperwork rather than waiting to receive

6 it, correct?

7     A   Correct.

8     Q   And that would cover, at least by the

9 end of the next fiscal year, 70 to 80 percent

10 of the prison population, correct?

11     A   Yes.

12     Q   The end of the next fiscal year being

13 the end of 2020, correct?

14     A   Correct.

15     Q   Did you implement that system?

16     A   No.  We didn't because of the COVID.

17 We didn't because -- actually, the facility,

18 which is a testing facility at Raymond

19 Laborde, is still under construction.  We're

20 doing that with Justice reinvestment money.

21 And so we had to build a facility to

22 accommodate the testing and so forth.  So all

23 that is, you know, that's -- there's a lot to

24 go with that.  And we're trying to work on

25 that, but we haven't gotten to where we are.

1　I think COVID probably has a lot to do with

2　that at this point.  Things have slowed down

3　quite a bit on all angles of our department.

4　　　Q　　So at least hypothetically, the idea

5　is that the DOC could set up a system where it

6　goes out and gets the paperwork rather than

7　waiting to receive it, right?

8　　　A　　Yes.  That's the intention of the new

9　-- which we're hoping for.  We do that for

10　Orleans and Jefferson now.  But we haven't

11　gotten to the other four, five, six parishes

12　that we were talking about in that particular

13　time.

14　　　Q　　Okay.  So the DOC has a model for how

15　it could go out and get the Pre-class

16　paperwork, rather than waiting passively to

17　receive it.  And the DOC has implemented for

18　some parishes, but not statewide, correct?

19　　　A　　Yes.  I mean, when you say:  "Go out

20　and get it," I mean that's an issue of -- when

21　they come into us, we've got to have the

22　appropriate paperwork to do the processing.

23　And, you know, that's a matter of chasing the

24　paperwork.  And, you know, I don't know that

25　anybody is physically going to that parish and

1  getting the paperwork.  But that's helped.  I

2  mean, that's not a cure.  Believe me.  That is

3  not a cure.

4     Q    Okay.  But at the very least, there's

5  a model by which, rather than the DOC waiting

6  passively for other system actors to bring the

7  paperwork to the DOC, the DOC alternatively

8  could affirmatively go out and get the

9  paperwork itself that it needs to compute

10  people's time, correct?

11     A    Yes.

12     Q    And that model has not implemented

13  statewide, you say, because of funding and

14  because of COVID; is that correct?

15          THE COURT REPORTER:

16              Was there an answer?

17          THE WITNESS:

18              Yeah, that's correct.

19          THE COURT REPORTER:

20              Thank you.

21  BY MR. MOST:

22     Q    Do you have any sort of estimate of

23  when that system will be in place statewide,

24  ballpark?

25     A    No, at this point, I don't want to

```
1   commit to anything, because then if I don't
2   meet the deadlines, then I'll be responsible
3   for that.  I'm going to hold on that at this
4   point.  I'm not sure.
5       Q    So you haven't set a deadline or a
6   target for that, correct?
7       A    No, I haven't.
8       Q    That project is more or less paused
9   for the current period of time?
10      A    I'm sorry?
11      Q    Is that project more or less paused
12  currently?
13      A    Yes.
14      Q    So shifting -- and we're getting
15  close to the end, Secretary.  Shifting gears a
16  little bit.  I want to talk about strategic
17  planning.  So every few years the Department
18  of Corrections develops a strategic plan,
19  correct?
20      A    Correct.
21      Q    And you participate in that process
22  of developing this strategic plan, correct?
23      A    Yeah, to some extent.  I try to do
24  the best I can to participate in it.  I think
25  our undersecretary handles submitting that
```

1  strategic plan, which we're required to do.
2  I'm not sure how often it's done.  It's five
3  years, so I assume it goes on every five
4  years.
5      Q    So your staff handles much of the
6  details of it, but you're involved at least in
7  the setting goals and priorities within the
8  strategic planning process, correct?
9      A    Yes.
10     Q    And the strategic plan sets the goals
11 and priorities for the Department of
12 Corrections, correct?
13     A    Yes.
14     Q    And so this current strategic plan
15 was submitted in September of 2019; is that
16 correct?
17     A    Yes.
18     Q    And that was Exhibit 43 we were
19 looking at, the strategic plan.
20          I'm turning to Exhibit 35.  This was
21 a deposition you took in July of 2019
22 regarding the Crittindon case.  Do you recall
23 this deposition?
24     A    Not really, no.
25     Q    This was the case that -- my

