UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

JAMES MURRAY, ET AL.

            CIVIL ACTION

VERSUS

            NO. 21-592-JWD-RLB

JAMES LEBLANC, SECRETARY OF
THE DEPARTMENT OF PUBLIC
SAFETY AND CORRECTIONS, ET AL.

RULING AND ORDER

I.   Introduction

   This matter comes before the Court on the *Motion to Dismiss Pursuant to Rule 12(b)(1) & (6)* (Doc. 26) filed by defendant James LeBlanc, Secretary of the Louisiana Department of Public Safety and Corrections ("DPSC"). Plaintiffs James Murray, Latavius Paschal, and Antone Henderson ("Plaintiffs") oppose the motion, (Doc. 32), and LeBlanc has filed a reply, (Doc. 46). Oral argument is not necessary. The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule.

   Plaintiffs in this case were inmates housed at Madison Correctional Center ("MPCC"). (*Sec. Am. Compl.* ("*SAC*"), Doc. 27 at 2.) MPCC is, like a number of other rural correctional centers owned by sheriffs, "responsible for safely holding both sentenced and pre-trial prisoners[.]" (*Id.* at 1.) Defendants in this action include the "three entities responsible for ensuring the safety of people held in their custody at MPCC": (1) Lasalle Management, LLC ("Lasalle") (the privately-owned operator of MPCC); (2) LeBlanc (Secretary of DPSC); and (3) Sheriff Sammie Byrd (Sheriff of Madison Parish)." (*Id.* at 1–2.) Other Defendants are also joined

in this suit (nearly all of whom are officials or officers at MPCC),[1] but only Secretary LeBlanc brings the instant motion.

The heart of Plaintiffs' case is that "Defendants have allowed fatally dangerous conditions of confinement to flourish at MPCC," with each entity "aware that MPCC has no functional classification, investigation, or staff supervision in place" and each entity "aware that these conditions allow threat of serious injury from rampant violence to go unchecked." (*Id.* at 2.) Plaintiffs maintain that, because of these conditions, they were stabbed and beaten by attackers who should not have been housed with them on the same unit. (*Id.*)

While the Court sympathizes with Plaintiffs for the serious injuries detailed in the *Second Amended Complaint*, the Court remains bound to apply the law to the facts and claims as alleged in that pleading. Having carefully considered both, the Court finds that Plaintiffs have no viable claims against this particular defendant. In sum, all of Plaintiffs' official capacity claims, except those brought under 42 U.S.C. § 1983 for prospective declaratory and injunctive relief, are dismissed because of Eleventh Amendment immunity. All remaining claims—including those equitable § 1983 claims and all individual capacity § 1983 and Louisiana state law claims—are dismissed for failure to state a claim.

The Court makes a few observations in closing this introduction. First, other defendants remain pending in this case. None have filed motions to dismiss,[2] and the instant ruling does not assess the validity of those claims.

---

[1] Those Defendants who are officials or officers at MPCC include: Warden Arthur Anderson, Assistant Warden Chris Stinson, Major Tommy Farmer, Major Steven Chase, Lieutenant Cantrell Guice, Captain John Murray, Captain Wendell Hughes, Captain Edward McDowell, Sergeant Jonathan Knox, Sergeant Shepherd, Correctional Officer ("CO") Esco Tillman, CO Robert Thornton, and CO Jane Doe. (*SAC* ¶¶ 7–19, Doc. 27.)
   The other Defendant in this action is Old Republic Union Insurance Company. (*SAC*, Doc. 27. at 8 (paragraph incorrectly labeled as "1").) Old Republic is Byrd and Lasalle's insurer. (*Id.*)
[2] Most of the other remaining defendants have, however, filed a *Motion to Sever and Transfer*, (Doc. 49), which is opposed, (Doc. 53). The Court will take up this motion in due course.

Second, the Court made its decision on the instant motion without considering the many exhibits attached by Plaintiffs to their opposition (an exercise of discretion that will be discussed below).  The Court makes no finding at this time as to whether those exhibits, if incorporated into the operative complaint, would have made a difference to the outcome of this ruling.

And third, Plaintiffs will be given leave to amend to cure the deficiencies outlined in this ruling.  But, given the complexity and breadth of this suit, the Court encourages both sides to conserve judicial and party resources by not filing any amendment or responsive motion that lacks a good faith basis in law or fact.

## II.    Relevant Factual Background[3]

### A.  Partnership between DPSC and Sheriffs, including Byrd

In 1996, DPSC formed a partnership with Louisiana sheriffs to hold DPSC-sentenced prisoners in facilities owned and operated by the sheriffs and private entities. (*SAC* ¶ 22, Doc. 27.) This partnership was indented to resolve capacity limitations in facilities operated by the state. (*Id.* ¶ 22.)  "These non-DPSC facilities were to operate in accordance with Basic Jail Guidelines (. . . the 'Guidelines') developed by both DPSC and the Louisiana Sheriff's Association [("LSA")] to [ensure] that the fundamental rights of DPSC prisoners housed in secure non-DPSC facilities are not jeopardized by this arrangement." (*Id.*) The Guidelines are periodically updated and revised. (*Id.*)  They were most recently reviewed on October 1, 2019, and they were signed by LeBlanc and the LSA Executive Director. (*Id.*)

---

[3] The following allegations come from Plaintiffs' *Second Amended Complaint* (Doc. 27). Non-conclusory allegations are assumed to be true for purposes of this motion and are construed in a light most favorable to Plaintiffs. *Thompson v. City of Waco*, 764 F.3d 500, 502–03 (5th Cir. 2014).

 However, as mentioned above and as will be discussed below, the relevant factual background will not include any discussion of the exhibits attached to Plaintiffs' opposition; the Court will exercise its discretion not to consider these documents at this time. *See Brackens v. Stericycle, Inc.*, 829 F. App'x 17, 23 (5th Cir. 2020) (per curiam).

Twenty-five years later, DPSC facilities contained capacity for 15,565 people. (*Id.* ¶ 23.) Non-DPSC facilities had 15,247. (*Id.*) Thus, non-DPSC facilities had almost half of the capacity for housing Louisiana's prison population, and, at all relevant times, Lasalle operated with a capacity for about 53% of the non-DPSC facility capacity (or 8,208 people). (*Id.*)

In Madison Parish, Sheriff Byrd entered into a contract with DPSC to house sentenced prisoners in the parish's correctional facilities, including MPCC. (*Id.* ¶ 24.) Byrd is "responsible for management and operation of [these] facilities, including MPCC," and he "contracted with [Lasalle] most recently in February 2020 to manage and operate [the parish's] correctional facilities for a period of ten years[.]" (*Id.* ¶ 25.) Lasalle "was to be responsible for management of MPCC, including operating and maintaining the facility for the secure custody, care, and safekeeping of prisoners at the facility in accordance with federal, state, and local law" and the Guidelines. (*Id.* ¶ 26.)

### B.  The Guidelines and Annual Reports

The *SAC* describes certain specific Guidelines that deal with various aspects of operating the facilities. (*SAC* ¶¶ 27–29, Doc. 27.) Such Guidelines cover (1) classification systems for inmates that look at a variety of factors (such as "age, gender, legal status, custody needs, special problems and needs, and behaviors"); (2) staffing requirements for security, custody, and supervision of prisoners; and (3) record keeping requirements for prisoners transferred to such a facility, which include information about classification and prior misconduct. (*Id.*)

Non-DPSC facilities like MPCC must submit statements annually that they complied with the Guidelines. (*Id.* ¶ 30.) These statements "must include proposed expansions, available rehabilitative programs, and a summary of reentry initiatives." (*Id.*) However, the "only external

validation or evidence that must accompany these statements of compliance are Fire Marshal and Health Inspection reports." (*Id.*)

According to the *SAC*, "[a]nnual monitoring reports include sparse discussion of compliance with various Guidelines. For example, the classification system focuses entirely on trustees working outside the secure perimeter of the facility with no metric to look beyond this narrow question." (*Id.* ¶ 31.)  Plaintiffs claim that "DPSC polices, guidelines and practices for local facilities are [facially] so vague that they cannot adequately protect sentenced DPSC prisoners and place both sentenced and un-sentenced prisoners at risk of harm from inadequate classification systems." (*Id.* ¶ 32.) "Perfunctory monitoring and audits allow non-DPSC facilities to ignore even these vague guidelines." (*Id.*)

Plaintiffs then devote several paragraphs to the deficiencies in the classification system developed by the Sheriff and Lasalle and how this system did not comply with the Guidelines. (*Id.* ¶¶ 33–37.)  These problems were exacerbated by failures to hire qualified staff and to monitor and train guards properly. (*Id.* ¶ 36.)  Plaintiffs claim:

> As a result, in practice, no proper classification plan existed at MPCC and prisoners were assigned to housing units based on available beds without regard to custodial status, disciplinary history, known enemies, or any other consideration included in classification plans. Although the Basic Jail Guidelines clearly require consideration of legal status in classifying people, MPCC as operated by [Lasalle] failed in this most basic of classification measures.

(*Id.* ¶ 37.)

## C.  Prior Incidents of Violence

Murray was housed in the same dorm as many sentenced DPSC prisoners who attacked him. (*SAC.* ¶ 37, Doc. 27.)  Further, in January and May 2020, there were four different instances of stabbing involving individuals in the same housing unit who were DPSC and non-DPSC. (*Id.*)

5

"Nevertheless, in October 2019, only four months before the first of these reported stabbings, DPSC signed off on MPCC's compliance with the Guidelines, including the provisions relating to classification." (*Id.* ¶ 38.)

