**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| JAMES MURRAY; LATAVIUS PASCHAL; ANTONE HENDERSON,<br><br>Plaintiffs<br><br>v.<br><br>JAMES LEBLANC, SECRETARY OF DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS, et al,<br><br>Defendants | *<br>*<br>*<br>*<br>*<br>*<br>*<br>* | Civil Docket Number:<br>3:21-cv-592-JWD-RLB<br><br>JUDGE:<br>JOHN W. DEGRAVELLES<br><br>MAGISTRATE:<br>RICHARD L. BOURGEOIS |

**OPPOSITION TO SETH SMITH'S AND JAMES LEBLANC'S**
**MOTION FOR SUMMARY JUDGMENT**

NOW INTO COURT, through undersigned counsel, come Plaintiffs James Murray, Antone Henderson, and Latavius Paschal, who file this Opposition to Seth Smith and James LeBlanc's Motion for Summary Judgment.

## I.    PROCEDURAL HISTORY

On October 18, 2022, Plaintiffs filed their Third Amended Complaint (TAC) naming Chief of Operations Seth Smith and Secretary James LeBlanc of the Louisiana Department of Public Safety and Corrections (DPSC) as Defendants.[1] Plaintiffs' claims arise from repeated stabbings and attacks by both DPSC-sentenced prisoners and pretrial detainees while they were being held at Madison Parish Correctional Center (MPCC).[2] These attacks left Plaintiffs injured both physically and psychologically.

---

[1] ECF No. 64.
[2] In 2020, MPCC was operated by LaSalle Management, LLC, and was comprised of two buildings for men: Madison Correctional Center (MCC) or Building 3; and Southern Correctional Center (SCC) or Building 4. Exhibit 1, 2020 Contract between LaSalle Management and Madison Parish Law Enforcement District at 2.

Defendant LeBlanc and later Defendant Smith each filed Motions to Dismiss in which they took the position that neither LeBlanc nor Smith were responsible for day-to-day operations at MPCC, and further that LeBlanc and Smith were not advised MPCC was not in compliance with the Basic Jail Guidelines, such that they could not be considered deliberately indifferent to conditions at MPCC.[3] Nowhere in the three distinct Motions to Dismiss filed between LeBlanc and Smith did they take the extraordinary position that neither have any legal obligation to ensure the safety of pretrial detainees harmed by DPSC-sentenced prisoners in facilities for which these Defendants have responsibilities – that argument is advanced for the first time on this Motion for Summary Judgment.[4]

This Court denied LeBlanc's and Smith's Motions to Dismiss on August 31, 2023.[5] In denying Defendants' Motions, the Court assessed the supervisory liability claims against Defendants, finding that Plaintiffs had successfully pled and would need to prove the following elements:

- LeBlanc knows that local facilities[6] need to comply with the Basic Jail Guidelines (hereinafter "Guidelines" or "BJG") with respect to classification;[7]

- Smith passes knowledge of the operations of local facilities and their compliance with the Guidelines to LeBlanc "by virtue of their respective jobs and actions;"[8]

- Smith knows that MPCC fails to maintain a classification system consistent with the Guidelines and that MPCC is violent, based on reporting from local facilities;[9] and

---

[3] ECF No. 66-1; ECF No. 91-1.
[4] Crittindon v. LeBlanc, 37 F.4th 177, 191 (5th Cir. 2022).
[5] ECF No. 107.
[6] DPSC holds half of those prisoners sentenced to its custody in local facilities operated by parish sheriffs or private entities. These detention centers will be referred to throughout this Opposition as "local facilities" or "local jails."
[7] ECF No. 107 at 13.
[8] ECF No. 107 at 13-14.
[9] ECF No. 107 at 13-15.

- Despite their knowledge about the problems at and deficits of local facilities, "Smith and LeBlanc persisted with a system that lack[ed] meaningful external validation or evidence, thus turning a willfully blind eye by refusing to direct audits that meaningfully examine the implementation of the Guidelines' requirements in local facilities holding DPSC's prisoners," going "well beyond gross negligence and represent[ing] a deliberate choice by these policymakers and supervisors."[10]

As detailed below, in the course of discovery, Plaintiffs have amassed documentary and testimonial evidence from Defendants themselves and DPSC employees[11] that establishes genuine issues of material fact that defeat Defendants' Motion for Summary Judgment. Specifically:

- Smith and LeBlanc have authority over local facilities, including MPCC, and as such bear responsibility for the harms to Plaintiffs;[12]

- Three of the five assaults included in Plaintiffs' complaint involved DPSC-sentenced assailants;[13]

- Smith and LeBlanc were aware of the serious deficiencies at MPCC as they both directly receive and have access to information about operations at local facilities holding DPSC-sentenced prisoners;[14]

- MPCC did not have a classification system in compliance with the Basic Jail Guidelines, and this failure was known and knowable to Smith and LeBlanc;[15]

---

[10] ECF No. 107 at 16.
[11] Testifying as witnesses and organizational representatives pursuant to Fed. R. Civ. P. 30(b)(6).
[12] See, infra, at 8-15.
[13] See, infra, at 15-16.
[14] See, infra, at 13-15, 19-21.
[15] See, infra, at 17-24.

- Smith, LeBlanc, and DPSC employees all know and understand that classification is critical to ensuring the safety of prisoners, correctional staff, and the public;[16] and

- Violence at MPCC is so pervasive and consistent that it is a condition of confinement known and knowable to Smith and LeBlanc.[17]

## II.    LAW

### A.    Legal Standard for Summary Judgment

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."[18] The party asserting that a fact cannot be genuinely disputed must support the assertions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."[19] If a party has satisfied the requirements of Fed. R. Civ. P. 56(c), then summary judgment should be granted.[20]

Summary judgment can be granted only if the inferences drawn from the underlying facts have been viewed in a light most favorable to the nonmoving party.[21] A genuine issue is one that could permit a reasonable factfinder to enter a verdict in the non-moving party's favor.[22] A material fact is determined by substantive law and whether it could affect the outcome of the suit.[23]

### B.    Operative Law

---

[16] See, infra, at 18-19.
[17] See, infra, at 21-24.
[18] Fed. R. Civ. P. 56(a).
[19] Fed. R. Civ. P. 56(c)(1)(A).
[20] Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).
[21] Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986).
[22] Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
[23] Id. at 248.

Plaintiffs have alleged both conditions of confinement claims and episodic acts and omissions claims against Defendants Smith and LeBlanc.

In the Fourteenth Amendment context, the Fifth Circuit has applied <u>Bell v. Wolfish</u>'s reasonable-relationship test to cases attacking "general conditions, practices, rules, or restrictions of pretrial confinement."[24] This reasonable-relationship test requires that the condition giving rise to the constitutional violation "has no reasonable relationship to a legitimate governmental interest."[25] <u>Bell v. Wolfish</u> defines the governmental interests at play in the Fourteenth Amendment context as "restrictions and conditions on [a pretrial detainee] to ensure his presence at trial,"[26] or "appropriate action to ensure the safety of inmates and corrections personnel."[27]

For a conditions of confinement claim, "a plaintiff is not required to prove deliberate indifference."[28] Rather, "[p]laintiffs must prove the existence of a condition, practice, rule, or restriction that was so inadequate that it resulted in a serious deprivation of his basic human needs and was not reasonably related to a legitimate governmental objective."[29] A formal written policy is not required to establish a condition or practice, rather "it may reflect an unstated or de facto policy, as evidenced by a pattern of acts or omissions sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by officials, to provide an intended condition or practice."[30]

A supervisor is liable under 42 U.S.C. § 1983 for failures to supervise or train individuals and entities under their control, and/or for polices or failures to implement policies, when the