1 understanding is some inmates were sort of

2 bypassing intake and kind of got lost at

3 Riverbend.  Do you remember that case?

4     A     Lost at Riverbend?  Is that Orleans?

5     Q     Yeah.  They were sort of coming from

6 Orleans, bypassing DOC intake and going

7 straight to Riverbend and kind of getting lost

8 in the system there.  I'm not asking you to

9 testify about it.  That's my big-picture

10 understanding of that case.

11     A     I'm not sure about the term, "Lost."

12     Q     Fair enough.  But you know what case,

13 generally, I'm talking about?

14     A     Yes.

15     Q     And any reason to think this isn't

16 the transcript of a deposition you did in July

17 of 2019?

18     A     No, no reason.  I think it is.  I

19 assume it is.

20     Q     I'm turning to page 95 here.  I read

21 this deposition, and it seems like you were

22 expressing some dissatisfaction with the

23 strategic plan in place at that time.  At the

24 top of this page, you testify:  "I have a

25 reason I'm smiling because I just had a

1    one-on-one with my undersecretary about the
2    strategic plan that I'm not real happy with."
3              Do you see that?
4         A    I do.
5         Q    Do you recall feeling some
6    dissatisfaction with the strategic plan that
7    was in place in July of 2019?
8         A    Not really.  I mean, I'm sure it had
9    something to do with what we were talking
10   about.  I don't recollect exactly what that
11   was all about.
12        Q    Okay.  So turning to page 97.  You
13   were asked:  "So it wouldn't surprise you to
14   be told that there's nothing -- that I found
15   nothing in the strategic plan addressing --
16   for the problem of timely Pre-classification
17   paperwork?"  Do you see that?
18        A    Yes.
19        Q    And your answer was:  "Amen."
20        A    Yeah, I see that.
21        Q    Is this ringing any bells, this
22   testimony?
23        A    Yeah, it kind of does, yeah.
24        Q    So you were asked:  "If you were king
25   or queen for the day, would the strategic plan

1  have that information?"

2       You responded:  "It would and it

3  will."

4       A    Yeah, I guess so.  I see it, yeah.

5       Q    So you were testifying in July of

6  2019 that the strategic plan would have

7  information about the timely submission of

8  Pre-classification paperwork; is that what you

9  were saying then?

10      A    I think I was trying say that, yeah.

11      Q    So that was July of 2019.  A few

12 months later, you issued the five-year

13 strategic plan for the Department of

14 Corrections, right?

15      A    Yeah.

16      Q    Do you know if this has anything in

17 it about timely Pre-classification paperwork?

18      A    I'm sure it doesn't.  I'm sure that's

19 where he's going.

20      Q    Yeah.  I can't find anything in here

21 about that.  And it doesn't sound like you

22 know of it anywhere in there.  Agreed?

23      A    Yeah, agreed.  I don't know if CIPRS

24 is in there.  Is any of that in there?  I

25 mean, again, without going through it, I don't

1  know if there may be something in there that
2  would relate to the issue with -- what we're
3  talking about.
4      Q    Yeah.  You certainly don't recall --
5  currently recall that this has any sort of
6  goals or priorities of timely
7  Pre-classification paperwork and timely inmate
8  release, correct?
9      A    Correct.
10     Q    Can you recall that this has anything
11  in it at all about inmates being released on
12  time being a priority?
13     A    No.  I mean, without having to look
14  at the document, I don't know.  I really don't
15  know if it has anything in it or not, to be
16  honest with you.  So, I mean, it's --
17     Q    This isn't a trick question.  I can't
18  find anything in here.  I'm just asking for
19  your recollection.
20     A    Okay.  Well, I guess there isn't
21  anything in it, then -- which is my fault.
22  Not because we're ignoring it.  I can assure
23  you of that.
24     Q    At least to your recollection, it's
25  not reflected in the Department of Corrections

1    strategic plan, right?