Moreover, between September and October 2020, MPCC reported three more deaths to LeBlanc and DPSC that were the result of these policies: "a. Robert Thomas, who was thirty-five, was found dead in his bunk during morning count. The cause of his death was undetermined; b. Kendall Reed, who was thirty-four, died of rhabdomyolysis following an altercation; c. Connie Brown, who was twenty-six, died after receiving multiple stab wounds to the chest." (*Id.* ¶ 39.)

From January 2020 to January 2021, at least nine serious assaults involving prisoners in MPCC were known to Lasalle and reported to DPSC. (*Id.* ¶ 40) Seven such incidents caused hospital transports for at least one injured person, and at least four dealt with knives or shanks causing serious lacerations and puncture wounds. (*Id.*)

Plaintiffs allege that the above deaths and assaults show "the lack of prisoner supervision, the availability of weapons, and the level of violence at MPCC." (*Id.* ¶ 41.) Lasalle "reported these deaths and serious injuries to DSPC and BYRD, alerting all three parties to the serious risks of harm posed by the plainly inadequate classification and supervision at the facility," yet LeBlanc and the others "each ignored the serious risk of harm and actual harm befalling people at MPCC." (*Id.* ¶¶ 41–42.)

### D.  Systemwide Failures

#### 1. Lasalle and Byrd

Plaintiffs first summarize the misconduct of Lasalle. (*SAC* ¶ 43, Doc. 27.) In sum, this defendant ignored prior incidents, failed to train or discipline guards, and failed to investigate incidents. (*Id.*)

Plaintiffs then move to Byrd. (*Id.* ¶ 44.)  Byrd purportedly "failed to monitor the contract

with [Lasalle] to ensure that Madison Parish's correctional facilities held prisoners in

constitutionally adequate conditions," despite "multiple reports of violent attacks at MPCC." (*Id.*)

The Sheriff "knew, must have known, or should have known of the serious risk of harm posed by

[Lasalle's] failure to reasonably respond to the lack of classification system, failure to investigate,

and failure to adequately staff but failed to take action to address these risks." (*Id.*)

### 2. LeBlanc and DPSC

Most relevant here, Plaintiffs allege the following with respect to LeBlanc:

> Finally, Secretary [LeBlanc] chose to continue to contract with
> Sheriff [Byrd] and the Madison Parish Law Enforcement District to
> house sentenced DPSC prisoners at MPCC. Defendant [LeBlanc]
> has authority to determine whether to house DPSC prisoners at local
> facilities based on the facilities' adherence to the Guidelines.
> Further, Secretary [LeBlanc] has authority to review files and other
> necessary information to determine if local facilities are complying
> with the Guidelines, but did not avail himself of this power. Despite
> the reports of assaults and deaths, the clear presence of weapons and
> other contraband, and the lack of classification system at MPCC,
> [LeBlanc] took no steps to look beyond the self-serving reports
> offered by [Lasalle] and Defendant [Byrd] regarding compliance
> with the Guidelines and the adequacy of the conditions of
> confinement for DPSC prisoners.

(*SAC* ¶ 45, Doc. 27.)

Plaintiffs then point to other local jails in Ouachita, Franklin, and Tensas that "reported at

least five serious altercations and assaults involving DPSC and non-DPSC individuals on the same

housing unit." (*Id.* ¶ 46.)  Despite these incidents, "annual compliance reports for these facilities

found them in compliance with the Guidelines including classification system and offender

management system." (*Id.*)

Plaintiffs then explain how LeBlanc's "failures to ensure adequate classification and

staffing at facilities housing sentenced DPSC prisoners pose credible ongoing threat[s] of harm to

Plaintiffs [Murray and Henderson]." (*Id.* ¶ 47.)  Murray is a sentenced DPSC prisoner being held in a non-DPSC facility, and Henderson is a pre-trial detainee held at a non-DPSC facility that holds DPSC prisoners; both may be held with inadequately classified people. (*Id.*)

Plaintiffs conclude this part:

> It was and is the policy and/or custom of Defendant [LeBlanc] to inadequately monitor, audit, review, and supervise local jail facilities, including MPCC to ensure sentenced prisoners were not subjected to unconstitutional conditions or unreasonable risks of harm, thereby failing to adequately discourage further constitutional violations at local facilities tasked with holding sentenced DPSC prisoners and creating a risk of harm to both sentenced and un-sentenced detainees held in these institutions.

(*Id.* ¶ 48.)

### E.  Attacks on Plaintiffs

Plaintiffs devote most of the rest of the *SAC* to details about the numerous attacks on them by others housed at MPCC. (*See SAC* ¶¶ 49–130, Doc. 27.)  However, Plaintiffs rely upon only a limited number of these paragraphs in their opposition to the instant motion. (*See* Doc. 32 at 11 nn.59–60.)

Specifically, with respect to the first attack on James Murray, Plaintiffs allege that Murray came to MPCC on June 19, 2020, as a pretrial detainee. (*SAC* ¶ 49, Doc. 27.)  Captain McDowell took Murray's "photograph for identification and was also responsible for determining whether [Murray] faced potential safety risks as a result of his transfer." (*Id.*)  McDowell failed to ask Murray about his incarceration history "or any known or potential enemies" before Murray was brought to Building 4, B-Dorm. (*Id.*)

According to the *SAC*, "[a]t MPCC, Defendants [Byrd and Lasalle] held both sentenced and pre-trial detainees in the same dorm." (*Id.* ¶ 50.)  Plaintiffs allege:

> [Murray] raised his concerns about the lack of a classification system by letter to DPSC, and by talking to Major [Chase] and Captain [Hughes] at MPCC. He expressed his concerns for his safety arising out of the housing of pre-trial and sentenced people together in the same dorm and the threat of violence on the dorm. He did not receive a response.

(*Id.*)

Following about "two months of increasing tensions, attacks, and stabbings on this unit, around August or September 2020, [Murray] learned that one of the people in the dorm, only known to him as 'Swamp,' was stabbed by another individual held in the dorm several times while he slept." (*Id.* ¶ 51.)  Following this, inmates in the dorm were separated, and Murray "was moved to Building 3, C-Dorm." (*Id.*)

There, "[Murray] was again housed with both sentenced and other pre-trial detainees.  He became increasingly concerned for his safety." (*Id.* ¶ 52.)  On October 18, 2020, he informed a Sergeant Knox that Murray had to leave the unit due to his safety concerns. (*Id.*)

Knox moved Murray to B-Dorm, but "[c]onsistent with MPCC's practice, Sgt. [Knox] did not consult with anyone regarding this transfer." (*Id.* ¶ 53.)  Knox failed to tell Murray who was on B-Dorm "to determine if [Murray] had any potential enemies on B-Dorm or take any other steps to ensure his safety" like checking the custody status of the people there to see if Murray was at risk of being hurt (or hurting anyone) there. (*Id.*)

B-Dorm ended up having several people who had previously stabbed or attacked others, (*id.* ¶ 54), and, within half an hour of Murray's being on B-Dorm, he was attacked by three individuals, (*id.* ¶ 56).  Plaintiffs allege how "[e]ach of these three individuals were known to present a serious risk of harm to other prisoners and detainees." (*Id.* ¶ 60.)  Plaintiffs then provide considerable detail about these assailants' violent histories and the inadequacies of MPCC's classification and documentation with respect to these histories. (*Id.* ¶¶ 60–64.)

9

### F.  Claims and Prayer for Relief

Plaintiffs assert seven claims. (*SAC* ¶¶ 131–185 , Doc. 27.) These include: (1) violations of all Plaintiffs' rights to equal protection and due process under the Fourteenth Amendment, (*id.* ¶¶ 131–136); (2) violation of Murray's right to be free of cruel and unusual punishment under the Eighth Amendment, (*id.* ¶¶ 137–143); (3) claims by all Plaintiffs against Lasalle and all official capacity defendants under *Monell*, *Hinojosa*, and the theory of supervisor liability for failure to train, supervise, and discipline, (*id.* ¶¶ 144–159); (4) violations of the Louisiana Constitution's rights to due process and to be free of cruel and unusual punishment, (*id.* ¶¶ 160–163); (5) state law claims against all defendants for intentional infliction of emotional distress, (*id.* ¶ 164–172); (6) state law negligence claims against all Defendants, (*id.* ¶¶ 173–182); and (7) state law claims against Defendants' insurance company, (*id.* ¶¶ 183–185).

Plaintiffs pray for "declaratory relief;" "injunctive relief," "judgment against Defendants[] for Plaintiffs' asserted causes of action;" attorneys' fees; and compensatory and punitive damages. (*Id.* at 41.)

## III.    Rule 12(b)(1) Motion

### A.  Relevant Standard

In *Ramming v. United States*, 281 F.3d 158 (5th Cir. 2001), the Fifth Circuit explained the following about the Rule 12(b)(1) standard:

> Motions filed under Rule 12(b)(1) . . . allow a party to challenge the subject matter jurisdiction of the district court to hear a case. Fed. R. Civ. P. 12(b)(1). Lack of subject matter jurisdiction may be found in any one of three instances: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. *Barrera–Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996).

The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction. *McDaniel v. United States*, 899 F. Supp. 305, 307 (E.D. Tex. 1995). Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist. *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980).

When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits. *Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977) (per curiam). . . .

In examining a Rule 12(b)(1) motion, the district court is empowered to consider matters of fact which may be in dispute. *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981). Ultimately, a motion to dismiss for lack of subject matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief. *Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998).

*Id.* at 161.

### B. Parties' Arguments

LeBlanc first seeks dismissal of Plaintiffs' claims for monetary damages under § 1983. LeBlanc contends they are barred by Louisiana law and the Eleventh Amendment. (Doc. 26-1 at 4.) This defendant maintains that the latter makes non-consenting states immune from lawsuits for money damages in federal courts by citizens of its own states, so any claim against LeBlanc in his official capacity must be dismissed. (*Id.* at 4–5.) Further, the State (and officials acting in their official capacity) are not "persons" under § 1983, so Plaintiffs' claims must be dismissed. (*Id.* at 5.)