---

[24] <u>Hare v. City of Corinth</u>, 74 F. 3d 633, 643 (5th Cir. 1996).
[25] <u>Duvall v. Dallas Cnty.</u>, 631 F. 3d 203, 2017 (5th Cir. 2011).
[26] <u>Bell</u>, 441 U.S. at 537.
[27] <u>Id</u>. at 547.
[28] <u>Edler v. Hockley Cnty. Comm'rs Ct.</u>, 589 F. App'x 664, 669 (5th Cir. 2014), citing <u>Duvall v. Dallas Cnty., Tex.</u>, 631 F.3d 203, 207 (5th Cir. 2011).
[29] ECF No. 107 at 10, citing <u>Shepherd v. Dallas</u>, 591 F. 3d 445, 452 (5th Cir. 2009) (internal quotations omitted).
[30] <u>Shepherd v. Dallas</u>, 591 F. 3d 445, 452 (5th Cir. 2009).

supervisor exhibits objective deliberate indifference towards likely or obvious rights violations arising from these failures of training, supervision, or policy.[31] Even when a supervisor enacts facially-valid policies, but fails to implement them in a constitutional manner, that failure constitutes an official policy that can support liability.[32] As the Fifth Circuit summarized the law in Porter v. Epps, "[a] failure to adopt a policy can be deliberately indifferent when it is obvious that the likely consequences of not adopting a policy will be a deprivation of constitutional rights."[33] The Fifth Circuit went on to clarify: "[t]o establish that a state actor disregarded a known or obvious consequence of his actions, there must be actual or constructive notice that a particular omission in their training program causes employees to violate citizens' constitutional rights and the actor nevertheless chooses to retain that program."[34]

## III. ARGUMENT

To the best of Plaintiffs' understanding, Smith and LeBlanc present three primary arguments in support of their Motion: 1) although LeBlanc and Smith have clear authority over local facilities that hold their DPSC-sentenced prisoners, because the Basic Jail Guidelines do not apply to pretrial detainees, LeBlanc and Smith have no responsibility for ensuring pretrial

---

[31] Porter v. Epps, 659 F. 3d 440, 446 (5th Cir. 2011); Gates v. Texas Dep't of Prot. & Reg. Servs., 537 F.3d 404, 435 (5th Cir. 2008) (finding supervisory liability when "(1) he affirmatively participates in the acts that cause the constitutional deprivation, or (2) he implements unconstitutional policies that causally result in constitutional injury") (emphasis added); see also Brumfield v. Hollins, 551 F.3d 322, 328 (5th Cir. 2008); Davidson v. City of Stafford, Texas, 848 F.3d 384, 397-98 (5th Cir. 2017) (defining objective deliberate indifference when supervisor fails to adopt a policy and deprivation of constitutional rights is a likely consequence of failure to adopt policy).

[32] See, e.g., City of Canton v. Harris, 489 U.S. at 388; Littell v. Houston Indep. Sch. Dist., 894 F. 3d 616, 624 (5th Cir. 2018); Garza v. City of Donna, 922 F. 3d 626, 637 (5th Cir. 2019).

[33] Porter v. Epps, 659 F.3d 440, 446 (5th Cir. 2011) (internal quotations omitted).

[34] Porter v. Epps, 659 F.3d 440, 447 (5th Cir. 2011) (internal quotations omitted, emphasis added); see also Doe v. Taylor Indep. School Dist., 15 F.3d 443, 453 (5th Cir. 1994) (applying the same standard in assessing individual supervisory liability claims as used in assessing municipal liability). With regard to LeBlanc specifically, the Fifth Circuit has recently re-articulated and re-affirmed Porter's constructive notice standard for a showing of deliberate indifference. See Crittindon v. LeBlanc, 37 F.4th 177, 186 (5th Cir. 2022), cert. denied, 144 S. Ct. 90, 217 L. Ed. 2d 21 (2023) (holding supervisory liability may be found for failure to adopt policies if such failure results in constitutional injuries: "Liability only arises when the officials act, or fail to act, with deliberate indifference, a disregard for a known or obvious consequence of their actions. Plaintiffs must introduce evidence that each Defendant had actual or constructive notice that their failure to adopt policies would result in constitutional violations.") (internal quotations omitted).

detainees are kept safe from the DPSC-sentenced prisoners with whom they are co-housed in these facilities; 2) keeping DPSC-sentenced prisoners and pretrial people separate does not have any bearing on the instant case because there were not enough DPSC-sentenced people involved in attacking Plaintiffs and violence resulted from other additional factors; and 3) Smith and LeBlanc did not know that failures in classification were an issue at MPCC.

Smith and LeBlanc's arguments fail to cite record evidence,[35] rely on misstatements of fact, and fundamentally misapprehend Plaintiffs' claims. This case is not about the Basic Jail Guidelines and whether they apply to pretrial people or not, or whether classification alone is a driver of violence. As is clear in the Third Amended Complaint,[36] Plaintiffs' three Oppositions to Motion to Dismiss,[37] and Plaintiffs' Motion for Summary Judgment,[38] this case is about how the unconstitutional conditions of confinement at MPCC violated Plaintiffs' rights. As this Court understands:

> The heart of Plaintiffs' case is that "Defendants have allowed fatally dangerous conditions of confinement to flourish at MPCC," with each entity "aware that MPCC has no functional classification, investigation, or staff supervision in place" and each entity "aware that these conditions allow [the] threat of serious injury from rampant violence to go unchecked." Plaintiffs maintain that, because of these conditions, they were stabbed and beaten by attackers who should not have been housed with them on the same unit.[39]

Below Plaintiffs outline the significant evidence they have uncovered in the course of discovery which establish genuine disputes of material facts that: (1) LeBlanc and Smith have authority over local facilities where they choose to hold their DPSC-sentenced prisoners, including

---

[35] See, e.g., ECF No. 191-1 at 17-18. Two full pages of ostensible fact statements only contain two citations to James Murray's deposition, which citations themselves fail to support most of the statements.
[36] ECF No. 64.
[37] ECF No. 32; ECF No. 74; ECF No. 96.
[38] ECF No. 189-1.
[39] ECF No. 107 at 2. (quoting Plaintiffs' Third Amended Complaint.)

MPCC, which makes them responsible for ensuring the safety of pretrial detainees held there; (2) failures of classification was one significant driver of violence Plaintiffs experienced at the hands of DPSC-sentenced people; and (3) LeBlanc and Smith knew of these dangerous conditions of confinement but did nothing.

A.      **LeBlanc and Smith are responsible for Plaintiffs' harms because they have supervisory authority over conditions at local facilities that hold DPSC-sentenced people, including those impacting pretrial detainees.**

Plaintiffs do not suggest LeBlanc and Smith have responsibility for all pretrial detainees in the state of Louisiana. But LeBlanc and Smith are responsible for a system that relies on holding pretrial and DPSC-sentenced people in the same facilities,[40] so they bear legal responsibility when their failures to manage and to oversee that system results in harm to pretrial detainees. Contrary to Defendants' representation, there is no statute that says DPSC bears no responsibility for pretrial detainees, only that Sheriffs are responsible for pretrial detainees.

The Fifth Circuit has held that LeBlanc and Smith have supervisory authority over local facilities holding sentenced prisoners: "DPSC is responsible for the local jails once they house DPSC prisoners. DPSC enters into contracts with local jails to house DPSC's prisoners. . . . Through the promulgation of the Basic Jail Guidelines and DPSC's audits of local parish jails, there is ample evidence that these DPSC officials had power to control the facilities in which DPSC housed its prisoners."[41] And LeBlanc and Smith's supervisory authority here is all the clearer in light of the origins of MPCC. Secretary LeBlanc testified that the only reason MPCC exists is

---

[40] As the prison population exploded in the 1990s, because the State did not want to fund new state facilities, "the department partnered with the sheriffs to basically give us the system we have now where we have half of our offenders at the local level and half at our state-level institutions." Exhibit 2, Deposition of Thomas Bickham at 54:24-55:7; Exhibit 3, Deposition of James LeBlanc at 44:7-17.