2         A     I'm assuming you're right, without

3    having to go through the document.

4         Q     The strategic plan does set, however,

5    goals and priorities of timeliness for other

6    things; like, provide 100 percent on-time

7    deliveries by 2025 on page 6.  Do you see

8    that?

9         A     Yes.

10        Q     And this is deliveries of Prison

11   Enterprises' products to customers?

12        A     I'm not sure.

13        Q     Going up to page 35.  You see this is

14   under "Prison Enterprises"?

15        A     Okay.

16        Q     So Prison Enterprises uses inmate

17   labor to create products and ship them to

18   customers, right?

19        A     Yeah.  You can look at it that way.

20   We look at it as a training program.

21        Q     The Department of Corrections

22   receives money for that?

23        A     Department of Corrections receive

24   money?  No.

25        Q     Prison Enterprises does, though?

1      A      Yeah.

2      Q      So it was -- in your strategic plan,

3   you set a goal of providing 100 percent

4   on-time deliveries of Prison Enterprises'

5   Products to customers, right?

6      A      Right.  By 2025.

7      Q      Yeah.  By 2025.  So you set a goal --

8   set a year-out target so that your staff would

9   make it a priority and create a plan to

10  achieve that goal by that date, right?

11     A      Right.

12     Q      You did not, however, do that in this

13  document for the timely release of inmates,

14  correct?

15     A      Correct.  I guess.  I mean, you're

16  telling me -- you've read it.  I haven't

17  looked at it.  I mean, I say I haven't looked

18  at it recently, so I don't know.  If it's not

19  addressed, then it's not.  I will do an

20  amendment to our five-year strategic plan if

21  it's not.

22     Q      Okay.  When will you do that by?

23     A      I'll have to talk to my

24  undersecretary, because he prepares the

25  document.  I'll see how long it takes.  I'll

1    let you know.

2        Q    Turning to page 13, you have as a

3    goal here to maintain the adult offender

4    institution population of state prisons at a

5    minimum of 99 percent of designed capacity

6    through 2025, right?

7        A    Right.

8        Q    So you're setting as a goal to keep

9    the prisons full through 2025, at least

10   99 percent capacity, right?

11       A    Yeah.  But you don't quite understand

12   what that means, I guess.  In the sense that

13   empty beds at the local level, when we reduce

14   our population -- which we've done by almost

15   15,000 -- those vacancies are at the local

16   level and they move into state prison.  As

17   they're discharged in state prisons, we move

18   local levels to our state prisons.  So it's

19   not as you're indicating that we're going to

20   maintain our prisons at 100 percent.  That's

21   not what we mean at all.

22       Q    Okay.  I guess -- it's not a trick

23   question about this.  I guess my point is, you

24   know how to set specific goals with timelines

25   and specific criteria to head, right?  You

1  know how to do that in a strategic plan,
2  correct?
3       A    I certainly do.  When I have control
4  and I have the resources and I'm not -- it's
5  not involving a statewide judges, clerk of
6  courts and sheriffs, I can set some goals.
7       Q    So you don't think you can set goals
8  about the timely release of inmates?
9       A    I can set goals, but then I'll be
10 sitting with you again wondering why I hadn't
11 met them when I'm depending on somebody else
12 to make them.  That's part of the problem, as
13 you know.  I mean --
14      Q    So you don't think it's even worth
15 setting goals?
16      A    No, I didn't say that.  I did not say
17 that at all.  I said I would do an amendment.
18 But when I set goals, I'm going to be
19 depending upon a lot of different people and
20 resources for a budget to meet those goals.
21      Q    Okay.  So I do know of one goal you
22 set, turning back to Exhibit 42 at page 36.
23 So we talked about -- I'm looking at page 43
24 of Exhibit 42.  We talked about -- there was a
25 goal on the Six Sigma Project to reduce

1    immediate releases down to 450 per year.  Do

2    you recall something about that generally?

3         A    I recall that from my deposition.

4         Q    Yeah.  Did you ever set a goal lower

5    than that for immediate releases, lower than

6    450 per year?

7         A    I mean, our goal is zero.

8         Q    Where is that goal reflected?

9         A    I mean -- do you really need to

10   reflect it in writing?