Plaintiffs respond that they "do not seek monetary damages from Defendant LeBlanc in his official capacity" and that Plaintiffs' prayer includes a request for declaratory and injunctive relief. (Doc. 32 at 4–5.) "Because Plaintiffs seek only non-monetary relief from Defendant

LeBlanc in his official capacity, their official capacity claims against him are not barred on the basis of jurisdiction." (*Id.* at 5.)  Additionally, Plaintiffs' claim for injunctive relief is prospective because it seeks to enjoin the State from continuing to violate the Constitution with the State's classification system. (*Id.*)  Thus, LeBlanc's motion must be denied. (*Id.*)

LeBlanc replies that Plaintiffs have conceded that any claim for monetary damages must be dismissed. (Doc. 46 at 3.) LeBlanc only adds that all state law claims against him must also be dismissed, including those for injunctive and declaratory relief. (*Id.*)

### C.  Applicable Law

"It is clear, of course, that in the absence of consent[,] a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment. This jurisdictional bar applies regardless of the nature of the relief sought." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984) (citations omitted).

Similarly, "the Eleventh Amendment bars a suit against state officials when the state is the real, substantial party in interest. Thus, the general rule is that relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter." *Id.* at 101 (cleaned up).  Accordingly, "[t]he Eleventh Amendment bars claims against a state brought pursuant to 42 U.S.C. § 1983." *Aguilar v. Tex. Dep't of Crim. Just.*, 160 F.3d 1052, 1054 (5th Cir. 1998) (citing *Farias v. Bexar Cty. Bd. of Trs. for Mental Health Mental Retardation Servs.*, 925 F.2d 866, 875 n.9 (5th Cir. 1991)). "Section 1983 does not waive the states' sovereign immunity[.]" *Id.* (citing *Quern v. Jordan*, 440 U.S. 332, 338 n.7 (1979)).

Indeed, "[t]he Supreme Court has 'held that a State is not a 'person' against whom a § 1983 claim for money damages might be asserted.' " *Griffin v. La. State Bd. of Nursing*, No. 21-303, 2021 WL 5239585, at *5 (M.D. La. Nov. 10, 2021) (deGravelles, J.) (quoting *Williams v.*

*Louisiana*, No. 17-453, 2019 WL 1003645, at *4 (M.D. La. Feb. 28, 2019) (deGravelles, J.) (quoting *Med. RX/Sys., P.L.L.C. v. Tex. Dep't of State Health Servs.*, 633 F. App'x 607, 610 (5th Cir. 2016) (citing *Lapides v. Bd. of Regents of Univ. Sys. of Ga*, 535 U.S. 613, 617 (2002)))). "This rule extends to 'arms of the state,' and to a state's 'officials acting in their official capacities.' " *Id.* (quoting *Williams*, 2019 WL 1003645, at *4 (internal citations and quotations omitted)).

Nevertheless, "[i]n *Ex Parte Young*, 209 U.S. 123, 28 S. Ct. 441, 52 L.Ed. 714 (1908), the Supreme Court carved out an exception to Eleventh Amendment immunity." *Aguilar*, 160 F.3d at 1054. "The [*Ex Parte Young*] Court held that enforcement of an unconstitutional law is not an official act because a state can not confer authority on its officers to violate the Constitution or federal law." *Id.* (citing *Am. Bank & Tr. Co. of Opelousas v. Dent*, 982 F.2d 917, 920–21 (5th Cir. 1993)). "To meet the *Ex Parte Young* exception, a plaintiff's suit alleging a violation of federal law must be brought against individual persons in their official capacities as agents of the state, and the relief sought must be declaratory or injunctive in nature and prospective in effect." *Id.* (citing *Saltz v. Tenn. Dep't of Emp. Sec.*, 976 F.2d 966, 968 (5th Cir. 1992)).

Nevertheless, "state officials cannot be sued for violations of state law in federal court, even under the *Ex Parte Young* exception." *Corn v. Miss. Dep't of Pub. Safety*, 954 F.3d 268, 275 (5th Cir.), *cert. denied*, 141 S. Ct. 672 (2020) (citing *Pennhurst*, 465 U.S. at 106 (We cannot "instruct[ ] state officials on how to conform their conduct to state law.")). Thus, the Eleventh Amendment bars state law claims against states and state officials in their official capacity for damages *and* for injunctive and declaratory relief. *See id.* at 274–75.

### D.  Analysis

There is little dispute on this issue.  Plaintiffs do not seriously argue that DPSC is not an "arm of the state" entitled to Eleventh Amendment immunity, nor could it. *See Hanna v. LeBlanc*,

716 F. App'x 265, 268 (5th Cir. 2017) (per curiam) ("DPS & C, as a Louisiana executive department . . . [is] entitled to the Eleventh Amendment's protection." (citations omitted)). Further, Plaintiffs concede that they only bring claims for injunctive and declaratory relief against LeBlanc. (Doc. 32 at 4–5.) Meanwhile, LeBlanc does not even contend in his reply that the claims are not for prospective declaratory and injunctive relief. (*See* Doc. 46 at 3.)

The sole matter not resolved expressly by the parties is clear from the caselaw; as LeBlanc correctly argues, the *Ex parte Young* exception does not apply to state law claims against state officials in their official capacity. *See Corn*, 954 F.3d at 274–75 (dismissing state law claims for injunctive and declaratory relief against state and state officers in their official capacity because of Eleventh Amendment immunity and because *Ex parte Young* did not save such claims). Thus, the Rule 12(b)(1) motion will be granted. All official capacity claims against LeBlanc, except the claims against him for injunctive and declaratory relief under § 1983, will be dismissed without prejudice.

## IV.    Rule 12(b)(6) Standard

In *Johnson v. City of Shelby*, the Supreme Court explained "Federal pleading rules call for a 'short and plain statement of the claim showing that the pleader is entitled to relief,' Fed. R. Civ. P. 8(a)(2); they do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." 574 U.S. 10, 11 (2014) (citation omitted).

Interpreting Rule 8(a) of the Federal Rules of Civil Procedure, the Fifth Circuit has explained:

> The complaint (1) on its face (2) must contain enough factual matter (taken as true) (3) to raise a reasonable hope or expectation (4) that discovery will reveal relevant evidence of each element of a claim. "Asking for [such] plausible grounds to infer [the element of a claim] *does not impose a probability requirement* at the pleading stage; it simply calls for enough facts to raise a reasonable

14

> expectation that discovery will reveal [that the elements of the claim existed]."

*Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 257 (5th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

Applying the above case law, the Western District of Louisiana has stated:

> Therefore, while the court is not to give the "assumption of truth" to conclusions, factual allegations remain so entitled. Once those factual allegations are identified, drawing on the court's judicial experience and common sense, the analysis is whether those facts, which need not be detailed or specific, allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." [*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)]; *Twombly*, 55[0] U.S. at 556. This analysis is not substantively different from that set forth in *Lormand, supra*, nor does this jurisprudence foreclose the option that discovery must be undertaken in order to raise relevant information to support an element of the claim. The standard, under the specific language of Fed. R. Civ. P. 8(a)(2), remains that the defendant be given adequate notice of the claim and the grounds upon which it is based. This standard is met by the "reasonable inference" the court must make that, with or without discovery, the facts set forth a plausible claim for relief under a particular theory of law provided that there is a "reasonable expectation" that "discovery will reveal relevant evidence of each element of the claim." *Lormand*, 565 F.3d at 257; *Twombly*, 55[0] U.S. at 556.

*Diamond Servs. Corp. v. Oceanografia, S.A. De C.V.*, No. 10-177, 2011 WL 938785, at *3 (W.D. La. Feb. 9, 2011) (citation omitted).

The Fifth Circuit further explained that, in deciding a Rule 12(b)(6) motion, all well-pleaded facts are taken as true and viewed in the light most favorable to the plaintiff. *Thompson v. City of Waco*, 764 F.3d 500, 502–03 (5th Cir. 2014). The task of the Court is not to decide if the plaintiff will eventually be successful, but to determine if a "legally cognizable claim" has been asserted. *Id.* at 503.

## V.        Rule 12(b)(6) Motion as to Section 1983 Claims

### A.  Parties' Arguments

#### 1. LeBlanc's Original Memorandum (Doc. 26-1)

LeBlanc next seeks dismissal of the remaining federal claims against him. (Doc. 26-1 at 5–6.)  LeBlanc argues that he was in no way involved in the day-to-day operation of MPCC, and he had no right to dictate how that facility operates. (*Id.* at 6.)  DPSC simply entered into a partnership with the Sheriffs to hold prisoners, yet Plaintiffs seek to impose liability merely because they were mistreated by employees of Lasalle and Byrd. (*Id.*)  The allegations against LeBlanc amount to mere conclusions. (*Id.*)

LeBlanc next argues that he is entitled to qualified immunity. (*Id.*)  Again, LeBlanc had no "direct involvement in the day-to-day operations of MPCC," and any such responsibility resided with others. (*Id.* at 7.)  Jails were required to follow the Guidelines, and "Plaintiffs even admit that those basic guidelines have been periodically updated and revised over the years." (*Id.* (citing Doc. 4-1 ¶ 23).)  LeBlanc cannot be deliberately indifferent in his decision to contract with the Sheriff or in the contents of the guidelines or compliance with same.