[41] Crittindon v. LeBlanc, 37 F.4th 177, 191 (5th Cir. 2022). See also Crittindon v. Gusman, No. CV 17-512-SDD-EWD, 2020 WL 1862467, at *12 (M.D. La. Apr. 13, 2020) (holding that DPSC's compensation of local sheriffs for holding DPSC-sentenced prisoners "could be made to talk . . . whether in . . . refusal to house inmates in non-compliant parishes, or some other measure").

because the state did not want to fund construction of additional state-operated facilities to address un-constitutional overcrowding,[42] so "there was some facilities, and I call it the I-20 corridor up there, that facilities were built at the local level with a 40 percent guarantee of housing inmates. **So they were built for state inmates, in particular.**"[43]

MPCC beds are consistently well more than forty percent (40%) occupied by sentenced DPSC prisoners and have been for years. Random samples of CFACILITY reports[44] reflect DPSC occupancy percentages as high as ninety-eight percent (98%) of available beds in the last week of November 2019 to sixty-three percent (63%) in the last week of August 2020 to seventy-two percent (72%) in the last week of September 2021 to eighty-six percent (86%) in the last week of November 2023.[45] Not only was MPCC originally built for DPSC-sentenced prisoners in particular, but it continues to primarily serve state inmates.

The Madison Parish Sheriff relies on revenue generated by holding DPSC-sentenced people in a facility built for the purpose of holding this population. Local sheriffs are paid based on the number of DPSC-sentenced prisoners held at their facility and the number of days those people spend in their facility.[46] Sheriff Byrd described the local sheriff's incentives to keep local

---

[42] Exhibit 3, Deposition of James LeBlanc at 53:13-54:11.

[43] Exhibit 3, Deposition of James LeBlanc at 41:4-9, 33:11-17. Tallulah, LA, where MPCC is located, sits on I-20, just over 50 miles east of Monroe, LA.

[44] CFACILITY reports are produced by a DPSC employee that contain a "breakdown of all local-level facilities, and it breaks down their capacity and what they are currently housing." Exhibit 4, Deposition of Seth Smith at 109:11-15; Exhibit 5, CFACILITY Report samples.

[45] Exhibit 5, CFACILITY Report samples. The only time the DPSC occupancy of MPCC dipped below 50% of the available beds was in April, May, and June of 2021 when DPSC occupancy hovered between 44 and 47% percent. The reports do not reflect a corresponding increase in the number of pretrial detainees held in these months, rather the decline in DPSC population resulted in more empty beds in MPCC, underscoring local facility reliance on DPSC prisoners specifically.

[46] Exhibit 7, October 2020 Billing from MPSO to DPSC. This reality is reflected in the contract between Madison Parish Sheriff Byrd and LaSalle Management, which includes a provision that "LaSalle will seek to maximize the occupancy of the Prison Facilities by entering into contracts . . . to house male and female prison inmates . . . at rates no less than the per diem rates established for the Housing of Louisiana Department of Corrections inmates in parish jails." Exhibit 1, 2020 Contract between LaSalle Management LLC and Madison Parish Law Enforcement District at Section 3.

facilities full: "my concern was whether or not they were making enough to operate and continue employing all those people."[47] As another section of this Court has observed, "DOC compensates local Sheriffs for holding DOC-sentenced inmates; surely that money could be made to talk, whether in the form of fines for later pre-classification packets, **refusal to house inmates in non-compliant parishes**, or some other measure."[48]

Within this general structure, LeBlanc and Smith themselves have significant supervisory responsibility for and authority over MPCC operations. LeBlanc has been Secretary of DPSC since 2008.[49] In that role, LeBlanc testified that he is ultimately responsible for all of the operations of the Department.[50] These responsibilities include reviewing and revising the Basic Jail Guidelines (of which he is signatory for the Department), although Director of Operations Smith is "more . . . in the weeds with reviewing and making recommendations for changes."[51]

LeBlanc testified that, as Chief of Operations, Smith is responsible for the management of the eight state-operated prisons, medical and mental health, and local facilities.[52] With regard to the local facilities, Smith is responsible for Basic Jail Guidelines audits, and a recently-created internal affairs division tasked with investigating incidents related to contraband, deaths, and staff

---

[47] Exhibit 8, Deposition of Sammie Byrd at 105:15-23. Further, for sheriffs' offices that have arrangements with private operators, these offices are paid a "sponsor fee" by the private entity for the sheriff to "vouch for" the contractor to DPSC. Exhibit 8, Deposition of Sammie Byrd at 67:24-25, 104:2-22. In Madison Parish, this sponsor fee in 2020 was $21,500 a month, approximately 8% of MPSO's budget.[47] Exhibit 1, 2020 Contract between LaSalle Management LLC and Madison Parish Law Enforcement District at Section 6.3. The current contract between Security Management LLC (the current operator of MPCC) and Madison Parish Law Enforcement District provides for the same sponsor fee amount. Exhibit 9, Contract between Security Management and Madison Parish Law Enforcement District at 7; Exhibit 10, Deposition of Lisa Byrd at 113:23-114:18. Private operators like LaSalle Management keep all excess payment from DPSC, after the sponsor fee is paid, so they also have an incentive to hold as many DPSC-sentenced people as cheaply as possible in a local facility. Exhibit 1, 2020 Contract between LaSalle Management LLC and Madison Parish Law Enforcement District at Section 6.3 (b); Exhibit 11, 6/30/2021 MPSO Ledger.
[48] Crittindon v. Gusman, No. CV 17-512-SDD-EWD, 2020 WL 1862467, at *12 (M.D. La. Apr. 13, 2020), aff'd in part, rev'd in part and remanded sub nom. Crittindon v. LeBlanc, 37 F.4th 177 (5th Cir. 2022) (emphasis added).
[49] Exhibit 3, Deposition of James LeBlanc at 15:22-16:9.
[50] Exhibit 3, Deposition of James LeBlanc at 22:1-5.
[51] Exhibit 3, Deposition of James LeBlanc at 23:2-20.
[52] Exhibit 3, Deposition of James LeBlanc at 133:22-134:11 (emphasis added).

misconduct at state-operated and local facilities.[53] LeBlanc testified that he and Smith have "a good working relationship. I mean, he doesn't hesitate to call me and let me know if something is going on and keeps me abreast of things. "[54] This Court has recognized that it may find supervisory liability where evidence supports that "knowledge is pled to pass between the two by virtue of their respective jobs and actions."[55]

LeBlanc testified that notwithstanding the organizational nightmare of holding DPSC prisoners in local facilities, the Department's Strategic Plan for 2020 through 2025 was to continue holding sentenced prisoners in local facilities, and acknowledges that this goal should be dependent on local facility compliance with the Basic Jail Guidelines.[56] Whether the Basic Jail Guidelines extend to pretrial detainees or not has nothing to do with LeBlanc's and Smith's responsibility to avoid violating the constitutional rights of any prisoner or detainee in a local facility for which LeBlanc and Smith have responsibility.[57] Although local sheriffs certainly have a statutory responsibility for pretrial detainees,[58] this statutory authority does not exempt Smith and LeBlanc from liability for the portion of harm they caused Plaintiffs by failing to exercise "the

---

[53] Exhibit 3, Deposition of James LeBlanc at 134:25-139:18; Exhibit 12, 2020-2025 Strategic Plan at 13.
[54] Exhibit 3, Deposition of James LeBlanc at 140:18-24, 141:5-141:19.
[55] ECF. No. 107 at 13.
[56] Exhibit 3, Deposition of James LeBlanc at 26:3-31:7, 29:9-24. Further, the Strategic Plan reported an effort to "shift beyond collecting and reviewing information to collecting information that will also enable decision makers to measure the relative success of Agency programs, policies, and practices." Exhibit 12, 2020-2025 Strategic Plan at 8, 7, 32.
[57] Contrary to Defendants' representations, there is no statute that says DPSC is not responsible for the safety of pretrial detainees, only that Sheriffs are responsible for pretrial detainees. Defendants cite inapposite statutory provisions, but otherwise fail to provide any authority to support the extraordinary position that DPSC, Smith, and LeBlanc have no legal responsibility to ensure that conditions of confinement at a local facility holding DPSC-sentenced people does not violate the rights of pretrial detainees held alongside them. La. R.S. §15:824 (A)&(C) only provides that any adult subject to confinement "shall be committed to the Department of Public Safety and Corrections and not to any particular institution" and specific circumstances when a pretrial detainee in a local parish facility may be held "under the control of the department." La. R. S. § 15:704 and La. R.S. § 15:706 provide that the sheriff is the keeper of the jail and for transfers. The sheriff's responsibility for pretrial detainees does nothing to exempt LeBlanc, Smith, or DPSC from their constitutional responsibility of ensuring the rights of pretrial detainees being held alongside DPSC-sentenced prisoners where they have authority and responsibility for the local facility.
[58] Madison Parish Sheriff Byrd was named as a defendant in the instant action, but the parties have settled claims against him and LaSalle Management.

power to control"[59] MPCC operations. Given the legal, economic, and practical authority Smith and LeBlanc have over MPCC operations, Smith and LeBlanc were obligated to Plaintiffs, even as pretrial detainees, to protect them from conditions created by holding DPSC-sentenced people in local facilities.