11        Q    So that's the goal in your head is

12   what you're saying?

13        A    That should be the goal of our

14   department or any department in this business.

15        Q    Right.

16        A    You don't want any one person being

17   held past their release date.  I mean, that's

18   simple.

19        Q    Right.  That should be the goal --

20        A    (INAUDIBLE).

21             THE COURT REPORTER:

22                  I'm sorry.  I did not hear what

23             the witness said.  I have:  "I mean,

24             that's simple."  And then the

25             question is:  "That should be" -- and

1            there was something that was said.

2            There was overtalk and I didn't get

3            what the witness was saying.

4            THE WITNESS:

5                 I guess I said that's our goal,

6            to get to zero.  I mean --

7    BY MR. MOST:

8        Q    Right.  Because that should be the

9    goal of any Department of Corrections to not

10   hold any inmates past their release date,

11   correct?

12       A    Correct.

13       Q    Is there any document you know of,

14   whatsoever, that communicates that goal to the

15   staff of the Department of Corrections?

16       A    No, not that I'm aware of.

17       Q    The staff of the Department of

18   Corrections don't just know what your goals

19   are.  They learn your goals and priorities

20   through the strategic plan and other

21   documents, correct?

22       A    Well, not necessarily just our

23   strategic plan, believe me.  We meet monthly

24   with leadership.  We meet monthly with

25   management team.  They hear from me on a

1    monthly basis.  If I depended on that

2    strategic plan to drive everybody to work, I

3    don't know that everybody has one of those on

4    their desk, to be honest with you.  You know,

5    we could all -- you know, it's a good thought

6    process, but it doesn't -- I don't think, in

7    my opinion, it doesn't drive people to do what

8    we need to do to get our job done.

9         Q    Do you recall any meetings where you

10   told people the goal is to get down to zero of

11   people being held past their release dates?

12        A    I'm sure I said it before, William,

13   but I can't tell you exactly when, what month

14   and what meeting I said it.

15        Q    Do you recall the most recent time

16   you said that?

17        A    No, I don't.

18        Q    Do you recall any specific time --

19   any specific time you said that to anyone

20   between 2012 and the present?

21        A    No.  I do not recall any specific

22   time or date.

23        Q    Last time we -- when we met for a

24   deposition in 2019, I asked you whether you

25   talked to the heads of other Departments of

1    Corrections to see how they addressed these

2    problems, and your answer, I think, was just

3    you only asked them what software they used.

4    Is that still your testimony?

5         A    I'm not sure if it's still my

6    testimony.  I know that the other states don't

7    have the same issues that we have.  I don't

8    know if I said that in this testimony or not.

9    But they don't keep prisoners in local jails

10   the way we do.  Nobody does.  Kentucky, I

11   think I mentioned -- I think still is --

12   second with four or five thousand.  But they

13   end up in a state prison before they're

14   discharged.  They're not discharging people

15   out of their local jails as we are.  They

16   don't have anything in common with what we're

17   doing.

18        Q    So you're saying Louisiana has a

19   unique problem with this because Louisiana

20   system is unique?

21        A    Yes.

22        Q    I don't totally understand.  In what

23   way is Louisiana system unique?

24        A    We have half of our prison population

25   in parish jails.  Nobody does that.

1    Q    Right.  The Department of Corrections

2  has chosen to contract out with local jails

3  the incarceration of inmates sentenced to the

4  custody of Department of Corrections; is that

5  right?

6        A    That's right, in the '80s.

7             THE COURT REPORTER:

8                  In the what?

9             THE WITNESS:

10                 In 1980-'90s is when the

11                 Department decided to move in that

12                 direction.

13  BY MR. MOST:

14       Q    So the thing that is unique by

15  Louisiana is the choice by the Department of

16  Corrections to set up this system by which

17  inmates withheld in local jails, correct?