#### 2. Plaintiffs' Opposition (Doc. 32)

Plaintiffs respond that they do not have to allege day-to-day involvement to state a viable claim. (Doc. 32 at 6.)  Rather, the claims against LeBlanc (in both his individual and official capacities) "arise from his failure as a supervisor to implement and enforce policies and procedures to ensure that the local jails holding sentenced prisoners, including MPCC, are housing people in conditions of confinement that meet the obligations of the . . . Constitution." (*Id.*)

Plaintiffs claim that LeBlanc is the policymaker for local jails housing sentenced prisoners. (*Id.*)  The Guidelines were established to protect offender rights in these housing arrangements,

and "LeBlanc has confirmed in testimony that local sheriffs must agree to operate and maintain the jail facility in accordance with the Basic Jail Guidelines." (*Id.* at 7.) Further, "LeBlanc has confirmed that DPSC can direct sheriff's practices through the . . . Guidelines and annual audits." (*Id.*)

As to deliberate indifference, Plaintiffs assert, "Failure to ensure institutions housing sentenced prisoners have a sufficient written classification policy, and abide by that policy, creates an obvious risk to individual constitutional rights for sentenced and pre-trial people held at such facilities." (*Id.* at 9.) According to Plaintiffs, the Fifth Circuit recognizes both a duty to protect prisoners from violence by inmates generally and a specific need to have a classification system. (*Id.*) Plaintiffs point to *Pembroke v. Wood Cnty.*, 981 F.2d 225, 229 (5th Cir. 1993), in support of this position. (*Id.*)

Here, the Guidelines specifically require a classification system that considers a number of factors when determining housing assignments and which uses an objective process to identify appropriate custody, housing assignment, and interest in and eligibility for programs. (*Id.* at 10.) The Guidelines also include documentation requirements. (*Id.*)

Plaintiffs also point to a Strategic Plan for Fiscal Year 2020-21. (*Id.*) This document states as an objective using local facilities as an effective alternative to State facilities, and two strategies listed are, "Ensure compliance with basic jail guidelines" and "Increase the use of reception center functions to ensure appropriate housing assignments." (*Id.*)

According to Plaintiffs, LeBlanc knew or should have known that he did not have a policy and that this put all prisoners (sentenced and pre-trial detainees) at a serious risk of harm. (*Id.*) MPCC's classification policy lacks basic requirements:

> The stated aim of the MPCC classification policy, which was in effect through the relevant time, was "to provide an offender work

force to accomplish the maintenance needs of the facility to the best extent possible." [Exhibit 6, MPCC Classification Policy.] The policy then states initial intakes are held in administrative segregation for 48 hours while an intake process is completed and then moved to general population. MPCC offers only three options for classifying prisoners and detainees – general population, trustee, and administrative segregation. The remainder of the policy defines minimum criteria for trustee status. There is functionally, no written classification policy at MPCC, and no classification policy or practice that satisfies the minimal requirements outlined in the Guidelines. . . . Exhibit 6, MPCC Classification Policy. Significantly, the only question reviewed by some of DPSC's annual monitoring focuses on the question of trustees, ECF No. 27, ¶31, and other audit reports approve MPCC's insufficient classification policy as complying with BJG's detailed requirements. Exhibit 7, MPCC Annual Monitoring Reports. Generally, these annual monitoring reports highlight the lack of oversight on corrections practice central to ensuring the safety of people held in local jails used by DPSC to house sentenced people. ECF No. 27, ¶ 48.

(*Id.* at 11, 11 n.58.)

Plaintiffs continue by saying that "[r]ecords obtained from MPCC strongly suggest that classification practice is as perfunctory as the policy would suggest." (*Id.*)  Plaintiffs then point to allegations reflecting that Murray was housed with those who had been sentenced, even though he was a pretrial detainee at the time of his arrival at MPCC. (*Id.* (citing *SAC* ¶¶ 49–52, Doc. 27).) Plaintiffs also refer to their allegations that those who attacked Murray had the same classification status as him, even though they were sentenced and had significant disciplinary histories. (*Id.* (citing *SAC* ¶¶ 60–64, Doc. 27).)  Plaintiffs also refer to the numerous documented incidents involving inmates and violence in the quarterly reporting from several facilities. (*Id.* (citing *SAC* ¶¶ 39–40), Doc. 27).)  Yet,

Despite these reports of actual harm befalling both sentenced and pre-trial people at local jails failing to follow Basic Jail Guidelines, DPSC annual monitoring failed to engage in any analysis of classification policies and procedures to determine if the local facility was in compliance with the Basic Jail Guidelines' classification requirements. Obvious and dangerous deficiencies in

> classification policy and practice appear to have gone entirely unmentioned in monitoring reports.
>
> Taking Plaintiffs['] claims as true, as required at this stage, MPCC does not comply with BJG classification requirements, creating an intolerable risk of harm to people at MPCC including Plaintiffs.

(*Id.* at 11–12.)

In sum, LeBlanc "knew or should have known that MPCC did not have a classification policy [or practices] that complied with Basic Jail Guidelines or the Constitution" and "that sentenced and pre-trial individuals at local jails, including MPCC, were at risk of harm and being harmed by unconstitutional failures to classify individuals." (*Id.* at 12.)  Nevertheless, LeBlanc "continues to house sentenced people in facially unconstitutional conditions at MPCC, perpetuating serious risks of harm to both sentenced and un-sentenced people," all of which resulted in serious harm to Plaintiffs and continues to cause them same. (*Id.* at 13.)

Plaintiffs also maintain that LeBlanc is not entitled to qualified immunity.  (*Id.*)  According to Plaintiffs, it is clearly established that the state has a duty to protect individuals when they have been restrained, and that duty includes (1) a duty to protect them from other prisoners and (2) this duty "has long specifically extended to ensuring an adequate classification system which, at a minimum, keeps separate sentenced and pre-trial people." (*Id.*)  Further, Plaintiffs have pled a violation of those rights, as demonstrated above. (*Id.* at 14.)

Plaintiffs argue in the alternative that the Court should defer any qualified immunity analysis pending discovery. (*Id.*)  They also assert that, if they have failed to state a claim, they should be given leave to amend to cure the deficiencies. (*Id.* at 15.)

### 3. LeBlanc's Reply (Doc. 46)

LeBlanc responds that "Plaintiffs have pled no facts or acts on the part of Mr. LeBlanc that could even remotely approach the standard for deliberate indifference." (Doc. 46 at 4.)  LeBlanc

highlights how Plaintiffs have not pled that LeBlanc's job involved personally visiting each prison, studying their operations, and determining whether the facility was compliant with the guidelines. (*Id.*)  Further, Plaintiffs do not claim that LeBlanc "directly participated in the implementation or annual monitoring of MPCC's . . . Guideline compliance" or that any person advised LeBlanc that the classification system failed to comply with the Guidelines. (*Id.* at 4–5.)  LeBlanc then asserts:

> To the contrary, Plaintiffs admit that DPSC created and required the implementation of Basic Jail Guidelines for purposes of protecting offenders in local custody, that DPSC periodically reviewed and updated those guidelines, and that DPSC performed annual monitoring as to local facilities' compliance with those guidelines. Even if DPSC's monitoring activities were somehow deficient, which is denied, such deficiency would still not amount to deliberate indifference on the part of Secretary LeBlanc, an individual who is not even alleged to have directly participated in the actual monitoring of local facilities.

(*Id.* at 5.)

As to qualified immunity, LeBlanc argues that the opposition's claim that he was aware of the problems with the classification system is conclusory. (*Id.*) There are simply no allegations that LeBlanc personally participated with the monitoring of MPCC or "was advised as a result of monitoring that MPCC did not have a proper classification policy." (*Id.*)  Even if LeBlanc was negligent, he would still be entitled to qualified immunity. (*Id.*)

As to the Eighth Amendment claim, again, Plaintiff must plead deliberate indifference, which is a subjective standard. (*Id.* at 6.)  Again, there are no allegations that LeBlanc knew the classification system was deficient or that MPCC's procedures presented an unreasonable risk of harm. (*Id.*)  Further, even if there were a violation, LeBlanc would be entitled to qualified immunity. (*Id.* at 6–7.)

As to supervisor liability, LeBlanc says the claim should be dismissed because it is made against him in his official capacity only; such claims for monetary relief are not viable. (*Id.*)

Further, any request to amend should be denied as futile because Plaintiffs cannot show that LeBlanc was deliberately indifferent or not entitled to qualified immunity. (*Id.*)

LeBlanc closes by arguing that Plaintiffs are essentially trying to bypass the bedrock rule that supervisory officials cannot liable under § 1983 under the theory of respondeat superior. (*Id.* at 8.)

> Specifically, Plaintiffs are attempting to make Mr. LeBlanc, who was the head of a large state agency, individually responsible for MPCC's alleged failure to comply with DPSC's Basic Jail Guidelines. Plaintiffs are also asking this Court to hold Mr. LeBlanc individually responsible for DPSC's supposed failure to discover that MPCC was allegedly not in compliance with the Basic Jail Guidelines. Yet Plaintiffs do not even allege (because they cannot) that Mr. LeBlanc was involved in the daily affairs of MPCC, or that Mr. LeBlanc was ever advised by anyone that MPCC's classification system was not in compliance with the Basic Jail Guidelines.
>
> There is simply no plausible nexus between the injuries Plaintiffs claim to have suffered in this matter and Mr. LeBlanc. The Complaint leaves little doubt that Mr. LeBlanc was sued merely because he was the head of DPSC. For the reasons set forth above, all the claims asserted against Mr. LeBlanc should be dismissed. Additionally, because no amendment to the pleadings would overcome the clear immunities that Mr. LeBlanc is entitled to under federal and state law, as it relates to Plaintiffs' claims that MPCC classification system was deficient, Plaintiffs should not be allowed to amend their Complaint.

(*Id.* at 8–9.)