Both LeBlanc and Smith are aware that MPCC holds pretrial detainees along with DPSC prisoners.[60] When conditions at local facilities result in violations of the rights of pretrial detainees, Smith and LeBlanc cannot simply shrug and disclaim responsibility because the people attacked (by DPSC-sentenced prisoners) were pretrial detainees. Further, as a practical matter, whether or not the Basic Jail Guidelines apply to pretrial detainees, the presence of DPSC-sentenced prisoners at MPCC means that the facility as a whole must operate in accordance with the Basic Jail Guidelines, including those for classification and staffing.[61] These Guidelines set out the "the minimum conditions necessary to ensure the safe, efficient, effective and legal operation of a jail facility" based on a "consensus of professional opinion,"[62] but do not go beyond the constitutional floor for holding prisoners.[63] Thus, even if the Guidelines do not explicitly apply to pretrial prisoners, in facilities like MPCC, where DPSC prisoners typically take up well more than half of the available bed space,[64] it is difficult to conceive of how a facility operating in accordance with the Guidelines for sentenced people would fail to implement the same constitutional safeguards for the smaller pretrial population held with the sentenced population. Thus, the Guidelines are

---

[59] <u>Crittindon v. LeBlanc</u>, 37 F.4th 177 at 191.
[60] Exhibit 4, Deposition of Seth Smith at 109:11-15; Exhibit 6, Deposition of Megan Kent at 108:15-20; Exhibit 3, Deposition of James LeBlanc at 48:21-25; Exhibit 5, CFACILITY Report samples.
[61] Exhibit 13, 2019 Basic Jail Guidelines at 14,18-19; Exhibit 16, 2022 Basic Jail Guidelines at 16, 20.
[62] Exhibit 13, 2019 Basic Jail Guidelines at 2; Exhibit 16, 2022 Basic Jail Guidelines at 3.
[63] La. R.S. 15: § 738 prohibits any sentenced or pretrial prisoner from having a standard of living above that required by the constitutions of the United States and the state of Louisiana. Thus, the Basic Jail Guidelines cannot represent anything other than constitutional minimum in care.
[64] Exhibit 5, CFACILIY Report samples.

useful evidence of the constitutional minimums for MPCC operations that LeBlanc and Smith simply failed to enforce at a facility for which they are responsible.

The failure of that enforcement is evidenced by the willful under-resourcing of any nominal DPSC oversight of local facilities. Local facilities are "audited" annually and recertified every three years. The general purpose of these audits is "to make sure [local facilities are] living up to our guidelines."[65] To perform these essential audit functions, LeBlanc and Smith rely on team leaders who are practically-uncompensated volunteers who do not receive standardized training and must perform these responsibilities on top of normal full-time job responsibilities.[66] Rather than sending a team of subject-matter experts to a local facility for multiple days to review records and policies as they are normally maintained,[67] the local facility audit process relies on a single beleaguered team leader and whatever group of uncompensated assistants they can assemble.[68] Smith understands that a team of subject-matter experts is essential for conducting an audit.[69] He is aware that a team of competent personnel is essential for auditing local facilities.[70] But he is also aware that anyone accompanying the team leader to audit a local facility is not paid, and left entirely to the discretion of the team leader.[71] As a result, local facilities audits are done in a single day by one or two people who may only have subject matter expertise in a few limited areas.[72]

---

[65] Exhibit 3, Deposition of James LeBlanc at 116:16-17.
[66] Exhibit 14, Deposition of Tyrone Mays at 16:3-5, 29:25-31:5, 31:8-21, 151:18-152:12; Exhibit 4, Deposition of Seth Smith at 45:1-8, 48:11-21, 51:14-23, 50:1-12, 58:3-25, 59:8-60:4, 62:2-9, 64:24-65:11, 200:6-202:19, 203:1-204:8; Exhibit 6, Deposition of Megan Kent at 33:1-4, 39:11-40:1, 41:11-25, 45:14-19, 102:23-103:78, 139:19-25.
[67] As is typically done in the course of DPSC audits of state-run facilities. Exhibit 3, Deposition of James LeBlanc at 84:23-86:23; Exhibit 4, Deposition of Seth Smith at 192:25-193:5, 215:4-216:8, 227:6-232:18.
[68] Tyrone Mays, the team leader responsible for auditing MPCC, testified that he would only take one other person with him to conduct audits because there is limited staff and "most of the people have to be at work." Exhibit 14, Deposition of Tyrone Mays at 78:22-79:24; Exhibit 4, Deposition of Seth Smith at 192:9-25. Mays also testified that he does not have any assistance for any of his other responsibilities as team leader. Exhibit 14, Deposition of Tyrone Mays at 59:14-60:15.
[69] Exhibit 4, Deposition of Seth Smith at 24:8-25.
[70] Exhibit 4, Deposition of Seth Smith at 192:25-193:5
[71] Exhibit 4, Deposition of Seth Smith at 202:20-22; 193:11-194:18.
[72] Exhibit 4, Deposition of Seth Smith at 246:20-248:24.

The audit procedure does not require the local facility to provide open access to records and the team leader is not required to select an unbiased sample of records to determine if the facility is implementing or complying with its own procedures and the Guidelines. Instead, the facility pre-selects a single record[73] as an example of compliance and puts that single record into a Basic Jail Guidelines folder for the team leader to review.[74] Smith, an experienced corrections auditor, clearly understands that such a method of pre-selecting records is entirely inappropriate. When asked if he would ever look at a single pre-selected record when conducting a facility audit, he responded: "Absolutely not . . . I mean, of course, if you let me do that, I'm going to give you the good ones."[75] But Smith knows that this is the method team leaders are using to conduct annual audits and recertifications of local facilities because, "[i]t's a one-day audit basically."[76]

Despite the importance of classification to the safety of prisoners, corrections staff, and the public,[77] the only thing related to classification reviewed in annual local facility audits concerns trustee status and work assignments, not "actual classification."[78] Although LeBlanc and Smith can decide to change audit forms and areas at any time,[79] they have not sought any information in the annual audits related to "actual classification," or how people are assigned housing to "maximize stability within the facility."[80]

---

[73] Exhibit 14, Deposition of Tyrone Mays 111:15-114:3; Exhibit 6, Deposition of Megan Kent at 85:11-86:6; Exhibit 4, Deposition of Seth Smith at 247:16-248:24.

[74] Exhibit 14, Deposition of Tyrone Mays at 94:9-24, 113:22-114:3.

[75] Exhibit 4, Deposition of Seth Smith at 231:19-232:18 (emphasis added).

[76] Exhibit 4, Deposition of Seth Smith at 246:20-248:24.

[77] See, infra, at 18-19.

[78] Exhibit 17, Deposition of Duane Cambre at 84:14-85:2; Exhibit 14, Deposition of Tyrone Mays 141:18-142:6, 142:20-144:1; 149:11-15; Exhibit 3, Deposition of James LeBlanc at 124:15-125:13; Exhibit 15, 2017-2022 MPCC Audits and Recertifications at 53-58.

[79] Exhibit 6, Deposition of Megan Kent at 152:16-21; Exhibit 4, Deposition of Seth Smith at 251:4-18. Although Smith testified that he could not remember if there had been any changes to the audit form related to classification, the classification provision of the 2022 Basic Jail Guidelines remains non-mandatory, requiring review only every three years. Exhibit 16, 2022 Basic Jail Guidelines at 20; Exhibit 15, 2017-2022 MPCC Audits and Recertification at 59-119.