18       A    It's a choice by the State of

19  Louisiana.  I don't know if it's the

20  Department of Corrections.  We can go back in

21  time with the federal courts and the system

22  and how that all was established as -- the

23  Basic Jail Guidelines was established through

24  the federal courts in order to house prisoners

25  at the local level.  All of that was done well

1  before my time.  But it was done, and here we
2  are.
3      Q    And when you're talking about this
4  unique aspect of inmates being held in jails,
5  you're talking about inmates serving out their
6  sentence in parish facilities, rather than
7  state facilities, right?
8      A    Correct.
9      Q    So I don't see how that is
10  particularly relevant to the people who are
11  eligible for immediate release upon
12  sentencing.  That doesn't seem related to the
13  people who are eligible for release upon
14  sentencing to me at all.  Is it somehow
15  related?
16     A    Well, it's related because they're in
17  a parish jail, rather than in a state prison,
18  I guess.  I mean, you're talking about on the
19  sentencing date?
20     Q    Right.
21     A    On the sentencing date, they're
22  pre-trial and they become a state inmate
23  immediately.  And that goes back to what we're
24  saying the problem is.  The uniqueness of them
25  being in a local jail is that 80 to 90 percent

that discharge, discharge out of local jails,
not a state prison.  Very -- you know, the
percentages are -- I mean, I think we
discharge 15,000, and 12,000 of those out of
local jails.  That's a lot of work out of
local jails, rather than a state facility.  I
mean, it just -- the logistics of that become
very -- in my opinion, become a lot more
complicated.  So on the sentencing day, I
mean, it may not have direct relationships,
but I think it makes a difference, you know,
as far as -- I think we know the answer to
that is the web portal and what we've talked
about, anyway.

    Q    I guess that's my point.  In every
state, inmates are held at a jail at the time
of sentencing and they -- if they're sentenced
to the custody of the state, then they become
state inmates.  That process is no different
in Louisiana than it is in any other state, is
it?

    A    I'm not sure.

    Q    Have you looked into that?

    A    No.

    Q    So do you know of any way Louisiana

1   is unique with regard to the inmates who are

2   eligible for immediate release upon

3   sentencing?

4        A    No.

5        Q    Have you made any efforts to find out

6   whether -- how other states have solved the

7   problem of dealing with inmates who are

8   eligible for immediate release upon

9   sentencing?

10       A    I think staff have.  I haven't,

11  personally.  I think our staff have looked at

12  other states, Georgia -- a few other states

13  that I think we got MI-Case from and some of

14  that kind of stuff.  I haven't personally done

15  it, but staff has.

16       Q    The Department of Justice is

17  currently be -- scratch that.  The department

18  of Corrections is currently being investigated

19  by the U.S. Department of Justice for -- about

20  allegations holding inmates past their

21  released date, correct?

22       A    Yes.

23       Q    Are you involved in providing

24  information to the USDOJ about that

25  information?

1    A    Yes.

2    Q    Do you know that some spreadsheets

3  have been created in my litigation about

4  inmates who are subject to immediate release?

5    A    What's the question?

6    Q    Sure.  So Melanie Gueho created 12

7  spreadsheets covering the months of April 2019

8  to May 2020, assessing immediate releases;

9  spreadsheets -- like the 2019 Pull document.

10 Are you familiar with those new spreadsheets

11 Melanie has produced?

12   A    No.

13   Q    Have you recently asked your staff

14 for any sort of assessment on whether the

15 problem with immediate releases is getting

16 better, getting worse or staying the same?

17   A    I don't think I have recently.  I

18 think we addressed that earlier.  But I think

19 that was --

20   Q    So other than that email from 2020

21 that we looked earlier, you don't recall the

22 time you've asked subsequent to that, correct?

23   A    No.

24   Q    So I want sum up with a couple of

25 questions.  In 2016, you told Debbie Hudnall

1   that you created an action plan about inmates
2   being held past their release date, right?
3       A    I think I said we would create an
4   action plan.  I don't remember exactly that
5   was, William.  You can show me the email.
6       Q    But you don't -- you didn't create an
7   action plan, did you?
8       A    Well, I had to get the information to
9   create an action plan.  I think we've already
10  been through this.  And I think Angela -- we
11  figured out where the issues were.  I'm not
12  sure where all that is.  Believe me, I wish
13  this was the only thing I had to work on in
14  the Department.  It's not.  You know, I have a
15  lot of going on.  It's been two years of
16  COVID.  You know, everything is shut down,
17  nobody is moving.  All that kind of stuff.
18  I've got to worry about that more than I do
19  anything else right now.  That's where I am.
20  I'm not sure if Angela and them had worked on
21  that.  I thought we were with an action plan
22  or if there was one developed, I'm not aware
23  of.
24      Q    At no point in your tenure as
25  Secretary of Department of Corrections, have

1  you ever made releasing inmates on their

2  release date a priority or a goal in any

3  strategic plan; agreed, to your recollection?