## B. Law and Analysis

### 1. Preliminary Note on Evidence

"In determining whether a plaintiff's claims survive a Rule 12(b)(6) motion to dismiss, the factual information to which the court addresses its inquiry is limited to (1) the facts set forth in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial notice may be taken under Federal Rule of Evidence 201." *Inclusive Communities Project, Inc. v. Lincoln*

21

*Prop. Co.*, 920 F.3d 890, 900 (5th Cir. 2019) (citations omitted). However, "[a]lthough 'a court may also consider documents attached to either a motion to dismiss or an opposition to that motion when the documents are referred to in the pleadings and are central to a plaintiff's claims,' the court need not do so." *Brackens v. Stericycle, Inc.*, 829 F. App'x 17, 23 (5th Cir. 2020) (per curiam) (quoting *Brand Coupon Network, L.L.C. v. Catalina Mktg. Corp.*, 748 F.3d 631, 635 (5th Cir. 2014)).

Here, Plaintiffs attach a number of documents to their opposition. These include the Guidelines (Pls. Ex. 1), Departmental Regulation (Pls. Ex. 2), various depositions given by LeBlanc in different cases (Pls. Exs. 3, 4), DPSC Strategic Plan for Fiscal Year 2020-21 (Pls. Ex. 5), the MPCC Classification Policy (Pls. Ex. 6), the MPCC Annual Monitoring Reports (Pls. Ex. 7), and certain quarterly and annual reports (Pls. Exs. 8–11).

While some documents like the Guidelines were clearly referenced in the *SAC*, others like LeBlanc's testimony, were clearly not. Rather than parsing out which of these exhibits were referenced to and central to the *SAC* and which were not (an effort which would be all the more daunting because neither party made any argument on this issue), the Court will simply exercise its discretion and decline to consider them at this time. *See Brackens*, 829 F. App'x at 23 (finding no abuse of discretion "in excluding ... exhibits, even though some were referenced in [plaintiff's] pleading." (citing *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) (using permissive language regarding a court's ability to rely on documents incorporated into the complaint by reference)). Thus, the Court will assess the viability of Plaintiffs' claims based solely on the *SAC*.

### *2. Summary*

Plaintiffs bring § 1983 claims under (1) the Fourteenth Amendment against all defendants in their individual capacities, (*SAC* ¶¶ 131–36, Doc. 27); (2) the Eighth Amendment, against all defendants in their individual and official capacities, (*id.* ¶¶ 137–143); and (3) and "*Monell, Hinojosa,* and Supervisory Liability*"* against all Defendants in their official capacity, (*id.* ¶¶ 144–159). But, as Plaintiffs assert in their opposition, the heart of their federal claims against LeBlanc lies in "his failure as a supervisor to implement and enforce policies and procedures to ensure that the local jails holding sentenced prisoners, including MPCC, are housing people in conditions of confinement that meet the obligations of the . . . Constitution." (Doc. 32 at 6.)

Meanwhile, the crux of LeBlanc's argument is that Plaintiffs fail to allege that he acted with deliberate indifference. As will be noted below, Plaintiffs seem to agree that this is a primary issue. Thus, deliberate indifference is a common thread running throughout these claims. *See Malone v. City of Fort Worth*, 297 F. Supp. 3d 645, 656 (N.D. Tex. 2018) ("Failure-to-supervise claims are governed by the same deliberate-indifference standard regardless of whether they are based on municipal liability or individual supervisory liability." (citing *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 453 (5th Cir. 1994) ("The legal elements of an individual's supervisory liability and a political subdivision[]'s liability . . . are similar enough that the same standards of fault and causation should govern")). Thus, this issue will be the focus of the Court's inquiry.

### *3. Official Capacity Claims*

#### *a.* Applicable Law

"An official capacity suit is the equivalent of a suit against the entity of which the officer is an agent. To determine whether a public official is liable in his official capacity, the Court looks to the jurisprudence discussing whether a municipality or local government entity is liable

under section 1983." *Skinner v. Ard*, 519 F. Supp. 3d 301, 312 (M.D. La. 2021) (deGravelles, J.) (quoting *Romain v. Governor's Off. of Homeland Sec.*, No. 14-660, 2016 WL 3982329, at *6 (M.D. La. July 22, 2016) (citations and quotations omitted)). At the outset, it should be noted that "a federal court may [not] apply a 'heightened pleading standard'—more stringent than the usual pleading requirements of Rule 8(a) of the Federal Rules of Civil Procedure—in civil rights cases alleging municipal liability under ... § 1983." *Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 164 (1993).

"Section 1983 offers no *respondeat superior* liability." *Pineda v. City of Hous.*, 291 F.3d 325, 328 (5th Cir. 2002). "Municipalities face § 1983 liability 'when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury. . . .' " *Id.* (quoting *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978)). That is, "[a] municipality is liable only for acts directly attributable to it 'through some official action or imprimatur.' " *Valle v. City of Hous.*, 613 F.3d 536, 541 (5th Cir. 2010) (quoting *Piotrowski v. City of Hous.*, 237 F.3d 567, 578 (5th Cir. 2001)). "To establish municipal liability under § 1983, a plaintiff must show the deprivation of a federally protected right caused by action taken 'pursuant to an official municipal policy.' " *Id.* (quoting *Monell*, 436 U.S. at 691). The Plaintiffs must allege "(1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy or custom." *Id.* at 541–42 (quoting *Pineda*, 291 F.3d at 328 (quoting *Piotrowski*, 237 F.3d at 578)).

Similarly, to prevail on a failure-to-supervise claim, "the plaintiff must show that (1) the supervision policies of the municipality were inadequate, (2) the municipality was deliberately indifferent in adopting such polices, and (3) the inadequate-supervision policies directly caused

the plaintiff's injuries." *Malone*, 297 F. Supp. 3d at 656 (citing *Callaway v. Travis Cnty.*, No. 15-103, 2016 WL 4371943, at *11 n.10 (W.D. Tex. July 28, 2016)); *see also Skinner*, 519 F. Supp. 3d at 314 ("All failure to act claims, such as ... failure to train [or] supervise ... involve the same basic elements: inadequacy, deliberate indifference, and causation." (citing *Snow v. City of El Paso, Texas*, 501 F. Supp. 2d 826, 833 n. 5 (W.D. Tex. 2006) (citations omitted))).

"[D]eliberate indifference is a stringent standard of fault, requiring [allegations] that a municipal actor disregarded a known or obvious consequence of his action." *Skinner*, 519 F. Supp. 3d at 314 (citing *Connick v. Thompson*, 563 U.S. 51, 61 (2011)). "Only when a failure to train or supervise reflects a 'deliberate' or 'conscious' choice can a municipality be liable for such a failure under § 1983. *Malone*, 297 F. Supp. 3d at 656 (citing *City of Canton v. Harris*, 489 U.S. 378, 388–89 (1989)).

"Proof that a single constitutional violation resulted from inadequate supervision is ordinarily insufficient to hold a municipality liable for inadequate supervision." *Malone*, 297 F. Supp. 3d at 656 (citing *Thompson v. Upshur Cnty.*, 245 F.3d 447, 459 (5th Cir. 2001) (citing *Snyder v. Trepagnier*, 142 F.3d 791, 798–99 (5th Cir. 1998))). "The plaintiff must usually demonstrate a pattern of similar violations to establish the deliberate indifference required to impose municipal liability for failure to supervise." *Id.* (citing *Thompson*, 245 F.3d at 459). "Plaintiffs 'must show that "in light of the duties assigned to specific officers or employees the need for more or different training [or supervision] is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." ' " *Skinner*, 519 F. Supp. 3d at 314 (quoting *Valle*, 613 F.3d at 547 (quoting *City of Canton*, 489 U.S. at 390). As the Supreme Court summarized in the analogous failure-to-train context:

> Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program. The city's "policy of inaction" in light of notice that its program will cause constitutional violations 'is the functional equivalent of a decision by the city itself to violate the Constitution. A less stringent standard of fault for a failure-to-train claim would result in *de facto respondeat superior* liability on municipalities[.] . . . *see also Pembaur* [*v. City of Cincinnati*, 475 U.S. 469] *supra*, at 483, 106 S. Ct. 1292 [89 L.Ed.2d 452 (1986)] (opinion of Brennan, J.) ("[M]unicipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by [the relevant] officials . . . ").
>
> A pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train. Policymakers' continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the "deliberate indifference"—necessary to trigger municipal liability. Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.

*Skinner*, 519 F. Supp. 3d at 314–15 (quoting *Connick*, 563 U.S. at 61–62 (citations and quotations mostly omitted)).

"A showing 'of deliberate indifference is difficult, although not impossible, to base on a single incident.' " *Id.* at 315 n.4 (quoting *Valle*, 613 F.3d at 549 (citation omitted)). "The 'single incident exception' is extremely narrow; a plaintiff must prove that the *highly predictable consequence* of a failure to train would result in the specific injury suffered, and that the failure to train represented the moving force behind the constitutional violation." *Id.* (quoting *Valle*, 613 F.3d at 549, emphasis by *Valle*, citations and quotations omitted).  In *Connick*, the Supreme Court summarized the type of scenario envisioned by this exception:

26

In *Canton*, the [Supreme] Court left open the possibility that, "in a narrow range of circumstances," a pattern of similar violations might not be necessary to show deliberate indifference. The Court posed the hypothetical example of a city that arms its police force with firearms and deploys the armed officers into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force. Given the known frequency with which police attempt to arrest fleeing felons and the "predictability that an officer lacking specific tools to handle that situation will violate citizens' rights," the Court theorized that a city's decision not to train the officers about constitutional limits on the use of deadly force could reflect the city's deliberate indifference to the "highly predictable consequence," namely, violations of constitutional rights. The Court sought not to foreclose the possibility, however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations.