[80] Exhibit 17, Duane Cambre at 84:14-85:2; Exhibit 18, DPSC Regulation B-02-017, Initial Classification Plan and Reclassification Plan at Paragraph 7.a.

Given the known absurdities of an auditing system in which auditors without any subject-matter expertise[81] rely on a single record, pre-selected by the entity being audited to assess performance,[82] Smith's and LeBlanc's reliance on the compliance findings to support their defense is puzzling. As another section of this Court has made clear, "the ostrich defense is no defense."[83] Rather, the relevant point is that in promulgating and allowing such an auditing system to continue, LeBlanc and Smith allow dangerous conditions of confinement to persist for all prisoners in Louisiana's local facilities, both pretrial and sentenced.

LeBlanc and Smith's failures to ensure oversight and the constitutional operation of a facility over which they have authority and control allows conditions to flourish that directly contributed to multiple assaults by DPSC prisoners on Plaintiffs. [84]

**B.     Smith and LeBlanc are responsible for Plaintiffs' harms because they had legal custody of the people who attacked James Murray and Latavius Paschal.**

In addition to LeBlanc's and Smith's authority over MPCC, Defendants had legal responsibility for at least five of the people who participated in attacks against Plaintiffs. Defendants are simply factually wrong in their repeated assertion that "all but one" of the attacks on Plaintiffs were perpetrated by pretrial detainees. Discovery has established that at least **three of the five separate attacks** described in Plaintiffs' TAC involved DPSC-sentenced attackers:

---

[81] Mays has never worked in classification and does not have any subject-matter expertise in classification. Mays has a general understanding of classification as important "for the inmate safety as well as the stability of the institution." But when questioned about the meaning of the elements of the BJG requirements on classification, he could not explain how inmate history and behavior would impact classification. Exhibit 14, Deposition of Tyrone Mays 15:10-16:5, 18:7-20:17, 120:10-22, 122:14-124:3.

[82] Exhibit 14, Deposition of Tyrone Mays 120:23-121:22, 129:3-6, 130:12-19.

[83] Crittindon v. Gusman, No. CV 17-512-SDD-EWD, 2020 WL 1862467, at *16 (M.D. La. Apr. 13, 2020), aff'd in part, rev'd in part and remanded sub nom. Crittindon v. LeBlanc, 37 F.4th 177 (5th Cir. 2022)

[84] Plaintiffs must question the seriousness with which Defendants LeBlanc and Smith make this argument as the omission of any fact related to this argument from their statement of uncontested facts, ECF No. 191-2, suggests that they understand the facts underpinning it are genuinely contested by Plaintiffs.

- On October 18, 2020, Murray was moved onto a dorm with a mix of sentenced and pretrial people without any review of the other people on the dorm to assess if it was a location where Murray would be safe, where he was stabbed by three DPSC-sentenced people, including Howard Willis.[85]

- In November 2020, Murray was attacked throughout the weekend by several prisoners.[86] In a handwritten statement given the same day he escaped from J Dorm, Murray named "Vic Meadows, Nick, Smoke, Rufus" as the people who had been beating him.[87] Vic Meadows was a DPSC-sentenced prisoner at the time.[88]

- Paschal was stabbed and beaten in January 2021. Paschal is clear that one of the people involved in beating and stabbing him had the last name of White, who was a DPSC-sentenced prisoner.[89]

Smith and LeBlanc's anemic feint at suggesting MPCC had a legitimate institutional interest in the obvious mixing of DPSC and pretrial populations is also unsupported and absurd.[90]

---

[85] Exhibit 19, Deposition of James Murray at 238:3-16; Exhibit 20, Deposition of Jonathan Knox at 54:1-18; Exhibit 21, October 2020 Critical Incident Reports at 323-347. Murray was stabbed twice in his upper back, once in his lower right side, and once in the back of his left arm.

[86] Murray testified that when other prisoners in J Dorm discovered Murray had named Howard Willis in a grievance, several people (including DPSC-sentenced Vic Meadows) kept him from approaching the door "through the weekend . . . I mean a couple of days, they took turns hitting me with the belt, wouldn't let me approach the door, nothing. And there's no guard sitting in – on the other side of the window." Exhibit 19, Deposition of James Murray at 180:4-9, 183:21-184:10. Murray finally escaped the dorm on November 23, 2020. Nurse Hasley documented whelps, bruising, and puncture wounds to Murray's stomach, legs, and back, as well as bleeding from his mouth, and noted that while the injuries were "minor physically," it was "serious mentally/emotionally." Exhibit 22, November 23, 2020 Critical Incident Report at 11-12.

[87] Exhibit 22, November 23, 2020 Critical Incidents Report at 9.

[88] Exhibit 23, Inmate Censuses 6/19/2020 to 11/24/2020 at 160, 313, 342, 371. On the inmate census, legal status is designated in the "CLASS" field with "DOC" for sentenced people and "PREPARIS" for pretrial people. LeBlanc and Smith do not offer any citation to the record to support their factually inaccurate statement that Murray testified that he was attacked exclusively by pretrial detainees in the November attack. ECF No. 191-1 at 17. Plaintiffs point to Exhibit 22, November 23, 2020 Critical Incident Report at 9; the Inmate Census; and Exhibit 24, Billing Records listing Vic Meadows as a DPSC-sentenced prisoner, as evidence to counter this unsupported claim.

[89] Exhibit 25, Deposition of Latavius Paschal at 85:13-89:4; Exhibit 26, Inmate Censuses 1/5/2021 to 2/22/2021 at 110.

[90] ECF No. 191-1 at 17-18. Again, Defendants' single citation is to Murray's deposition testimony that he did not know why DPSC and pretrial people were being mixed. Defendants do not cite to a single piece evidence to suggest that COVID provided a legitimate penological justification for mixing populations.

Plaintiffs have never alleged that mixing sentenced and pretrial populations is automatically a constitutional rights violation, only that there is no legitimate institutional interest to justify the practice at MPCC. In three years of litigation, none of the Defendants, including Smith and LeBlanc, have ever put forward any legitimate institutional interest to justify the practice of mixing pretrial and sentenced prisoners at MPCC. Duane Cambre[91] testified that pretrial detainees would be held separately whenever feasible.[92] According to the head of classification at MPCC, Captain McDowell, the penological interest of the facility, even during COVID, was in keeping pretrial and sentenced people separate and it was physically possible to do so at MPCC.[93] But directly contrary to this testimony, census information reflects a mix of sentenced and pretrial prisoners in all of the facility's dorms throughout 2020 and 2021.[94] In fact, censuses reflect that a mix of pretrial and sentenced prisoners were directly assigned to the same dorm at intake, "confined together and treated alike."[95] Although Defendants make much of the attempted creation of various pretrial dorms (including J Dorm) to suggest MPCC had a classification system,[96] the November 2020 Census is clear that these efforts failed and six DPSC-sentenced prisoners were on the dorm,

---

[91] Cambre was proffered as DPSC's 30(b)(6) representative on policies, procedures, and practices at DPSC-operated facilities, as well as on assignment and transfer of sentenced people to local facilities. Exhibit 17, Deposition of Duane Cambre at 13:5-15:10. He is currently the Deputy Assistant Secretary for DPSC, but during 2019 to mid-2021, he was program manager of the transitional work release program, reporting directly to Smith. Exhibit 17, Deposition of Duane Cambre at 49:13-51:25. Immediately prior to his promotion to DPSC headquarters, Cambre worked as a classification officer and classification supervisor at Dixon Correctional Institution (DCI), a DPSC-operated facility. Exhibit 17, Deposition of Duane Cambre at 29:2-16, 31:21-33:15, 33:21-34:22, 42:7-44:4.

[92] Exhibit 17, Deposition of Duane Cambre at 202:8-21.

[93] Captain McDowell testified "the first thing we going to ask them is they pretrial or DOC and then we go from there." Exhibit 27, Deposition of Edward McDowell at 87:10-22. McDowell also testified that pretrial detainees were supposed to only be held on one designated dorm or in lock down. Exhibit 27, Deposition of Edward McDowell at 85:10-86:13, 88:9-12. Actual practice at MPCC has been documented to be repeatedly and routinely to the contrary.