4      A    In any written strategic plan, no.  I

5  don't think I have, according to what you just

6  showed me.  But I haven't looked at every

7  strategic plan or plan that may not be in that

8  strategic plan that we may have had or

9  developed that I'm not aware of.

10     Q    In 2019 you told me, by the end of

11  the next year, you'd have a system in place to

12  go out and get the documents, rather than wait

13  to receive them.  That system is not in place,

14  agreed?

15     A    You're talking about with those seven

16  parishes?  What are you talking about,

17  William?

18     Q    In 2019, you told me that by the end

19  of next fiscal year, there would be a system

20  in place for 70 or 80 percent of inmates to --

21  the DOC to go out and get in documents, rather

22  than wait passively to receive them, and that

23  system is not currently in place, agreed?

24     A    Agreed.

25     Q    At no point have you put a timeline

```
 1   into the Basic Jail Guidelines for the
 2   provision of the Pre-class documents to the
 3   Department of Corrections, agreed?
 4       A    Agreed.
 5            MR. MOST:
 6                 Let's take a five-minute break.
 7            I'm going to consult my papers here.
 8            And then if Drew may -- has the
 9            option to ask you questions
10            afterwards.  And if there's none,
11            we'll wrap it up.  We'll reconvene at
12            12:20.
13            MR. BLANCHFIELD:
14                 Okay.
15                 (BRIEF RECESS)
16            MR. MOST:
17                 We can go back on the record.
18            Secretary, that's all the questions
19            I've got, unless I have any followup
20            after Drew.
21                 Drew, do you have any questions
22            to ask?
23            MR. BLANCHFIELD:
24                 I do not, William.  Thank you.
25            MR. MOST:
```

1      Secretary, again, thank you for

2      your time.  I know there's a lot on

3      your plate and I appreciate you're

4      taking the time to talk to with me.

5           Thank you to Drew and Jonathan

6      and Cecilia and everybody.

7           *      *      *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                 WITNESS' CERTIFICATE

2

3         I, SECRETARY JAMES LEBLANC, do

4  hereby certify that the foregoing testimony

5  was given by me, and that the transcription of

6  said testimony, with corrections and/or

7  changes, if any, is true and correct as given

8  by me on the aforementioned date.

9

10

11  Dated: _____  Signed:_____

12                 SECRETARY JAMES LEBLANC

13

14

15  _____  Signed with corrections as noted.

16

17  _____  Signed with no corrections noted.

18

19

20

21  DATE TAKEN: January 7, 2022

22

23

24

25

```
1              C E R T I F I C A T E

2

3          I, CECILIA M. HENDERSON, Certified
   Court Reporter, in and for the State of
4  Louisiana, as the officer before whom this
   testimony was taken, do hereby certify that
5  SECRETARY JAMES M. LEBLANC  after having been
   duly sworn by me upon authority of R.S.
6  37:2554, did testify as hereinbefore set forth
   in the foregoing 117 pages; that this
7  testimony was reported by me in the stenotype
   reporting method, was prepared and transcribed
8  by me or under my personal direction and
   supervision, and is a true and correct
9  transcript to the best of my ability and
   understanding; that the transcript has been
10 prepared in compliance with transcript format
   guidelines required by statute or by rules of
11 the board, that I have acted in compliance
   with the prohibition on contractual
12 relationships, as defined by Louisiana Code of
   Civil Procedure Article 1434 and in rules and
13 advisory opinions of the board; that I am not
   related to counsel or to the parties herein,
14 nor am I otherwise interested in the outcome
   of this matter.

15

16      Dated this 31st day of January, 2022

17

18

19

20      CECILIA M. HENDERSON, CCR
        CCR #84099
21      STATE OF LOUISIANA

22

23

24

25
```