*Connick*, 563 U.S. at 63–64 (internal citations omitted).  Similarly, the Fifth Circuit discussed its case law on the single incident exception in *Valle*:

In the one case in which we found a single incident sufficient to support municipal liability, there was an abundance of evidence about the proclivities of the particular officer involved in the use of excessive force. *See Bryan County,* 219 F.3d at 462 (finding deliberate indifference based on the police officer's known "personal record of recklessness and questionable judgment," inexperience, exuberance, and involvement in forcible arrest situations). On the other hand, we have rejected claims of deliberate indifference even where a municipal employer knew of a particular officer's propensities for violence or recklessness. *See, e.g.,* [*Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 382–85 (5th Cir. 2005)] (finding no deliberate indifference even though city was aware that officer fired weapon inappropriately, had a propensity for violence, and had received citizen complaints about the officer); *Snyder v. Trepagnier,* 142 F.3d 791, 798 (5th Cir. 1998) (rejecting claim of deliberate indifference even though evidence showed officer was extremely stressed, may have had a quick temper, and was aggressive). This court has been wary of finding municipal liability on the basis of a single incident to avoid running afoul of the Supreme Court's consistent rejection of respondeat superior liability. *See, e.g., Pineda,* 291 F.3d at 334–35 (noting that the court rarely finds municipal liability for a failure to train claim on the basis of a single incident).

*Valle*, 613 F.3d at 549.

"The single incident exception requires proof [or in this case, allegations] of the possibility of recurring situations that present an obvious potential for violation of constitutional rights and the need for additional or different police training." *Id.* (citations omitted). "Indeed, in considering the single-incident exception, several panels of [the Fifth Circuit] . . . have reviewed cases where a decision not to train was made long before the alleged violation, and found that the lack of any similar violations indicates that a violation could not be the 'highly predictable consequence of failing to train." *Id.* at 550 (cleaned up). "This approach reflects common sense: if there have been thousands of opportunities for municipal employees to violate citizens' constitutional rights, and yet there have been no previous violations, then the need for training is simply not 'so obvious.' " *Id.* (cleaned up).

*b.* Analysis

Having carefully considered the matter, the Court will grant the motion to dismiss. In sum, Plaintiffs have failed to allege that LeBlanc acted with deliberate indifference.

The allegations against LeBlanc are sparse. Plaintiffs claim that the Guidelines used to operate non-DPSC facilities are periodically updated and revised; that they were most recently reviewed on October 1, 2019; and that LeBlanc signed them. (*SAC* ¶ 22, Doc. 27.) Plaintiffs further allege:

> Secretary [LeBlanc] chose to continue to contract with Sheriff [Byrd] and the Madison Parish Law Enforcement District to house sentenced DPSC prisoners at MPCC. Defendant [LeBlanc] has authority to determine whether to house DPSC prisoners at local facilities based on the facilities' adherence to the Guidelines. Further, Secretary [LeBlanc] has authority to review files and other necessary information to determine if local facilities are complying with the Guidelines, but did not avail himself of this power. Despite the reports of assaults and deaths, the clear presence of weapons and other contraband, and the lack of classification system at MPCC,

28

> [LeBlanc] took no steps to look beyond the self-serving reports offered by [Lasalle] and Defendant [Byrd] regarding compliance with the Guidelines and the adequacy of the conditions of confinement for DPSC prisoners.

(*Id.* ¶ 45.)  Plaintiffs conclude:

> It was and is the policy and/or custom of Defendant [LeBlanc] to inadequately monitor, audit, review, and supervise local jail facilities, including MPCC to ensure sentenced prisoners were not subjected to unconstitutional conditions or unreasonable risks of harm, thereby failing to adequately discourage further constitutional violations at local facilities tasked with holding sentenced DPSC prisoners and creating a risk of harm to both sentenced and un-sentenced detainees held in these institutions.

(*Id.* ¶ 48.)

But these allegations are largely conclusory and reflect a lack of deliberate indifference. Again, Plaintiffs must allege that LeBlanc was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that he "actually drew the inference." *Estate of Davis*, 406 F.3d at 381.  To the contrary, Plaintiffs here specifically allege that LeBlanc did "not avail himself of [the] power . . . to review files and other necessary information to determine if local facilities are complying with the Guidelines[.]" (*SAC* ¶ 45, Doc. 27.)  Plaintiffs also say that "[LeBlanc] took no steps to look beyond the self-serving reports offered by [Lasalle] and Defendant [Byrd] regarding compliance with the Guidelines and the adequacy of the conditions of confinement for DPSC prisoners." (*Id.*)    That is to say, even construing the allegations in a light most favorable to Plaintiffs, they admit in their operative complaint that LeBlanc did *not* know what happened at MPCC.  This is insufficient to show that LeBlanc actually drew the inference that a substantial risk of harm existed to these Plaintiffs.

Further, "[t]he plaintiff must usually demonstrate a pattern of similar violations to establish the deliberate indifference required to impose municipal liability for failure to supervise," *Malone*,

297 F. Supp. 3d at 656.  "A pattern . . .  requires 'sufficiently numerous prior incidents,' as opposed to 'isolated instances.' " *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 851 (5th Cir. 2009) (quoting *McConney v. City of Hous.*, 863 F.2d 1180, 1184 (5th Cir. 1989)).

Here, Plaintiffs refer to "reports of assaults and deaths, the clear presence of weapons and other contraband, and the lack of classification system at MPCC," (*SAC* ¶ 45, Doc. 27), but such allegations also fail to justify relief at this time.  Plaintiffs allege that LeBlanc received reports of various incidents of violence, including four instances of stabbings involving DPSC and non-DPSC individuals in January and May 2020, (*id.* ¶ 37); three more deaths in September and October 2020, (*id.* ¶ 39); and at least nine serious assaults from January 2020 to January 2021, (*id.* ¶ 40), all involving prisoners at MPCC.

This number of incidents is very serious and troubling to the Court, and it could very easily be a constitutional violation at the motion to dismiss phase; however, at this time, the Court lacks sufficient information to see these assaults in context to find such a violation.  That is to say, the only figures provided by Plaintiffs is that Lasalle operated capacity for about 53% of the non-DPSC facility capacity (or about 8,208 people).  But Plaintiffs do not provide the total number of pretrial detainees and sentenced prisoners at MPCC so that the Court can evaluate whether this number of incidents during this time period with this sized-population represents a substantial risk of harm.  Without more, the Court cannot find deliberate indifference at this time. *See Peterson*, 588 F.3d at 851 (finding that 27 complaints of excessive force between 2002 and 2005 were insufficient to constitute a pattern in part because the police force was large in Fort Worth); *Pineda*, 291 F.3d at 329 (finding that eleven instances of warrantless entry in Houston did not support a pattern of unconstitutional warrantless entry).[4]

---

[4] The Court notes that Plaintiffs will be given leave to amend to supply this information.

Nor could the reduced number of incidents in this case be shoehorned into the single-incident exception.  This case is not nearly as extreme as *Connick* and is more comparable to those situations outlined in *Valle* which did not impose liability.  *See Valle*, 613 F.3d at 549.  Ultimately, the Court cannot find that the "the *highly predictable consequence* of [the] failure to [supervise] would result in the specific injury suffered." *Id.*

Other allegations also support a finding of no deliberate indifference.  Plaintiffs complain that the "[a]nnual monitoring reports include sparse discussion of compliance with various Guidelines. For example, the classification system focuses entirely on trustees working outside the secure perimeter of the facility with no metric to look beyond this narrow question." (*SAC* ¶ 31, Doc. 27.)  Plaintiffs further claim that "DPSC polices, guidelines and practices for local facilities are [facially] so vague that they cannot adequately protect sentenced DPSC prisoners and place both sentenced and un-sentenced prisoners at risk of harm from inadequate classification systems." (*Id.* ¶ 32.) "Perfunctory monitoring and audits allow non-DPSC facilities to ignore even these vague guidelines." (*Id.*)

But "sparse discussions," "vague" policies, and "perfunctory monitoring and audits" are insufficient, as "deliberate indifference requires a showing of more than negligence or even gross negligence." *Estate of Davis*, 406 F.3d at 381 (cleaned up). "Only when a failure to train or supervise reflects a 'deliberate' or 'conscious' choice can a municipality be liable for such a failure under § 1983." *Malone*, 297 F. Supp. 3d at 656 (citing *City of Canton*, 489 U.S. at 388–89).  The failures outlined in the operative complaint rise to the level of negligence or even gross negligence, but they do not satisfy the steep requirements of deliberate indifference.

For all these reasons, Plaintiffs' motion to dismiss the official capacity claims against LeBlanc will be granted.  These claims will be dismissed.

### 4. Individual Capacity Claims

a. Applicable Law

i. *Qualified Immunity Generally*

"Qualified immunity provides government officials performing discretionary functions with a shield against civil damages liability, so long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Gobert v. Caldwell*, 463 F.3d 339, 345 (5th Cir. 2006) (citing *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)). "In determining whether an official enjoys immunity, we ask (1) whether the plaintiff has demonstrated a violation of a clearly established federal constitutional or statutory right and (2) whether the official's actions violated that right to the extent that an objectively reasonable person would have known." *Id.* (citing *Hope v. Pelzer*, 536 U.S. 730 (2002)). Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

ii. *Due Process and Eight Amendment Violations*

"Pursuant to the Due Process Clause, a pretrial detainee may not be punished prior to an adjudication of guilt." *Jones v. Dall. Cnty.*, No. 21-10617, 2022 WL 3334493, at *2 (5th Cir. Aug. 12, 2022) (citing *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)). "When a pretrial detainee complains of conditions or restrictions of detention, 'the proper inquiry is whether those conditions amount to punishment of the detainee.' " *Id*. at *2 (citing *Bell*, 441 U.S. at 535 (footnote and citation omitted)). "Absent an expressed intent to punish on the part of prison officials, [ ] a restriction [of pretrial detention] is valid if 'an alternative purpose to which (the restriction) may rationally be connected is assignable for it' unless 'it appears excessive in relation to the alternative purpose

assigned (to it).' " *Id.* (quoting *Jones v. Diamond*, 636 F.2d 1364, 1369 (5th Cir. 1981), *overruled on other grounds*, *Int'l Woodworkers v. Champion Int'l Corp.*, 790 F.2d 1174 (5th Cir. 1986)). "In other words, 'if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to punishment.' " *Id.* (quoting *Jones*, 636 F.2d at 1369.