[94] Exhibit 28, James Murray Location History at 1-2; Exhibit 29, Antone Henderson Location History at 3-7; Exhibit 23, Inmate Censuses 6/19/2020 to 11/24/2020. Censuses and testimony reflect that a mix of pretrial and sentenced prisoners were directly assigned to the same dorm at intake. Exhibit 19, Deposition of James Murray at 85:24-86:16. Additionally, any initial classification was completely eviscerated by the absence of any reclassification process at MPCC. Exhibit 27, Deposition of Edward McDowell at 68:9-77:22; Exhibit 20, Deposition of Jonathan Knox at 53:21-54:18.

[95] For example, Murray went directly to Building 4, Dorm B. Exhibit 23, Inmate Censuses 6/19/2020 to 11/24/2020 at 24; Exhibit 19, Deposition of James Murray at 85:24-86:16.

[96] ECF No. 191-1 at 18.

including Victor Meadows and William White, who attacked James Murray and Latavius Paschal respectively.[97]

Further, Defendants themselves and their own employees testified about the important role classification plays in ensuring the safety of prisoners, correctional staff, and the public.[98] Consistent with that importance, DPSC has a detailed department regulation on classification that reflects the ongoing nature of an objective classification system, with the primary objective to "maximize stability within the facility.[99] The basic correctional premise that an "actual classification"[100] system is critical for prisoner, correctional staff, and public safety does not change from state-operated prisons to local facilities.[101] As LeBlanc testified, the classification Guideline includes specific reference to DPSC's regulation on classification, which is meant to give local facilities "a little help in kind of how . . . to look at things, and that's what the purpose of that is. This is to help them establish guidelines."[102] LeBlanc expects local facilities to determine appropriate housing for each prisoner using the criteria in the DPSC regulation on classification.[103]

Smith and LeBlanc present absolutely no evidence to answer the testimony of their own employees and MPCC's head of classification that penological interest is best served by keeping pretrial and sentenced populations separate. Similarly they have not pointed to anything to rebut Plaintiffs' showings that MPCC's joke of a classification policy did not serve any of the functions

---

[97] Sgt. Knox testified that movements of prisoners within the facility are recorded in the "bed movement book." Exhibit 20, Deposition of Jonathan Knox at 40:15-23. The bed movement log for early November 2020 reflects a mass movement on and off Building 4, J Dorm. Exhibit 30, Bed Movement Log excerpts at 3-6. Exhibit 23, Inmate Censuses 6/19/2020 to 11/24/2020 at 268-298, 301, 307, 313, 324; Exhibit 26, Inmate Censuses 1/5/2021 to 2/22/2021 at 110.
[98] Exhibit 4, Deposition of Seth Smith at 210:11-21, 240:8-242:21; Exhibit 17, Deposition of Duane Cambre at 35:9-36:21. Cambre pointed out that there is a distinction between "trustee reviews" and "actual classification," requiring two separate state auditors to review state-operated facility compliance with departmental regulations and facility policy. Exhibit 17, Deposition of Duane Cambre at 84:14-85:2.
[99] Exhibit 18, DPSC Regulation B-02-017, Initial Classification Plan and Reclassification Plan at Paragraph 7.a.
[100] Exhibit 17, Deposition of Duane Cambre at 84:14-85:2.
[101] Exhibit 13, 2019 Basic Jail Guidelines at 17-18; Exhibit 16, 2022 Basic Jail Guidelines at 20.
[102] Exhibit 3, Deposition of James LeBlanc at 62:16-63:6, 63:11-17, 93:3-94:25, 98:22-99:12.
[103] Exhibit 3, Deposition of James LeBlanc at 100:4-100:21, 101:3-10, 105:25-106:14.

they would expect of a constitutional classification system.[104] As this Court previously found, a classification system that fails to distinguish between pretrial and sentenced people fails to satisfy the constitutional duties of the officials responsible for the facility.[105] At a minimum, Plaintiffs have presented enough evidence to support a material dispute of fact regarding any penological justification for mixing pretrial and sentenced people at MPCC.

### C.    Smith and LeBlanc had requisite knowledge that conditions of confinement at MPCC were unconstitutional but chose to do nothing.

As an initial matter, there is unquestionably a genuine issue of material fact regarding LeBlanc's knowledge as both Murray and Paschal offer testamentary and documentary evidence that they directly informed LeBlanc and DPSC that mixing of pretrial and sentenced people at MPCC was placing them in danger.[106]

In addition, and perhaps even more significantly, Smith[107] and LeBlanc[108] receive information about local facilities from a range of sources, including:

- Monthly Activity Reports from each local facility, "reviewed" and "approved" by the regional team leader[109] and sometimes by the BJG administrator,[110] which provide information about

---

[104] Smith and LeBlanc rely only on the fact that Murray himself did not know why pretrial and sentenced people were being held together and that Murray acknowledged that COVID was ongoing.

[105] ECF No. 107 at 17.

[106] Exhibit 44, Certified Letter to James LeBlanc from James Murray; Exhibit 19, Deposition of James Murray at 108:23-109:18, 231:4-10; Exhibit 25, Deposition of Latavius Paschal at 184:24-187:22. Again, LeBlanc's and Smith's omission of any facts/citations related to LeBlanc's and Smith's knowledge (or lack thereof) further undermines their Motion as it suggests they know that there is in fact a genuine dispute of material fact about LeBlanc's and Smith's knowledge of the conditions.

[107] Smith receives and reviews the quarterly summary reports, annual audits, and recertification reports. Exhibit 4, Deposition of Seth Smith at 103:12-22, 131:2-12, 134:7-135:5; Exhibit 6, Deposition of Megan Kent at 156:13-17.

[108] LeBlanc receives monthly reports for state-operated facilities, but he does not receive monthly reports for local facilities. He relies on Smith and his team (including the BJG administrator) to review the monthly reports from local facilities. Exhibit 3, Deposition of James LeBlanc at 163:22-164:7, 167:14-168:5, 168:23-169:3. LeBlanc does see "the local audits. I pay attention to those. And I do look at those." Exhibit 3, Deposition of James LeBlanc at 87:4-6, 120:2-121:20.

[109] Exhibit 14, Deposition of Tyrone Mays at 40:15-50:3; Exhibit 6, Deposition of Megan Kent at 32:25-33:4; Exhibit 4, Deposition of Seth Smith at 100:10-101:1.

[110] Exhibit 6, Deposition of Megan Kent at 105:13-108:9. Megan Kent is the current BJG administrator and was designated as DPSC's 30(b)(6) representative on various BJG topics. Exhibit 6, Deposition of Megan Kent at 11:7-12:6. Smith and LeBlanc testified about their reliance on Kent for a range of BJG tasks. Exhibit 4, Deposition of Seth

the total number of pretrial detainees, DPSC-sentenced prisoners, fights, assaults, contraband, deaths, transfers, and transports;[111]

- BJG Quarterly Summary Reports (until these reports were discontinued sometime in 2022)[112] as compiled by the regional team leader;[113]

- Annual audits and three-year recertifications based on reviews conducted by the regional team leader;[114] and

- CFACILITY reports produced by a DPSC employee that contain a "breakdown of all local-level facilities, and it breaks down their capacity and what they are currently housing."[115]

LeBlanc's and Smith's testimony, evidence of their responsibilities, and this reporting structure together confirm this Court's prior finding that "the Court can reasonably infer from LeBlanc's

---

Smith at 51:3-53:11, 68:5-21, 70:16-71:2, 100:18-21, 181:1-182:17, 205:23-206:4; Exhibit 3, Deposition of James LeBlanc at 117:13-23, 152:8-25, 156:4-19. Notwithstanding the essential nature of this role, Smith and LeBlanc allowed it to go unfilled for over a year. Exhibit 31, Deposition of Angela Tauzin at 19:1-23, 22:5-24, 25:8-22, 27:5-31:17; Exhibit 32, Deposition of Markesha Stewart at 25:13-17. Ms. Stewart then held the position for less than a year (from February to November 2021), and during that time did not undertake activities related to the Guidelines or compliance by local facilities because that work was "back burnered." Exhibit 32, Deposition of Markesha Stewart at 27:9-28:16, 43:21-25; Exhibit 33, Deposition of James Ray Wesley at 44:17-22.