"In *Jones v. Diamond*, [the Fifth Circuit] held '[t]he confinement of pretrial detainees indiscriminately with convicted persons is unconstitutional unless such practice is reasonably related to the institution's interest in maintaining jail security . . . or physical facilities do not permit their separation.' " *Id.* at *3 (quoting *Jones*, 636 F.2d at 1374 (internal quotation marks and citation omitted)). "[P]retrial detainees have a due process right to be considered individually to the extent security and space requirements permit." *Id.* (quoting *Jones*, 636 F.2d at 1374). "Because in *Diamond* pretrial detainees and convicted persons 'were confined together and treated alike[,]' the court concluded the 'defendants [ ] failed to satisfy their constitutional duties.' " *Id.* (quoting *Jones*, 636 F.2d at 1374). Further:

> The court also directed the district court to grant the plaintiffs injunctive relief, specifically stating: '[T]he defendants [must] institute and operate a reasonable classification system for those confined," and "Pretrial detainees shall be classified and separated from convicted persons to the extent reasonably possible, except where detention in the same cell is required for institutional security." [*Jones*, 636 F.2d at 1376]; *cf. Pembroke v. Wood County*, 981 F.2d 225, 229 (5th Cir. 1993) (affirming finding of constitutional violation because "there was absolutely no classification system in place" to separate pretrial detainees and convicted detainees).

*Id.*

As to the Eight Amendment, the Fifth Circuit succinctly summarized the standard as follows:

33

The Supreme Court formally recognized and described the Eighth Amendment failure-to-protect theory in *Farmer v. Brennan:*

> [P]rison officials have a duty ... to protect prisoners from violence at the hands of other prisoners.... [G]ratuitously allowing the beating or rape of one prisoner by another serves no legitimate penological objectiv[e], any more than it squares with evolving standards of decency. Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society.

511 U.S. 825, 833–34 . . . (1994) (second and fifth alterations in original) (citations and internal quotation marks omitted). The Court went on to explain that, to succeed on such a claim, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm" and that the prison officials acted with "deliberate indifference" to the inmate's safety. *Id.* at 834 . . . . An official is deliberately indifferent when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. . . . The official's knowledge of the risk can be proven through circumstantial evidence, such as by showing that the risk was so obvious that the official must have known about it. *Id.* at 842. . . . Finally—and significantly for purposes of this case—there is no liability if the official "responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844. . . .

*Johnson v. Johnson*, 385 F.3d 503, 524 (5th Cir. 2004).

Additionally, "under *Jones v. Diamond*, failure to adequately classify inmates is a violation of the Eighth Amendment's prohibition against cruel and unusual punishment." *Pembroke*, 981 F.2d at 229.

### iii.   *Supervisory Liability*

But, as stated above, Plaintiffs maintain that their claims against LeBlanc lie in supervisor liability. " 'A supervisory official may be held liable . . .   only if (1) he affirmatively participates in the acts that cause the constitutional deprivation, or (2) he implements unconstitutional policies

that causally result in the constitutional injury.' " *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011) (quoting *Gates v. Tex. Dep't of Prot. & Reg. Servs.*, 537 F.3d 404, 435 (5th Cir. 2008)). " 'In order to establish supervisor liability for constitutional violations committed by subordinate employees, plaintiffs must show that the supervisor act[ed], or fail[ed] to act, with *deliberate indifference* to violations of others' constitutional rights committed by their subordinates.' " *Id.* (quoting *Gates*, 537 F.3d at 435 (internal quotation marks and citation omitted, alterations and emphasis in *Gates*)).

"[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Estate of Davis*, 406 F.3d at 381 (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997)). "For an official to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (quoting *Smith v. Brenoettsy*, 158 F.3d 908, 912 (5th Cir. 1998)). "Deliberate indifference requires a showing of more than negligence or even gross negligence." *Id.* (citing *City of Canton*, 489 U.S. at 388; *Doe*, 15 F.3d at 453). "Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference and do not divest officials of qualified immunity." *Id.* (quoting *Alton v. Tex. A&M Univ.*, 168 F.3d 196, 201 (5th Cir. 1999)).

Additionally, "[a] failure to adopt a policy can be deliberately indifferent when it is obvious that the likely consequences of not adopting a policy will be a deprivation of constitutional rights." *Porter*, 659 F.3d at 446 (quoting *Rhyne v. Henderson Cnty.*, 973 F.2d 386, 392 (5th Cir. 1992)). Nevertheless, "[l]iability for failure to promulgate policy . . . require[s] that the defendant . . . acted with deliberate indifference." *Id.* As the Fifth Circuit stated with respect to "failure-to-train" claims (and, by "logical" analogy, failure-to-supervise claims):

> To establish that a state actor disregarded a known or obvious consequence of his actions, there must be actual or constructive notice that a particular omission in their training program causes ... employees to violate citizens' constitutional rights and the actor nevertheless chooses to retain that program. A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference, because without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights. Without cabining failure-to-train claims in this manner (or, logically, failure-to-promulgate-policy claims), a standard less stringent than deliberate indifference would be employed, and a failure-to-train claim would result in *de facto respondeat* superior liability.

*Porter*, 659 F.3d at 447 (citations, alterations, and quotations omitted).

### iv.  *Violations of Clearly Established Law*

As to the second prong, "[q]ualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam) (alterations and internal quotation marks omitted)). "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)).

"Although '[the Supreme] Court's caselaw does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate.' " *Id.* (quoting *White*, 137 S. Ct. at 551 (internal quotation marks omitted)). "In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (quoting *White*, 137 S. Ct. at 551 (internal quotations omitted)).

"Of course, general statements of the law are not inherently incapable of giving fair and clear warning to officers." *Id.* at 1153 (quoting *White*, 137 S. Ct. at 552 (internal quotation marks omitted)). "But . . . [a]n officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.' " *Id.* (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779–80 (2014)).

Phrased another way, "When considering a defendant's entitlement to qualified immunity, [the Court] must ask whether the law so clearly and unambiguously prohibited his conduct that '*every* reasonable official would understand that what he is doing violates [the law].' " *McLin v. Ard*, 866 F.3d 682, 695 (5th Cir. 2017) (citing *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (en banc) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011))). "To answer that question in the affirmative, we must be able to point to controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity." *Id.* (quoting *Morgan*, 659 F.3d at 371–72 (internal quotations omitted) (quoting *al-Kidd*, 563 U.S. at 742)). "Where no controlling authority specifically prohibits a defendant's conduct, and when the federal circuit courts are split on the issue, the law cannot be said to be clearly established." *Id.* (quoting *Morgan*, 659 F.3d at 372).

v.    *Qualified Immunity and Discovery*

Fifth Circuit case law is clear on discovery and qualified immunity. "One of the most salient benefits of qualified immunity is protection from pretrial discovery, which is costly, time-consuming, and intrusive." *Zapata v. Melson*, 750 F.3d 481, 484–85 (5th Cir. 2014) (quoting *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012) (citing *Helton v. Clements*, 787 F.2d 1016 (5th Cir. 1986))). "Consequently, [the Fifth Circuit] has established a careful procedure under which a

district court may defer its qualified immunity ruling if further factual development is necessary to ascertain the availability of that defense." *Id.* at 485 (quoting *Backe*, 691 F.3d at 648). "[A] district court must first find 'that the plaintiffs pleadings assert facts which, if true, would overcome the defense of qualified immunity.' " *Id.* (quoting *Wicks v. Miss. State Emp. Servs.*, 41 F.3d 991, 994 (5th Cir. 1995)).  "Thus, a plaintiff seeking to overcome qualified immunity must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm he has alleged and that defeat a qualified immunity defense with equal specificity." *Id.* (quoting *Backe*, 691 F.3d at 648). "After the district court finds a plaintiff has so pleaded, if the court remains 'unable to rule on the immunity defense without further clarification of the facts,' it may issue a discovery order 'narrowly tailored to uncover only those facts needed to rule on the immunity claim.' " *Id*. (quoting *Backe*, 691 F.3d at 648 (quoting *Lion Boulos v. Wilson*, 834 F.2d 504, 507–08 (5th Cir. 1987))).

*b.*   Analysis

As stated above, "[f]ailure-to-supervise claims are governed by the same deliberate-indifference standard regardless of whether they are based on municipal liability or individual supervisory liability." *Malone*, 297 F. Supp. 3d at 656 (citing *Doe*, 15 F.3d at 453 ("The legal elements of an individual's supervisory liability and a political subdivision's liability . . . are similar enough that the same standards of fault and causation should govern")).