[111] Exhibit 34, Monthly Activity Reports for MCC from January 2020 to June 2021; Exhibit 35, Monthly Activity Reports for SCC from January 2020 to June 2021. These Monthly Activity Reports are compiled by a DPSC employee into a Single Monthly Activity Report Roll-up for review by leadership to see data on the various local facilities side by side. Exhibit 36, Northeast Monthly Activity Report Roll-up for 2019 to 2023 (in globo, all monthly reports for the Northeast region provided by Defendants for the time period); Exhibit 6, Deposition of Megan Kent at 108:13-110:15.

[112] Exhibit 37, Northeast Region Quarterly Summary Reports for 2019 to 2022 (in globo, all quarterly summary reports for the Northeast region provided by Defendants for the time period).

[113] Exhibit 14, Deposition of Tyrone Mays at 93:20-94:4. The primary distinction between the Quarterly Reports and the Monthly Activity Reports are incident narratives drafted by the team leaders based on information they receive from the facility on assaults, deaths, and contraband. Exhibit 14, Deposition of Tyrone Mays at 68:1-19. Since the discontinuation of the Quarterly Reports, no other reports compile and track this information beyond sporadic electronic mail. See Exhibit 6, Deposition of Megan Kent at 115:4-118:8; Exhibit 4, Deposition of Seth Smith at 106:4-108:15.

[114] Exhibit 6, Deposition of Megan Kent at 86:12-17; Exhibit 3, Deposition of James LeBlanc at 57:12-23, 110:10-20, 114:8-16; Exhibit 14, Deposition of Tyrone Mays at 75:1-76:11. These reports include information on facility capacity, numbers of pretrial detainees and DPSC-sentenced prisoners, assaults, and contraband. Exhibit 15, 2017 to 2022 MPCC Annual Audit Reports and Recertifications (in globo, all audits of MPCC by DPSC done in the time period).

[115] Exhibit 4, Deposition of Seth Smith at 109:11-15; Exhibit 5, CFACILITY Report samples. Both Smith and LeBlanc have access to the CFACILITY reports and monthly activity reports at any time they would care to access them. Exhibit 4, Deposition of Seth Smith at 109:11-15; Exhibit 6, Deposition of Megan Kent at 108:15-20; Exhibit 3, Deposition of James LeBlanc at 48:21-25.

own actions that he had knowledge of the need for local jails to comply with the Guidelines with respect to classification," and "from this strategy and its intention that LeBlanc knew there was a problem that needed to be addressed."[116] LeBlanc and Smith are aware that holding half of the sentenced population in local facilities (which also hold pretrial detainees) is an organizational nightmare that must be closely monitored to ensure that this system does not endanger persons held subject to this arrangement. Despite this knowledge, as outlined above,[117] Smith and LeBlanc have failed to create a meaningful audit system to monitor performance of local facilities holding DPSC prisoners.

LeBlanc and Smith have also returned to the questionable argument that violence from other causes somehow defeats Plaintiffs' claims and could not have put LeBlanc and Smith on notice of the unconstitutional conditions at MPCC.[118] First, Plaintiffs' claim has never been that classification alone was the cause of widespread violence, but that it was one driver of violence coupled with inadequate investigation and staff supervision.[119] Second, as outlined above, LeBlanc, Smith, and their employees all recognize the critical role adequate classification plays in preventing violence as evidenced by their deposition testimony and DPSC's own regulations.[120]

Finally, widespread violence is a condition of confinement that violates the constitutional rights of detainees.[121] When there is evidence of a "constant threat of violence . . . in an institution where terror reigns . . . it is not necessary that every inmate be assaulted every day before a federal

---

[116] ECF No. 107 at 13 (internal citations omitted). The Court specified that it was drawing reasonable inferences in Plaintiffs' favor as appropriate in deciding a Motion to Dismiss and Motion for Summary Judgment by Defendants.

[117] See, supra, at 13-15.

[118] ECF No. 191-1 at 18.

[119] ECF No. 64 at 29-52; ECF No. 107 at 2.

[120] See, supra, at 18-19; Exhibit 4, Deposition of Seth Smith at 210:11-21, 240:8-242:21; Exhibit 17, Deposition of Duane Cambre at 35:9-36:21. Exhibit 17, Deposition of Duane Cambre at 84:14-85:2; Exhibit 18, DPSC Regulation B-02-017, Initial Classification Plan and Reclassification Plan at Paragraph; Exhibit 3, Deposition of James LeBlanc at 62:16-63:6, 63:11-17, 93:3-94:25, 98:22-99:12; 100:4-100:21, 101:3-10, 105:25-106:14.

[121] Alberti v. Klevenhagen, 790 F. 2d 1220, 1224 (5th Cir. 1986).

court may intervene."[122] Further, a pattern of violence coupled with a lack of supervision and inadequate staffing is enough to establish "a continuous pattern of deprivations which clearly reach constitutional dimensions."[123] There is no constitutionally acceptable rate of injury from violence contemplated by Eighth and Fourteenth Amendment case law when harm results from a lack of policy or widespread practice.[124]

Reports readily available to Smith and LeBlanc reflect perpetual widespread violence at MPCC, putting them on notice of unconstitutional conditions there. Even based on conservative estimates from MPCC's monthly reports, for over two and half years from January 2019 through August 2022, MPCC averaged an assault every three and a half days.[125] In 2020 alone, MPCC averaged an assault roughly every other day for the year, including the violent deaths of Connie Brown and Kendall Reed.[126] In October 2020, the month Murray was stabbed by three DPSC-sentenced prisoners, the Monthly Activity Report reflects MPCC reported twenty-four assaults at MCC and SCC;[127] thus, approximately 7.8%[128] of the total population of MPCC was impacted by

---

[122] Id. at 1226.

[123] Id. at 1224.

[124] See, e.g., Farmer v. Brennan, 511 U.S. 825, 857 (1994) (holding "[b]eing violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society"); Hare v. City of Corinth 74 F. 3d 633, 639 (5th Cir. 1996) (holding since "pretrial detainees and convicted state prisoners are similarly restricted in their ability to fend for themselves, the State owes a duty to both groups that effectively confers upon them a set of constitutional rights that fall under the Court's rubric of 'basic human needs,'" specifically including basic safety).

[125] Exhibit 38, MCC Monthly Reports 2019; Exhibit 39, SCC Monthly Reports 2019; Exhibit 34, Monthly Activity Reports MCC January 2020 to June 2021; Exhibit 35, SCC Monthly Reports January 2020 to June 2021; Exhibit 40, MCC Monthly Reports 2022; Exhibit 41, SCC Monthly Reports January to August 2022; Exhibit 37, Northeast Monthly Activity Roll-up 2019-2023.

[126] Exhibit 34, Monthly Activity Reports MCC January 2020 to June 2021; Exhibit 35, SCC Monthly Reports January 2020 to June 2021. These reports reflect 180 assaults over the course of the year; See also, Exhibit 21, October 2020 Critical Incident Reports at 128-142. On October 10, 2020, an incident described as death was the stabbing homicide of Connie Brown; Exhibit 42, August 2020 Critical Incident Reports at 70-86; Exhibit 43, Reed Autopsy findings.

[127] Exhibit 34, MCC Monthly Activity Reports January 2020 to June 2021, October; Exhibit 35, SCC Monthly Activity Reports January 2020 to June 2021, October.

[128] Plaintiffs estimated people impacted by violence by multiplying the number of reported assaults by two, on the basis that each fight must involve at least two people. Plaintiffs added to that number if notes at the conclusion of the monthly report indicated more than two people involved in an assault or fight. Plaintiffs then divided this total number of people involved in violence by the total number of people at the facility to get a rough percentage of the population impacted by violence. According to the October 2020 Monthly Report of twenty-four assaults, at least forty-eight

violence at the facility. There are at least six incidents involving assaults and injury between pretrial detainees and sentenced prisoners.[129] The pretrial population at MPCC in October 2020 was 53,[130] so in October 2020, 11.3% of the pretrial population at MPCC was involved in an assault or altercation with a sentenced prisoner.