Thus, for the same reasons given in the official capacity section, the Court finds that LeBlanc is entitled to qualified immunity on Plaintiffs' Eighth Amendment claims; Plaintiffs have not shown that he "disregarded a known or obvious consequence of his action." *Estate of Davis*, 406 F.3d at 381 (cleaned up).  Again, at most, LeBlanc acted with gross negligence, but "[a]ctions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount

to deliberate indifference and do not divest officials of qualified immunity." *Id.* (cleaned up).  As a result, the claims against LeBlanc will be dismissed.  And since Plaintiffs have failed to overcome qualified immunity in their pleading and since the Court has no difficulty finding same "without further clarification of the facts," *Zapata*, 750 F.3d at 485, Plaintiffs are not entitled to any discovery at this time.[5]

## VI.    Rule 12(b)(6) Motion as to State Law Claims

### A.    Parties' Arguments

LeBlanc closes by arguing that he is entitled to discretionary immunity under Louisiana law for any state law claims. (Doc. 26-1 at 8.)  "Any decision to contract with the Sheriff of Madison Parish for the housing of certain inmates, and any decisions as to the precise level of oversight that DPSC would exercise over MPCC, would all constitute policymaking or discretionary acts that would fall within the confines of La. Rev. Stat. § 9:2798.1." (*Id.*)

Plaintiffs respond that this Court should decline LeBlanc's request for immunity.  (Doc. 32 at 15.)   Plaintiffs assert that "Ensuring the constitutionality of facilities housing sentenced

---

[5] The Court notes in closing that there is some ambiguity in Plaintiffs' Due Process claim.  Plaintiffs rely on the case of *Jones v. Diamond*, a case which, as discussed above, involved conditions of confinement under the Due Process clause of the Fourteenth Amendment.  The "reasonable-relationship test" used for such claims is "functionally equivalent to a deliberate indifference inquiry," *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 643 (5th Cir. 1996), but is framed somewhat differently; under this test, "if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to punishment." *Jones*, 2022 WL 3334493, at *2.

  However, Plaintiffs maintain that this claim requires a showing a deliberate indifference in their *SAC* and opposition. (*See SAC* ¶ 133, Doc. 27 (stating, under Count One's Fourteenth Amendment claim, that, "At all times described herein, the Defendants . . . acted unreasonably, recklessly, and with deliberate indifference and disregard for the safety, and constitutional and civil rights of Plaintiffs."); *Opposition*, Doc. 32 at 8–9 ("Defendant LeBlanc was deliberately indifferent to substantial risk of harm caused by failing to ensure classification policies and practices at local jails housing sentenced people.").)  Plaintiffs' position appears to be that all supervisor liability claims, including conditions of confinement claims under the Fourteenth Amendment generally and under *Jones v. Diamond* specifically, require a showing of deliberate indifference.  (*See Opposition*, Doc. 32 at 8–9.)

  Given Plaintiffs' position, this Court declines to review the matter further.  Any argument to the contrary is, at this time, waived. *See Miller v. La. Dep't of Corr.*, No. 21-390, 2022 WL 2080308, at *1 (M.D. La. June 9, 2022) (deGravelles, J.) (discussing issue of waiver, dismissing Plaintiffs' claims as waived for inadequate briefing, but allowing leave to amend to cure deficiencies (numerous citations omitted)).  Plaintiffs may (but are not required to) flush this issue out further in any amended pleading.

prisoners who are the responsibility of the Department is not a discretionary act because it is directed by the United States Constitution and attendant jurisprudence as well as state and federal statute." (*Id.*)  Further, LeBlanc has failed to demonstrate how his decisions were "grounded in social, economic, or political policy." (*Id.*)

LeBlanc replies (in a perfunctory way) that Plaintiffs have not adequately pled any state law claim. (Doc. 46 at 8.)  LeBlanc says:

> In their Opposition, Plaintiffs contend that this statute should not be applied by the Court because "LeBlanc has not explained how these decisions are grounded in social, economic, or political policy." However, it is beyond argument that any decisions as to the housing of prisoners in non-state facilities, the contracting with sheriffs of local parishes for the housing of such prisoners, and the staffing or resources to be allocated for DPSC's monitoring for compliance with Basic Jail Guidelines, to the extent even made by Mr. LeBlanc, would constitute decisions grounded in social, economic, or political policy.

(*Id.* at 8.)

### B.  Applicable Law

Judge Barbier recently and correctly summarized the law associated with Louisiana Revised Statute § 9:2798.1, which gives immunity to state officials for certain conduct:

> Louisiana's discretionary immunity statute provides that "[l]iability shall not be imposed on public entities or their officers or employees based upon the exercise or performance or the failure to exercise or perform their policymaking or discretionary acts when such acts are within the course and scope of their lawful powers and duties." La. Rev. Stat. § 9:2798.1(B). In determining whether immunity applies, Louisiana courts employ the two-step test set out by the United States Supreme Court in *Berkovitz v. United States*, 486 U.S. 531, . . . (1988), for determining immunity under the Federal Tort Claims Act. *Commerce & Indus. Ins. Co. v. Grinnell Corp.*, 280 F.3d 566, 571 (5th Cir. 2002). The first step requires that the action at issue be discretionary. *Id.* Conduct cannot be discretionary unless it involves an element of judgment or choice. Thus, immunity does not apply "when a federal statute, regulation, or policy specifically prescribes

a course of action for an employee to follow." *Id.* (quoting *Berkovitz*, 486 U.S. at 536 . . . ).

If there is no statutory, regulatory, or procedural policy directive dictating the employees' course of conduct, then the court proceeds to the second step of the test. The second step requires a court to "determine whether that judgment is of the kind that the discretionary function exception was designed to shield." *Id.* at 572 (quoting *Berkovitz*, 486 U.S. at 536–37. . . .). The discretionary immunity statute was designed to protect governmental actions and decisions based on considerations of public policy. *See id.* Thus, the statute immunizes a public entity or employee from suit "[o]nly if the discretionary act was grounded in social, economic, or political policy." *Id.*

The immunity offered by Louisiana's discretionary immunity statute is in the nature of an affirmative defense which must be specifically pleaded in the defendant's answer. *White v. City of New Orleans*, 806 So.2d 675, 677 (La. App. 4 Cir.2001). As such, the defendant bears the burden of proving that this statutory immunity applies. *Johnson v. Orleans Par. Sch. Bd.*, 975 So.2d 698, 710 (La.App. 4 Cir.2008).

*Mitchell v. City of New Orleans*, 184 F. Supp. 3d 360, 377 (E.D. La. 2016).

### C. Analysis

Having carefully considered the matter, the Court finds that LeBlanc is entitled to immunity under La. R.S. § 9:2798.1.  LeBlanc's conduct with respect to contracting and working with Lasalle and similar institutions was clearly discretionary, and any fair reading of the pleadings shows that his conduct was grounded in "social, economic, or political policy."  As a result, all state law claims will be dismissed.

### VII.  Leave to Amend

"[A] court ordinarily should not dismiss the complaint except after affording every opportunity to the plaintiff to state a claim upon which relief might be granted." *Byrd v. Bates*, 220 F.2d 480, 482 (5th Cir. 1955). The Fifth Circuit has further stated:

> In view of the consequences of dismissal on the complaint alone, and the pull to decide cases on the merits rather than on the sufficiency of pleadings, district courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal.

*Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002).

One leading treatise has further explained:

> As the numerous case[s] ... make clear, dismissal under Rule 12(b)(6) generally is not immediately final or on the merits because the district court normally will give the plaintiff leave to file an amended complaint to see if the shortcomings of the original document can be corrected. The federal rule policy of deciding cases on the basis of the substantive rights involved rather than on technicalities requires that the plaintiff be given every opportunity to cure a formal defect in the pleading. This is true even when the district judge doubts that the plaintiff will be able to overcome the shortcomings in the initial pleading. Thus, the cases make it clear that leave to amend the complaint should be refused only if it appears to a certainty that the plaintiff cannot state a claim. A district court's refusal to allow leave to amend is reviewed for abuse of discretion by the court of appeals. A wise judicial practice (and one that is commonly followed) would be to allow at least one amendment regardless of how unpromising the initial pleading appears because except in unusual circumstances it is unlikely that the district court will be able to determine conclusively on the face of a defective pleading whether the plaintiff actually can state a claim for relief.

5B Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2016).

Here, though Plaintiffs previously amended their complaint, they did not do so in response to a ruling by this Court assessing the sufficiency of their claims. Thus, "the Court will act in accordance with the 'wise judicial practice' and general rule and grant Plaintiff[s'] request." *Jordan v. Gautreaux*, No. 21-48, --- F. Supp. 3d ----, 2022 WL 895720, at *30–31 (M.D. La. Mar. 25, 2022) (quoting *Watkins v. Gautreaux*, 515 F. Supp. 3d 500, 519 (M.D. La. 2021) (deGravelles, J.) (citing *JMCB, LLC v. Bd. of Com. & Indus.*, 336 F. Supp. 3d 620, 641–42 (M.D.

La. 2018) (deGravelles, J.))); *see also Fetty v. La. State Bd. of Priv. Sec. Exam'rs*, No. 18-517, ---
F. Supp. 3d ----, 2020 WL 520026, at *15 (M.D. La. Jan. 31, 2020) (deGravelles, J.) ("because
Plaintiffs did not amend their complaint in response to a ruling by this Court, and because of the
above 'wise judicial practice,' the Court will grant Plaintiffs one final opportunity to amend their
complaint to state viable claims against the Board Members." (citing *JMCB*, 336 F. Supp. 3d at
641–42)); *Murphy v. Bos. Sci. Corp.*, No. 18-31, 2018 WL 6046178, at *1 (M.D. La. Nov. 19,
2018) (deGravelles, J.) (reaching same result) (citing, inter alia, *JMCB, supra*).

## VIII.   Conclusion

Accordingly,

**IT IS ORDERED** that the *Motion to Dismiss Pursuant to Rule 12(b)(1) & (6)* (Doc. 26)
filed by defendant James LeBlanc, Secretary of the Louisiana Department of Public Safety and
Corrections ("DPSC") is **GRANTED**, and all claims by Plaintiffs James Murray, Latavius
Paschal, and Antone Henderson against LeBlanc are **DISMISSED WITHOUT PREJUDICE.**

Plaintiffs will have twenty-eight (28) days from the issuance of this ruling to amend the
operative complaint to cure any deficiencies.  If Plaintiffs fail to cure these deficiencies within that
time, the Court will dismiss all claims dismissed above under Rule 12(b)(6) with prejudice.

Signed in Baton Rouge, Louisiana, on <u>September 20, 2022</u>.

_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**