The perpetual violence reflected in the various reporting sources available to Smith and LeBlanc meets or exceeds similar rates of violence considered by other district courts. In United States v. Hinds Cnty., the court found violence to be pervasive at a facility by considering that 77 reported assaults "breaks down to about 20 assaults per month, one of them being an assault that resulted in the inmate being beaten to death."[131] In Ogletree v. Colbert Cnty., the court was persuaded that the plaintiffs' evidence of assaults occurring on average between every 17 to every 12 days over a period of months could support a factual finding of pervasive violence at the facility.[132] Here, Plaintiffs present evidence from Defendants' own reporting that MPCC experienced near daily assaults and two deaths from violence in 2020, exceeding even the extreme levels of violence at Hinds County. The violent conditions and complete lack of classification at MPCC are devastatingly obvious. There is no other way to describe a facility with two deaths by

---

people were involved in fights in a total population of 614 people. This conservative estimate does not consider fights involving multiple people, which are a frequent occurrence as detailed in critical incident reports.

[129] See generally Exhibit 21, October 2020 Critical Incident Reports. Specifically, on October 4, 2020, COs saw Quantavis Durgin (pretrial) had a swollen left eye that was suspected to be the result of an assault. Exhibit 30 at 88-98. The same day, Jeremy Silas (pretrial) was attacked by multiple unidentified inmates. Exhibit 23, Inmate Censuses 6/19/2020 to 11/24/2020 at 168 (reflecting Silas as pretrial). Exhibit 30, October 2020 at 65-77. An October 12, 2020 incident involving John Lewis. Exhibit 30 at 203-219. On October 13, 2020, Travis Alexis (pretrial) and Anthony Bertrand (DPSC-sentenced) were involved in a fight. Exhibit 30 at 233-247. On October 18, 2020, Howard Willis and two others (all DPSC-sentenced) stabbed James Murray (pretrial). Exhibit 30 at 323-349. On October 28, 2020, Dmarco Evans (DPSC-sentenced) and Michael Handford (pretrial) where involved in a fight in a lockdown cell. Exhibit 30 at 424-437.

[130] Exhibit 34, MCC Monthly Activity Reports January 2020 to June 2021 at 28-30; Exhibit 35, SCC Monthly Activity Reports January 2020 to June 2021 at 28-30.

[131] United States v. Hinds Cnty., 2022 WL 879696, at *4 (S.D. Miss. Mar. 23, 2022).

[132] Ogletree v. Colbert Cnty., Alabama, No. 3:18-CV-01218-HNJ, 2021 WL 4477630, at *33-34 (N.D. Ala. Sept. 30, 2021).

homicide in two months and near daily stabbings, assaults, and beatings – all information available to LeBlanc and Smith.[133]

> **D.** **Smith and LeBlanc have not carried their burden to establish their entitlement to qualified immunity.**

As an initial matter, it is again unclear if LeBlanc and Smith assert qualified immunity as a defense to an official capacity claim.[134] To the extent they do, qualified immunity does not extend to claims for injunctive or declaratory relief.[135]

Smith and LeBlanc are not entitled to qualified immunity for claims brought against them in their individual capacities because their conduct violated clearly established law. As this Court previously held: "It has been the law in this circuit since 1981 that "[t]he confinement of pretrial detainees indiscriminately with convicted persons is unconstitutional unless such practice is reasonably related to the institution's interest in maintaining jail security . . . or physical facilities do not permit their separation.""[136] Additionally, in Pembroke v. Wood Cty., Texas, the Fifth Circuit upheld the district court's instruction to a jury that a classification system that failed to segregate convicted and pretrial detainees "constituted a violation of minimum constitutional standard."[137] Plaintiffs have set out evidence above establishing a genuine dispute of material facts

---

[133] Exhibit 38, MCC Monthly Reports 2019; Exhibit 39, SCC Monthly Reports 2019; Exhibit 34, Monthly Activity Reports MCC January 2020 to June 2021; Exhibit 35, SCC Monthly Reports January 2020 to June 2021; Exhibit 40, MCC Monthly Reports 2022; Exhibit 41, SCC Monthly Reports January to August 2022; Exhibit 37, Northeast Monthly Activity Roll-up 2019-2023.

[134] ECF No. 91-1 at 11.

[135] Chrissy F. by Medley v. Mississippi Dep't of Pub. Welfare, 925 F.2d 844, 849 (5th Cir. 1991) (citing Pulliam v. Allen, 466 U.S. 522, 541–42 (1984), Supreme Court of Virginia v. Consumers Union, Inc., 446 U.S. 719, 736 (1980), and Minton v. St. Bernard Parish School Bd., 803 F.2d 129, 134 (5th Cir. 1986)).

[136] ECF No. 107 at 17, citing Jones v. Dallas Cnty., 2022 WL 3334493, at *3 (quoting Jones v. Diamond, 636 F.2d at 1374).

[137] 981 F.2d 225, 229 (5th Cir. 1993). The Pembroke Court relied on a long line of Fifth Circuit cases recognizing that cruel and unusual punishment can result from a high level of violence and a failure "to control or separate prisoners who endanger the physical safety of other prisoners." Jones v. Diamond, 636 F.2d 1364, 1374 (5th Cir. 1981), overruled by Int'l Woodworkers of Am., AFL-CIO & its Loc. No. 5-376 v. Champion Int'l Corp., 790 F.2d 1174 (5th Cir. 1986), citing McCray v. Sullivan, 509 F.2d 1332, 1334 (5th Cir. 1975), cert. denied, 423 U.S. 859 (1975); Gates v. Collier, 501 F.2d 1291, 1308-10 (5th Cir. 1974)).

regarding Smith and LeBlanc's violation of these rights. Here, Smith and LeBlanc received reports of actual and ongoing fatal harm every month. Yet, Smith and LeBlanc failed to take any action to respond to MPCC's lack of a classification policy and procedure and the reports of violence arising from this deficiency.

Further, in a case arising from injuries to plaintiffs in 2016, the Fifth Circuit declined to extend qualified immunity to DPSC defendants, including LeBlanc, holding that "DPSC is responsible for the local jails once they house DPSC prisoners."[138] Thus, in 2020 the law was clearly established that LeBlanc and Smith were responsible for operations of local jails holding DPSC prisoners. The Basic Jail Guidelines are not law. They are just one piece of evidence of Smith and LeBlanc's own knowledge of "the minimum conditions necessary to ensure the safe, efficient, effective and legal operation of a jail facility" based on a "consensus of professional opinion."[139] It has also long been clearly established in this Circuit that pretrial detainees are entitled to at least the same minimum conditions as sentenced people.[140] Thus, even if the Basic Jail Guidelines do not apply to pretrial detainees, their evidentiary power contributes to a genuine dispute of material fact regarding Smith's and LeBlanc's violations of Plaintiffs' rights by failing to enforce the minimum conditions at MPCC.

## IV.    <u>CONCLUSION</u>

For the forgoing reasons, Plaintiffs respectfully request this Court deny Smith's and LeBlanc's Motion for Summary Judgment.

Respectfully submitted,

s/ Elizabeth Cumming
**ELIZABETH CUMMING (**Bar Roll No. 31685), T.A.
**EMILY WASHINGTON** (Bar Roll No. 34143)

---

[138] <u>Crittindon v. LeBlanc</u>, 37 F.4th at 191.
[139] ECF No. 64 at ¶ 46.
[140] <u>Hare v. City of Corinth</u>, 74 F. 3d 633, 643 (5th Cir. 1996).

Roderick and Solange MacArthur Justice Center
4400 S. Carrollton Ave.
New Orleans, LA 70119
Phone: (504) 620-2259
Fax: (504) 208-3133
elizabeth.cumming@macarthurjustice.org
emily.washington@macarthurjustice.org

*Attorneys for Plaintiffs*

Dated: August 12, 2024